No. 1:21-cv-00996 AT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
(ATLANTA DIVISION)

SHANITA D. SWANSON,
*Plaintiff*

*versus*

JAMES LUSTER ET AL.,
*Defendants*

**FULTON COUNTY POLICE DEFENDANTS' BRIEF IN SUPPORT OF
MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT
WILLIAM R. ANDERSON**

Kaye Burwell
Deputy County Counsel

Brad Bowman
Supervising County Counsel

Juliana Sleeper
Senior Assistant County Counsel

OFFICE OF THE FULTON COUNTY ATTORNEY
141 Pryor Street S.W.
Suite 4038
Atlanta, Georgia 30303
(404) 612-0246 (Office) | (404) 730-6324 (Facsimile)

## **Table of Contents**

I.  SUMMARY OF THE ARGUMENT ................................................................1

II.  RELEVANT FACTS ...........................................................................3

III.  ARGUMENT AND CITATION TO AUTHORITY .......................................4

  A.  Dr. Anderson's Opinions are Not Based on Sufficient Facts or Data..............6

    (1)  The Opinion Did Not Consider the Duration and Intensity of the Restraint. .....................................................................................7

    (2)  Dr. Anderson Did Not Have Sufficient Facts or Data to Conclude that Anthony Mitchell Died from Metabolic Acidosis..............................................11

  B.  Dr. Anderson's Testimony is Not Based on Reliable Scientific Principles...12

    (1)  Plaintiff Failed to Meet Her Burden in Demonstrating That Dr. Anderson's Opinion on Ketoacidosis is Reliable. ............................................14

    (2)  Plaintiff Failed to Meet Her Burden in Showing That Dr. Anderson's Opinion on Pulmonary Edema is Reliable. .......................................18

  C.  Dr. Anderson's Testimony Will Not Assist the Trier of Fact. ......................20

IV.  CONCLUSION ..............................................................................24

COME NOW, Jennifer Jones, Victoria Whaley, Douglas Hardnett, and Desmond Lowe (hereafter "Police Defendants"), pursuant to Rule 702 of the Federal Rules of Evidence and the United States Supreme Court decisions of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, (1993) and *Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137 (1999), and hereby submit this brief in support of their Motion to Exclude Testimony of Plaintiff's Expert, William R. Anderson.

## I.     SUMMARY OF THE ARGUMENT

Plaintiff claims Police Defendants' use of the prone restraint technique on Anthony Mitchell caused Anthony Mitchell to die after he was released from police custody and was taken home by Plaintiff. To prove this causation, Plaintiff employed pathologist William R. Anderson, M.D. (hereafter "Dr. Anderson"), as her expert.

Dr. Anderson opines that the prone restraint contributed to the death of Anthony Mitchell, because Anthony Mitchell suffered from two common physical conditions associated with positional asphyxia death after a police restraint – metabolic acidosis and pulmonary edema. (Ex 1, p. 2; Ex 2, pp. 46-47; 58-60). However, in arriving at this conclusion, Dr. Anderson failed to consider the relevant facts and/or data that he himself stated were necessary. (Ex 2, pp. 34; 37-39; 41; 148; 53-54, 81-82, 98-99). For instance, Dr. Anderson stated that Anthony Mitchell's PH

1

level would have indicated whether he suffered from metabolic acidosis but acknowledged that no such data was available for his review. (Ex 2, pp. 53-54, 81-82, 98-99).

Understanding this limitation, Dr. Anderson then opined that Anthony Mitchell's postmortem lab result for beta-hydroxybutyrate level showed that Anthony Mitchell suffered ketoacidosis. (Ex 2, pp.81-82). However, Dr. Anderson failed to identify a single scientific literature or a peer-reviewed journal to support his opinion that Anthony Mitchell's postmortem beta-hydroxybutyrate level equates to the level of a person suffering from ketoacidosis. (Ex 2, *per totum*; Ex 6, *per totum*). Moreover, he also failed to provide any literature, or peer-reviewed journal that would suggest that the police restraint is related to someone suffering from ketoacidosis. (Ex 2, *per totum;* Ex 6, *per totum*)).

As for Dr. Anderson's opinion that Anthony Mitchell suffered pulmonary edema, Dr. Anderson provided multiple different theories. (Ex 2, pp. 46-47). Again, none of the theories advanced by Dr. Anderson has been scientifically proven, tested or been peer-reviewed. (Ex 2, *per totum;* Ex 6, *per totum*).

Ultimately, even if this Court were to accept Dr. Anderson's opinions despite lack of any factual or scientific foundation, Dr. Anderson's opinions will not assist the trier of fact, because Dr. Anderson's opinions were only provided in terms of

mere possibilities. (Ex 1; Ex 2). Therefore, this Court should exercise its role as a gatekeeper and prohibit Dr. Anderson from proffering his opinions in this case.

## II.    RELEVANT FACTS

On the night of November 16, 2019, Plaintiff's son, Anthony Mitchell, went to a Bojangles Restaurant located at 5628 Fulton Industrial Blvd SW., Atlanta, Georgia (hereafter "Bojangles"). (Doc. 47, ¶ 16, 17). Plaintiff alleges that Bojangles employees taunted Anthony Mitchell, leading to a physical confrontation and a subsequent call to police regarding an irate customer. (Doc. 47, ¶ 19, 20, 24). Police Defendants were the responding police officers. (Doc. 47, ¶ 11,12,13,14). Once on scene, Police Defendants detained Anthony Mitchell and contacted Plaintiff. (Doc. 47, ¶ 49, 50).

Shortly after Police Defendants' phone call to Plaintiff, Plaintiff arrived on scene and Anthony Mitchell was released to Plaintiff. (Doc. 47, ¶ 51). Plaintiff then drove back to her residence with Anthony Mitchell. (Doc. 47, ¶ 51). Plaintiff claims that ten minutes after she arrived home with Anthony Mitchell, she found Anthony Mitchell unresponsive in his bedroom. (Doc. 47, ¶ 53).

Plaintiff contends that the restraint method used by Police Defendants on Anthony Mitchell during his detention compromised his breathing and caused his death. (Doc. 47, ¶ 30, 79, 80). In order to prove this allegation, Plaintiff hired a cause

of death expert – Pathologist William R. Anderson, M.D. (Ex 1 – William R. Anderson Report).

Dr. Anderson completed his report for this matter on October 5, 2022. (Ex 1). On December 9, 2022, Defendants deposed Dr. Anderson. (Ex 2 – Deposition of William R. Anderson). On February 15, 2023, Plaintiff deposed Police Defendants' cause of death expert – Cardiovascular Pathologist Richard N. Mitchell M.D. (Ex 3 – Deposition of Richard N. Mitchell). On February 17, 2023, Plaintiff deposed Co-Defendants' cause of death expert – Pathologist Gerald T. Gowitt, M.D. (Ex 4 – Deposition of Gerald T. Gowitt). This motion follows.

## III.   ARGUMENT AND CITATION TO AUTHORITY

Fed. R. Evid. Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. "Rule 702 compels district courts to perform a **gatekeeping** role concerning the admissibility of expert testimony." *Seamon v. Remington Arms Co., LLC,* 813 F.3d 983, 988 (11th Cir. 2016) citing *Daubert*, 509 U.S. at 597, and, *Kumho,* 526 U.S. at 141. This role is mandatory to ensure that scientific evidence is "both reliable and relevant **before** being admitted as evidence." *Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1310 (11th Cir. 1999) (emphasis added). "[T]he judge's role is to keep unreliable and irrelevant information from the

jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Id.*, at 1312.

Although the Supreme Court and the Eleventh Circuit both acknowledge the difficulty of this role, both courts also remind the district courts that "[n]either the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the 'gatekeeper' duties that the Federal Rules impose...." *Id.,* at 1310 (citing to *General Elec. Co. v. Joiner*, 522 U.S. 136, 148, (1997) (Breyer, J., concurring).

Rule 702 provides that a qualified expert witness may offer opinion testimony if:

> 1) the expert's specialized knowledge "**will help the trier of fact** to understand the evidence or to determine a fact in issue," (2) "the testimony **is based on sufficient facts or data**," (3) "the testimony is the product of **reliable principles** and methods," and (4) "the expert has reliably applied the principles and methods to the facts of the case."

*Broussard v. Maples*, 535 Fed. Appx. 825, 828 (11th Cir. 2013) (emphasis added). Here, Dr. Anderson's Opinions should be excluded because: 1) Dr. Anderson failed to base his opinions on sufficient facts and/or data; 2) Dr. Anderson's opinions are not based on reliable scientific principles; and 3) Dr. Anderson's opinions will not assist the trier of fact.

It is the **burden of the party seeking to introduce the expert testimony** to establish that the requirements of Rule 702 have been met. *Horton v. Maersk Line, Ltd.*, 603 Fed. Appx. 791, 798 (11th Cir. 2015); *McDowell v. Brown*, 392 F. 3d 1283, 1298 (11th Cir. 2004) ("McDowell bears the burden of demonstrating that each of his proffered experts is qualified to render an expert opinion, that the opinion is reliable, and that the opinion would assist the trier of fact in resolving disputed issue of material fact – here, causation."). In the case at bar, Plaintiff utterly failed to meet this burden and prove causation. *See infra*. As such, this Court should prohibit Dr. Anderson from offering his opinions in this case.

### A. Dr. Anderson's Opinions are Not Based on Sufficient Facts or Data

The opinion of a qualified expert is admissible only if the opinion is based on sufficient facts or data. Fed. R. Evid. 702. Dr. Anderson's opinions are not based on sufficient facts or data. Rather, his opinions are based on assumptions and speculations. Despite testifying that the severity of a person's injury from a prone restraint depends on how much pressure was applied on the person's chest, Dr. Anderson admitted that he failed to consider both the duration of the restraint applied on Anthony Mitchell, and the intensity of the restraint. (Ex 2, pp. 34; 37-39; 41; 148). Moreover, Dr. Anderson concluded that the mechanism of death for Anthony Mitchell was metabolic acidosis, yet Dr. Anderson conceded that he did not have the

necessary data or lab results to make that conclusion. (Ex 2, pp. 53-54, 81-82, 98-99)

**(1) The Opinion Did Not Consider the Duration and Intensity of the Restraint.**

Dr. Anderson opined that Police Defendants contributed to the death of Anthony Mitchell by placing Anthony Mitchell in a prone position with an officer's knees on his back. (Ex 2, pp. 36, 162, 172). He suggested that this restraint interfered with Anthony Mitchell's respiratory function. (Ex 2, pp. 36, 162, 172). In order to properly assess whether such restraint interfered with Anthony Mitchell's respiratory function, Dr. Anderson would have had to consider the duration and intensity of the pressure applied on Anthony Mitchell. *See Lombardo v. City of St. Louis, Missouri,* 210 L. Ed. 2d 609, 141 S. Ct. 2239, 2241–42 (2021) (holding that assessing a claim of excessive force relating to prone restraint requires careful attention to the facts of each case and the court should consider, "intensity, duration and surrounding circumstances" of the restraint).

Dr. Anderson himself stated during his deposition that a determination of the extent of a person's injury from a prone restraint involves consideration of the "severity" of the restraint, "in other words, how much pressure is applied to chest."

(Ex 2, p. 37).  However, Dr. Anderson failed to review any evidence that would have allowed him to make this determination.

For instance, Dr. Anderson admitted that he did not review any deposition transcripts of the witnesses who were on the scene who had observed the restraint used by Police Defendants on Anthony Mitchell, as well as its approximate duration. (Ex 2, p. 34). He also admitted that he did not review any of the eighteen (18) videos of security footage from Bojangles that captured not only the lengthy physical altercation between Anthony Mitchell and Bojangles' employees, but also the initial interactions between Anthony Mitchell and Police Defendants and the restraint used by Police Defendants on Anthony Mitchell. (Ex 2, pp. 38-39; 148). Hence it is not surprising that when Dr. Anderson was asked if he knew the duration of the allegedly injurious police restraint, he answered in negative.  (Ex 2, p. 41).

Moreover, Dr. Anderson could not provide any testimony relating to how much pressure was put on Anthony Mitchell during the restraint, despite Dr. Anderson himself testifying that the degree of pressure is what determines whether the prone restraint could cause death. (Ex 2, pp. 37-38). Dr. Anderson stated that he only reviewed a six second video taken by Plaintiff's daughter when Plaintiff and her daughter arrived on the scene. (Ex 2, p. 148). Unlike the Bojangles security footage, the six second video is poor quality, and it is very hard to see what is

happening in the video. (Ex 5 – six second video). However, Dr. Anderson believes this six second video shows Anthony Mitchell on the ground in a prone position with an officer's knee on Anthony Mitchell's back. (Ex 2, pp. 171-172).

Even if Dr. Anderson's interpretation of this video were accurate, the video only shows that a prone restraint was used and does not provide any details that are needed to measure or estimate the pressure on Anthony Mitchell's back. For instance, the video does not provide information regarding the weight of the officer who allegedly had a knee on Anthony Mitchell's back; whether it was single knee restraint or double; whether the knee was downwards; whether it was consistent pressure; placement of the knee; and if there was an unengaged knee, where was it kept. (Ex 2, pp. 36-41; 148; 171-172; Ex 5); *Perez v. City of Fresno*, 591 F. Supp. 3d 725, 740 (E.D. Cal. 2022) (in addition to duration of the restraint, weight of the officers with and without gears were considered in determining the reasonableness of a prone restraint); *McBeth v. City of Union,* CV 7:15-1473-BHH, 2018 WL 4594987, at *3 (D.S.C. Sept. 25, 2018) (duration of the restraint, as well as, weight and height of the officers considered when determining amount of pressure applied during prone restraint); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1054 (9th Cir. 2003) (court noting the detainee's relatively slight weight at 160 pounds compared to one of the officer's 225 pounds); *Wroth v. City of Rohnert Park*,

17-CV-05339-JST, 2019 WL 1766163, at *14 (N.D. Cal. Apr. 22, 2019) (both the duration and the amount of body weight, whether minimal or full body weight was exerted, were considered).

Understanding the limitation of the evidence he reviewed, Dr. Anderson repeatedly conceded that the six second restraint did not cause Anthony Mitchell to die. (Ex 2, p. 38).

> A. The position, for six seconds or however long it was, clearly was not the cause of death because he later – he later basically went home ambulatory before he collapsed. So that's clearly not a positional asphyxia death.

(Ex 2, p. 40).

Rather, he suggested that the restraint only contributed, "in part". (Ex 2, 162-163). However, Dr. Anderson failed to proffer any facts or data upon which he relied to come to his conclusion that the restraint used by Police Defendants contributed to Anthony Mitchell's death. (Ex 2, *per totum*). Accordingly, Dr. Anderson's testimony that police restraint contributed to Anthony Mitchell's death should be excluded. *See Glowczenski v. Taser Int'l, Inc.*, CV04-4052 WDW, 2012 WL 976050, at *9 (E.D.N.Y. Mar. 22, 2012) (excluding forensic pathologist who opined that detainee died of positional asphyxia for failing to consider the weight of the officers, duration of the prone restraint, and the amount of pressure applied on detainee); *Pace v. National Union Fire Ins.Co. of Pittsburgh, PA*, 1:12-CV-3096-AT,

2014WL4976773 (granting defendant's motion to exclude testimony of an expert who proffered opinions regarding the speed of the vehicle based on insufficient data – i.e. failed to consider or investigate weight of the vehicle).

### (2) Dr. Anderson Did Not Have Sufficient Facts or Data to Conclude that Anthony Mitchell Died from Metabolic Acidosis.

Dr. Anderson opined that Anthony Mitchell's death was a **metabolic death, more specifically a death from metabolic acidosis**. (Ex 1, p. 2; Ex 2, pp. 58-60). According to Dr. Anderson, metabolic acidosis occurs when there is a decrease in the body's PH level from its normal level (about 7.35 to 7.45). (Ex 2, pp. 53-54, 98-99). However, when asked what Anthony Mitchell's PH level was, Dr. Anderson stated that there was no PH level measured in this case and he does not have that information. (Ex 2, pp. 81). Dr. Anderson was then asked how he knows whether Anthony Mitchell died from acidosis, he replied:

> "Well, we don't know. I think it is.  I think the level – if they had – in other words, if they had – if somebody had measured, presented to the hospital at Grady and they were able to do a PO2 on him… But unfortunately, he wasn't that's one of the problems, he wasn't monitored so we know what was going on"

(Ex 2, p. 82). Because Dr. Anderson's opinion regarding metabolic acidosis is based on his speculated PH level of Anthony Mitchell, his opinion is not grounded on facts

or data. Consequently, Dr. Anderson's opinion on this topic is not reliable and should be excluded pursuant to Rule 702.

### B. Dr. Anderson's Testimony is Not Based on Reliable Scientific Principles.

**Plaintiff bears the burden** to demonstrate not only that her expert is qualified, but also that her expert's opinion is **reliable**. For the expert testimony to be reliable, it must be "'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning something **more than subjective belief or unsupported assumptions.**" *Id.,* citing to *Daubert,* 509 U.S. at 590, (emphasis added). Hence, to assess the reliability of an expert, the courts review:

> whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." This reliability analysis considers **a number of factors**, including **"(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.**

*Kelley v. C.R. Bard, Inc*., 2:20-CV-0045-SCJ, 2022 WL 17414867, at *2 (N.D. Ga. Dec. 5, 2022) (quoting *Arevalo v. Mentor Worldwide LLC*, No. 21-11768, 2022 WL 16753646, at *3 (11th Cir. Nov. 8, 2022) (emphasis added). Here, Plaintiff

completely failed to show that her expert's opinions met any of the aforementioned reliability factors.

Even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method." *Id.* Dr. Anderson opined that Police Defendants contributed to the death of Anthony Mitchell because the restraint method used by Police Defendants caused Anthony Mitchell to suffer from (1) keto acidosis and (2) pulmonary edema. (Ex 2, pp. 80, 162-163). However, Dr. Anderson could not identify any scientific method, data, literature, testing, or peer-reviewed studies to support this opinion.  (Ex 2, *per totum;* Ex 6, *per totum*).

At the deposition, he was given an opportunity to list any scientific textbooks, treatises or any other research materials he relied on in coming to his conclusion in this case, but he did not provide any. (Ex 2, p. 33). After the deposition, he was provided with additional opportunity and Dr. Anderson produced two documents that he claims, "supports his causation opinion." (Ex 6 – Documents Produced by Dr. Anderson on March 2, 2023). The additional documents were a screenshot of an article from the Mayo Clinic website, and a PDF document of an article from the Journal of Forensic Sciences. (Ex 6). Neither document supports Dr. Anderson's opinion.

Therefore, Dr. Anderson's opinions, at best, amount to nothing more than his subjective opinions, which cannot survive the reliability test of Rule 702, *Daubert*, 509 U.S. at 579, or its progeny. *General Electric v. Joiner*, 522 U.S. 136, 146, (1997) (holding that an expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions).

**(1) Plaintiff Failed to Meet Her Burden in Demonstrating That Dr. Anderson's Opinion on Ketoacidosis is Reliable.**

Dr. Anderson opined that the police restraint interfered with respiration and caused Anthony Mitchell to suffer ketoacidosis. (Ex 2, pp. 81-82). To admit this opinion, the Court would have to make several scientifically unsupported leaps of faith in the causal chain because: 1) Dr. Anderson failed to provide any scientific method, scientific data, scientific literature, or peer-reviewed studies that would support his conclusion **that Anthony Mitchell suffered ketoacidosis**, and 2) Dr. Anderson also failed to proffer any scientific method, scientific data, scientific literature, or peer-reviewed studies that would support his conclusion that Police Defendants' **use of the prone restraint technique caused Anthony Mitchell to suffer ketoacidosis.** Therefore, Dr. Anderson's determination that Anthony Mitchell experienced ketoacidosis should be excluded. *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002) (holding that the Daubert rule requires

14

more than unsupported leaps of faith in the causal chain because "[t]he courtroom is not the place for scientific guesswork, even of the inspired sort.").

    **a) Dr. Anderson Failed to Provide Any Scientific Literature or Principles to Support His Diagnosis of Anthony Mitchell of Ketoacidosis.**

Dr. Anderson opined that the beta-hydroxybutyrate level reported in Anthony Mitchell's postmortem lab report is evidence that Anthony Mitchell suffered ketoacidosis. (Ex 2, pp. 81-82). In coming to this conclusion, Dr. Anderson speculates that "any elevated level" compared to the normal beta-hydroxybutyrate level indicates that a person "may be" suffering from ketoacidosis. (Ex 2, pp. 68-69). Not only is this speculation not supported by any scientific literature or generally accepted by the scientific community, but also Dr. Anderson failed to provide any scientific principles, peer reviewed studies or journal to support this theory. (Ex 2, *per totum,* Ex 3, 91; Ex 4, 80-81; Ex 6). Because the Eleventh Circuit has repeatedly cautioned "not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles," this Court should exclude Dr. Anderson's speculation that is not supported by scientific principles. *Rider*, 295 F.3d at 1202.

Assuming, *arguendo*, that the forementioned speculated theory is true and any elevated level of beta-hydroxybutyrate indicates ketoacidosis, it is still troubling

because Dr. Anderson fails to define what is a normal beta-hydroxybutyrate level, independent from Anthony Mitchell's lab report.

> **Q. Are you saying this is normal range based on the lab report?**
> **A.** That's their normal range, their reference range.
> **Q. Right. Do you have any independent knowledge of what is normal range?**
> **A**. Well, the laboratory range is what – their normal range. Each laboratory has different normal ranges in different hospitals, so forth. So what you go by is what the laboratory range is for their laboratory.

(Ex 2, pp. 72-73). Moreover, according to Dr. Anderson, the normal range of beta-hydroxybutyrate level is different based on the population of each laboratory. (Ex 2, pp. 72-73). Dr. Anderson further opined that in order to determine whether someone is suffering from ketoacidosis, one should review the normal level of the individual laboratory where the person had his/her lab completed. (Ex 2, pp, 73, 75-76).

This defies even the most commonsense logic. If Dr. Anderson's theory is true, the normal healthy level of beta-hydroxybutyrate each person would be different based on where that person obtains his/her postmortem lab result; ergo, depending on where someone's body is sent after his/her death would determine whether someone had suffered ketoacidosis. Simply put, according to Dr. Anderson, ketoacidosis is affected by which lab one's deceased body ends up. Again, such theory is not supported by scientific principle. (Ex 3, 91; Ex 4, 80-81). Rather, it is just a baseless theory advocated by Dr. Anderson alone. Accordingly, under

16

*Daubert*, this Court should exclude Dr. Anderson's opinion which is based purely on his speculated theory. *Allison*, 184 F.3d at 1316–17 ("Under the regime of *Daubert* ... a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."); *McClain v. Metaolife Int'l, Inc.,* 401 F.3d 1286, 1245 (11th Cir. 2005) ("[t]he Daubert requirement that the expert testify to scientific knowledge…means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible.")

### b) Dr. Anderson Failed to Proffer Any Scientific Literature, Or Principles to Support His Conclusion That Police Restraint Caused Anthony Mitchell to Suffer Ketoacidosis.

Dr. Anderson opined that the police restraint employed by Police Defendants increased Anthony Mitchell's beta-hydroxybutyrate level, which in turn caused him to suffer ketoacidosis. (Ex 2, p. 80). This opinion is not supported by any scientific literature or studies. (Ex 3, 88-89; Ex 4, 75-76). Instead, it is generally accepted in the scientific community that ketoacidosis and increase of beta-hydroxybutyrate level are caused by **diabetes, glucose deficiency, alcohol, or starvation**, not police restraint. (Ex 3, 88-89; Ex 4, 75-76; Ex 6).[1]

---

[1] The acidosis that is frequently related to the cause of death of the individuals who die from a police restraint is lactic acidosis, not ketoacidosis. (Exhibit 3, pp.87-89;

Dr. Anderson did not provide any scientific data or peer-reviewed studies to support his theory that ketoacidosis is related to police restraint, let alone that ketoacidosis is caused by police restraint. (Ex 2, *per totum*; Ex 6, *per totum*).  Given that Dr. Anderson did not identify any scientific literature/study that supports his theory that police restraint causes ketoacidosis, his opinion should be excluded. *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004) (reliability of expert's opinion undermined where expert could suggest no study supporting his opinion).

### (2) Plaintiff Failed to Meet Her Burden in Showing That Dr. Anderson's Opinion on Pulmonary Edema is Reliable.

Dr. Anderson opined that he found evidence of pulmonary edema from Anthony Mitchell's autopsy and this finding is proof that Defendants' use of restraint interfered with Anthony Mitchell's respiratory function. (Ex 2, pp. 46-47). Dr. Anderson attempted multiple different theories to justify his finding of pulmonary edema. (Ex 2, pp. 46-47).

Initially, Dr. Anderson theorized that the weight of Anthony Mitchell's lungs was consistent with someone who suffered a pulmonary edema because the weight

---

Exhibit 4, pp.75-76); *see Murphy v. City of Farmington,* CIV 19-0639 RB/JFR, 2021WL1517939, at * 1 (D.N.M. Apr. 16, 2021) (discusses build up of lactic acid in the body of a person during a police restraint); *Rosa v. Taser Int'l, Inc.,* 684 F. 3d 941, 945 (9th Cir. 2012) (police restraint death linked to lactic acid buildup, resulting in lactic acidosis); Price v. Cnty. of San Diego, 990 F. Supp. 1230, 1237 (S.D. Cal. 1998) (detainee experienced lactic acidosis during the police restraint).

of Anthony Mitchell's lungs was heavier than normal: "[Anthony Mitchell's] lungs are heavy, they're 400 grams and 300, and they should be somewhat less than that." (Ex 2, p. 46). Then when Dr. Anderson was confronted with his prior testimony that normal lung weight for the right lung is 350-400, and 300 for the left lung, Dr. Anderson agreed that Anthony Mitchell's autopsy showed lung weights within the normal range.

> **Q. You have past testified that right lung normally weighs about 350 to 400; left lung weighs about 300 for a normal person, correct?**
> A. Right
> **Q. And here, the right lung weighed 400 gram and left lung weighed 300 grams, correct?**
> A. Right.

(Exhibit 2, 46-47). Dr. Anderson does not identify any scientific studies, literature or peer-reviewed journal to support the allegation that the weight of Anthony Mitchell's lungs is consistent with the weight of the lungs of someone that suffered pulmonary edema. (Ex 2, *per totum*; Ex 6, *per totum*).

When his lung weight theory proved to be unsuccessful, Dr. Anderson advanced another theory for why he believed Anthony Mitchell suffered pulmonary edema: "But [the medical examiner] describes [lungs] as congested. So that may have been – what congestion is, is basically you see fluid or heaviness of the lungs...but it was not --- **it was not very significant**" (Ex 2, p. 47) (emphasis added). However, as noted by other pathologists in this case, congestion of the lungs occurs

with **<u>any death.</u>** (Ex 3, 90; Ex 4, 78-79). Moreover, there are no scientific literature or peer-reviewed studies that would support Dr. Anderson's theory that the insignificant amount of congestion seen in Anthony Mitchell's lungs indicates pulmonary edema. (Ex 3, 89-92; Ex 4, 77-80).

Lastly, Dr. Anderson states that the microscopic slides of Anthony Mitchell's lungs that he reviewed showed insignificant amounts of fluids in the lungs. (Exhibit 2, pp. 47, 49). Again, his findings of insignificant amounts of fluid and diagnosis of pulmonary edema are not supported by any scientific literature or peer-reviewed studies. (Ex 3, 89-92; Ex 4, 77-80). Accordingly, Dr. Anderson's testimony is not reliable and should be excluded. *See Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1319 (11th Cir. 1999) (holding that the district court properly excluded expert's testimony that was not based in generally accepted scientific knowledge but on his own personal opinion).

### C. Dr. Anderson's Testimony Will Not Assist the Trier of Fact.

To be admissible under Rule 702, expert opinions must "assist the trier of fact to understand the evidence or to determine a fact in issue." As the Supreme Court has recognized in *Daubert*, such opinions must be "relevant to the task at hand." 509 U.S. at 597. The "task at hand" in this case is Plaintiff's burden to prove the proximate cause of Anthony Mitchell's death. Here, even if this Court were to accept

20

and admit Dr. Anderson's equivocal testimony on causation, because Dr. Anderson provides his opinions only in terms of possibilities, it does not assist the trier of fact in determining proximate cause. *Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1368 (M.D. Ga. 2007), aff'd, 300 Fed. Appx. 700 (11th Cir. 2008) (holding that expert's opinion should be excluded when it discusses only in terms of possibilities).

It is evident that Dr. Anderson's opinions are not based on reasonable medical certainty, rather his opinions are based merely on "possibilities". *See infra.* This fact is indisputably shown throughout his report and deposition transcript, as follows:

### Dr. Anderson's Report Relating to Police Restraint

Notably, the photos also show that while Mr. Mitchell was in this position of restraint, one of the officers was in a semi-kneeling position with at least one knee positioned in contact with the subject's back—a situation *that can cause* significant impairment to the ability of an individual to properly expand their chest and *can result* in respiratory insufficiency and ultimately lack of proper oxygenation to the body, and the heart in particular.

(Ex 1, p. 2) (emphasis added).

### Dr. Anderson's Report Relating to Acidosis:

Deprivation of needed oxygen in this situation *may* lead to alteration in the body's homeostasis, with resultant acidosis and/or ketosis. Serum analysis from a serum sample taken from Mr. Mitchell indicates a significant increase in Beta-Hydroxybutyrate, one of the ketone molecules *that is associated*[2] with keto-acidosis.

---

[2] "[S]howing association is far removed from proving causation." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1315 (11th Cir. 1999)

This is particularly important in the functioning of the heart, where situations in which the muscle is not receiving adequate oxygenation *can* result in an increased sensitivity to abnormal electrical activity, and in the worst-case scenario, *can* promote arrhythmic events that can be dangerous and even fatal.

While this situation is usually tolerated in 'normal' individuals, it **can** be particularly problematic in cases of an injured or compromised heart, as was the case in Mr. Mitchell…

(Ex 1, p. 3) (emphasis added).

### Dr. Anderson's Report Relating to Head Trauma and Hypoxia:

The degree of head trauma documented by the autopsy is significant, *raising the possibility* of acute brain swelling and hypoxic neuronal changes that *may not be evident* because the interval between injury and death is only a few hours, but points out the necessity for a comprehensive medical evaluation

(Ex 1, p. 4) (emphasis added).

### Dr. Anderson's Deposition Testimony Relating to Acidosis:

**Q. What type of acidosis did Mr. Mitchell have, in your opinion?**
A. I **think**[3] it started out respiratory and made it a component of metabolic as well.

…

**Q. Any evidence that [respiratory acidosis] happened with Mr. Mitchell on the night of November 16th, 2019?**

---

[3] The statement above only shows that Dr. Anderson "thinks" acidosis started with respiratory and then became metabolic. Thus, it shows that Dr. Anderson was not completely certain about this theory. It is also telling that Dr. Anderson failed to proffer any objective reasons why he thought Anthony Mitchell suffered acidosis. Instead, he provided certain symptoms that one may exhibit when suffering from acidosis that he admits was not present at in Anthony Mitchell's case. (Exhibit 2, pp. 102-105).

> A. Well, we don't have any – ***I don't – I don't know one way or another.*** I don't have any indications or information that I've gotten one way or another that it was measured.

(Ex 2, pp. 101-102) (emphasis added).

> **Q. Define acidosis for us, Doctor.**
> A. Well, basically, a change in the body's PH. So the PH is normally about 7.35 to 7.45 and it goes to the alkaline. The PH will go up. If it goes up to acidotic, the PH goes down.
> …
> A. ***We don't have PH or anything*** on this guy because nobody clinically took those measurements.

(Ex 2, pp. 81-82; 98-99) (emphasis added).

### Dr. Anderson's Deposition Testimony Relating to Pulmonary Edema:

> **Q. Do you believe that the ketoacidosis and the pulmonary edema would have been evidence in Mitchell after the fight and the police restraints?**
> A. Well, the milieu is there for those to develop. How rapidly that developed or what it developed was – we don't know because there was no evaluation. ***It may well have been at the scene that it did not develop at all, or they may have been well…***

(Ex 2, 168) (emphasis added).

### Dr. Anderson's Deposition Testimony Relating to Head Trauma and Hypoxia:

> Q. **So did you see any brain swelling?**
> A. ***There did not appear to be any***, but it was fairly soon. Hypoxia in the brain is not evident unless the individual survives about four to six hours away. ***So we could not be sure that there was hypoxia***.

(Ex 2, pp. 52-53) (emphasis added).

As shown above, Dr. Anderson's testimony and report are littered with words

denoting mere possibilities, e.g., may, can, could. *See supra.* "'May' is not

synonymous with 'probable.'" *Bowers v. Norfolk S. Corp.,* 537 F. Supp. 2d 1343,

1368–69 (M.D. Ga. 2007), *aff'd*, 300 Fed. Appx. 700 (11th Cir. 2008). "'May' connotes something merely possible, not probable." *Id.* "[U]se of the qualifier 'may,' therefore, does not logically advance a material aspect of [Plaintiff's] case." *Id.,* citing to *Allison,* 184 F.3d at 1312. The same is said for use of word "could" and "can." *See Clarke v. Schofield*, 632 F. Supp. 2d 1350, 1370 (M.D. Ga. 2009) ("'could, could, could' testimony and 'possibility' opinions add nothing to assist the jury.").

At best, Dr. Anderson's opinions present a "mere possibility" that Police Defendants' use of restraint contributed to the death of Anthony Mitchell, and do not prove causation. Therefore, his opinions will not assist the jury in this matter. *See Mann v. Taser Int'l, Inc*., 588 F.3d 1291, 1304 (11th Cir. 2009) (Citing to *Zwiren v. Thompson*, 276 Ga. 498, 578 S.E.2d 862, 867 (2003) ("The Georgia Supreme Court has held that in medical cases, "reasonable medical probability or reasonable medical certainty" is required to prove causation."). Consequently, Dr. Anderson's testimony should be excluded.

## IV.   CONCLUSION

In giving his opinion, Dr. Anderson has set aside the mantle of an objective expert witness with scientific knowledge and replaced it with that of a zealous advocate armed only with possibilities, speculations, and assumptions. This led Dr.

Anderson to incorrectly conflate risk of death from prone restraint with actual cause of death in this matter.

It is evident from Dr. Anderson's testimony that he completely disregarded the absence of any factual evidence supporting Plaintiff's allegations about cause of death in this matter and hoped that his *ipse dixit* will be sufficient to satisfy the requirements under Fed. R. Evid. 702. However, the Eleventh Circuit Court has repeatedly held that Federal Rules of Evidence require more than just "the *ipse dixit* of the expert." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.,* 402 F.3d 1092, 1113 (11th Cir. 2005). Therefore, Defendants respectfully request this Court that it exercise its role as a gatekeeper and prohibit Dr. Anderson from proffering his opinions in this case.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| SHANITA D. SWANSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action File No. |
| v. | ) | |
| | ) | 1:21-cv-00996-AT |
| JAMES LUSTER, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

THIS IS TO CERTIFY that on this the 3rd day of March, 2023, the undersigned counsel presented this document in Times New Roman, 14 point type in accordance with L.R. 5.1(C), and that I have electronically filed this **Brief in Support of Motion to Exclude Testimony of Plaintiff's Expert, William R. Anderson,** with the Clerk of Court using the CM/ECF system, which will provide email notification to all of the following attorneys of record.

Michael D. Harper
Michael D. Harper, P.C.
3481 Lakeside Dr. N.E.
Suite 2406
Atlanta, Georgia 30326

Jefferey E. Tompkins
Thomas Kennedy Sampson & Tompkins LLP
3355 Main Street
Atlanta, Georgia 30337

26

Harvey S. Gray
Alex Joseph
Gray, Rust, St. Amand, Moffet, & Brieske, LLP
950 East Paces Ferry Road, N.E.
Suite 1700-Salesforce Tower
Atlanta, Georgia 30326

Respectfully submitted, this 3rd day of March, 2023

**OFFICE OF THE FULTON COUNTY ATTORNEY**

*/s/ Juliana Sleeper*
Juliana Sleeper
Senior Assistant County Counsel
Georgia Bar No. 376099
juliana.sleeper@fultoncountyga.gov

**Attorneys for Jennifer Jones, Douglas
Hardnett, Victoria Whaley, and Desmond Lowe**

141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303
(404) 612-0267 (office)
(404) 730-6324 (facsimile)

27