**MOTION TO EXCLUDE TESTIMONY OF
PLAINTIFF'S EXPERT WILLIAM R. ANDERSON**

**EXHIBIT 2**

DEPOSITION TESTIMONY OF DR. ANDERSON

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.

December 09, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


SHANITA D. SWANSON, Natural
Mother and Administrator of the
Estate of Anthony J. Mitchell,

       Plaintiff,

vs.

                            CIVIL ACTION FILE
                            NO. 1:21-cv-00996-AT

FULTON COUNTY, GA, et al.,

       Defendants.


~~~~~~~~~~~~~~~~~~~~~~~~~~~~~




REMOTE VIDEOTAPED DEPOSITION OF
WILLIAM R. ANDERSON, M.D.



December 9, 2022
10:01 a.m.




(All attendees appeared remotely via
videoconferencing and/or teleconferencing.)




Heather Brown, CCR
CCR-4759-4284-5258-1376



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 2

1                    APPEARANCES OF COUNSEL

2

3   On behalf of the Plaintiff:

4
    MICHAEL D. HARPER, Esquire
5   Michael D. Harper, P.C.
    3481 Lakeside Drive, N.E.
6   Suite 2406
    Atlanta, Georgia 30326
7   (404) 271-6618
    mharper@mharperlaw.com
8

9
    On behalf of Defendants Jennifer Jones, Victoria
10  Whaley, Douglass Hardnett, and Desmond Lowe:

11
    JULIANA SLEEPER, Esquire
12  KAYE W. BURWELL, Esquire
    Office of the Fulton County Attorney
13  141 Pryor Street, S.W.
    Suite 4038
14  Atlanta, Georgia 30303
    (404) 612-0267
15  juliana.sleeper@fultoncountyga.gov
    kaye.burwell@fultoncountyga.gov
16

17
    On behalf of Defendants William Roberts, Jeremiah
18  Whitehead, and James Luster:

19
    HARVEY S. GRAY, Esquire
20  Gray, Rust, St. Amand, Moffett & Brieske, LLP
    950 East Paces Ferry Road, N.E.
21  Suite 1700
    Atlanta, Georgia 30326
22  (404) 870-7376
    hgray@grsmb.com
23

24

25

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                December 09, 2022

Page 3

```
 1                    APPEARANCES OF COUNSEL
                           (Continued)
 2

 3
      On behalf of Defendants Grady Memorial Hospital
 4    Corporation, Jeremy Holland, and James Baumgartner:

 5
      JEFFREY E. TOMPKINS, Esquire
 6    Thomas, Kennedy, Sampson & Tompkins, LLP
      3355 Main Street
 7    Atlanta, Georgia 30337
      (404) 688-4503
 8    j.tompkins@tkstlaw.com

 9

10    Also Present:

11
      DeJuan Boyd, Videographer
12    Shanita D. Swanson

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                    December 09, 2022

Page 4

1                          INDEX TO EXAMINATIONS

2

3    WITNESS:   WILLIAM R. ANDERSON, M.D.

4
     EXAMINATION                                              PAGE
5

6    Examination By Ms. Sleeper                                  7

7    Examination By Mr. Tompkins                                93

8    Examination By Mr. Gray                                   138

9    Examination By Mr. Harper                                 161

10   Further Examination By Ms. Sleeper                        173

11   Further Examination By Mr. Tompkins                       178

12

13                            — — —

14

15

                             INDEX TO EXHIBITS
16

17
     Exhibit            Description                           Page
18

19

20               (No exhibits were marked.)

21

22

23

24

25

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 5

1                Remote Videotaped Deposition of

2                  William R. Anderson, M.D.

3                      December 9, 2022

4              THE VIDEOGRAPHER:  We are now on the

5    record.  Today's date is December 9th, 2022.  The

6    time is approximately 10:01 a.m.  This will be the

7    videotaped deposition of Dr. William R. Anderson in

8    the case of Shanita D. Swanson, et al., vs. Fulton

9    County, Georgia.

10             Will the attorneys present please state

11   their names and whom they represent.

12             MR. HARPER:  Michael Harper, I represent

13   the Plaintiff.

14             MS. SLEEPER:  What is the source of that

15   noise?  Do we know?

16             MR. GRAY:  Let's get rid of it.  It's

17   not me.

18             MR. HARPER:  It's not me either.

19             MR. TOMPKINS:  I don't even hear

20   anything.

21             MS. SLEEPER:  That's better.

22             THE WITNESS:  It sounds like -- yeah.

23             MS. SLEEPER:  That's better.

24             This is Juliana Sleeper with the Office

25   of the Fulton County Attorney.  I represent Officer

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                    December 09, 2022

Page 6

1  Victoria Whaley, Jennifer Jones, Douglass Hardnett,

2  and Desmond Lowe.

3           MR. GRAY:  This is -- hold on.  This is

4  Harvey Gray, and I represent individual Defendants

5  Luster, Whitehead, and Roberts.

6           MR. TOMPKINS:  Jeffrey Tompkins for

7  Grady Memorial Hospital Corporation, Jeremy Holland,

8  and James Baumgartner.

9           THE VIDEOGRAPHER:  Will the court

10  reporter please swear in the witness.

11           WILLIAM R. ANDERSON, M.D.,

12  having first been duly sworn, was examined and

13  testified as follows:

14           MS. SLEEPER:  Okay.  So this will be the

15  deposition of Dr. William Anderson on behalf of

16  Defendants for the purpose of cross-examination,

17  discovery, and all other purposes allowed under the

18  Federal Rules of Civil Procedure, pursuant to notice

19  and agreement of counsel.

20           If it's agreeable with counsel, I

21  request that we reserve all objections, except as to

22  form of the question and responsiveness of the

23  answer, until first use.  Is that agreeable?

24           MR. HARPER:  Yes.

25           MR. TOMPKINS:  Agreeable.

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 7

1              MR. GRAY:  Agreeable.

2              MS. SLEEPER:  Doctor, are you reading

3    and signing?

4              THE WITNESS:  Yes.

5                     EXAMINATION

6    BY MS. SLEEPER:

7       Q.  Okay.  So, again, good morning, Doctor.

8    Thank you for your time today.  My name is Juliana

9    Sleeper.  I am an assistant county counsel with the

10   office of the Fulton County Attorney.

11             I know you've had many depositions

12   before, so you don't need a basic instruction from

13   me, but I'm going to go through just a few things.

14   At any point in time, if you do not understand my

15   question, I want you to let me know so that I can

16   repeat or rephrase the question for you, okay?

17      A.  Yes.

18      Q.  If you are to answer my question, I'm going

19   to assume that you understood my question, okay?

20      A.  Yes.

21      Q.  All right.  And, lastly, as you know,

22   because Madam Court Reporter is writing down

23   everything we say, we both have to take turns.  And I

24   will do my best to not talk over you, and if you

25   could wait until I ask the entirety of the question



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 8

1   before you answer.

2       A.  Yes.

3       Q.  Perfect.  Dr. Anderson, what is your date of

4   birth?

5       A.  07/12/43.

6       Q.  Oh.  So your big 8-0 is coming up?

7       A.  I think so.  I'm not counting anymore.

8       Q.  All right.  And, Dr. Anderson, our office

9   was provided with your 2022 CV.  Is that the most

10  recent version?

11      A.  Yes, it is.

12      Q.  Okay.  Does your 2022 CV contain complete

13  history of your medical career?

14      A.  I believe so, yes.

15      Q.  Okay.  So, let's go through them quickly.

16          You were in Los Angeles in 1976?

17      A.  Correct.

18      Q.  You were there for about a year?

19      A.  Yes.

20      Q.  And then you went to Cobb County, right?

21      A.  Well, Cobb and DeKalb County actually.

22      Q.  Right.  But in Cobb, you were there about

23  two years, right?

24      A.  No.  I was both offices about the same time.

25      Q.  Okay.

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                          December 09, 2022

Page 9

1      A.  I'd have to look at the years again.  It's

2   getting -- about -- almost two years.

3      **Q.  Okay.  And why did you leave Cobb County?**

4      A.  Well, I was medical examiner for both Cobb

5   and DeKalb Counties, and I resigned from DeKalb, so,

6   consequently, I also resigned from Cobb because I had

7   an offer at a hospital situation.

8      **Q.  But, in the past, you have testified that**

9   **you resigned the position because some controversies,**

10  **right?**

11     A.  From DeKalb County, yes.

12     **Q.  Okay.  And --**

13     A.  There were two separate counties.  DeKalb

14  was under a coroner system, which we tried to get

15  abolished, and ultimately did, and Cobb was already

16  under a professional medical examiner system.

17     **Q.  And have you ever worked for Hall County?**

18     A.  Yeah.  I was a -- I was -- not for Hall

19  County, no.  I was -- I practiced in Hall County in

20  Northeast Georgia Medical Center.

21     **Q.  Is that in your CV?**

22     A.  Yeah.  Northeast Georgia Medical Center in

23  hospital pathology.

24     **Q.  Okay.  And, that job, you were involuntarily**

25  **dismissed, right?**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                            December 09, 2022

Page 10

1       A.  No, no.  I was the hospital pathologist.

2   They ended our contract in 1986, I believe.

3       **Q.  So, if in the past you testified that you**

4   **were involuntarily dismissed from that job, was that**

5   **an inaccurate statement by you?**

6       A.  No.  The job was the hospital pathologist.

7   When I was in Hall County as a pathologist, I also

8   did work for the Hall County coroner by contract.

9       **Q.  Right.  And that job, you were involuntarily**

10  **dismissed?**

11      A.  No.  I was removed as medical examiner by

12  the state medical -- by the state -- Georgia Bureau

13  of Investigation.  That was for testifying against

14  them in a case.

15      **Q.  So GBI terminated you?**

16      A.  I wouldn't say it was incriminated.  They

17  said I -- I think they -- well, we ended up suing

18  them, a civil rights case.

19          But the reason I left that was because,

20  mainly, I was dismissed, if you will, from a

21  volunteer position.  I was never -- I was appointed

22  as medical examiner and they said I wasn't doing

23  enough cases.  That was the argument.

24      **Q.  Okay.  But you were involuntarily**

25  **terminated?**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 11

1       A.   From that position.  Yeah --

2       Q.   Okay.

3       A.   -- as the Hall County appointed medical

4  examiner, I was reappointed, and then several months

5  later when I testified against them, I actually

6  had -- I had decided not to become reappointed and

7  was asked by Dr. Howard, who was then in charge, to

8  essentially, if I would please reapply.  So I did,

9  and they put me in.

10            And then we had a case of a homicide

11 that was really basically botched up by the State,

12 and I testified for the defendant in the case as a

13 forensic pathologist.  And basically, the next day, I

14 was terminated.

15      Q.   Right.  So --

16      A.   Several months -- several months after

17 having been reinstated, asked to reapply -- and asked

18 to reapply for the position.

19      Q.   Okay.  Short answer is, you were terminated?

20      A.   Well, there is no short answer.

21      Q.   All right.  Well, let's move on.

22            Did you also work at Glynn-Brunswick?

23      A.   Yeah.  I was there for almost a year, I

24 believe.

25      Q.   Right.  And that's not on your CV, is it?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 12

1      A.   It should be.   The hospital,

2  Glynn-Brunswick, the hospital.   It wasn't -- again,

3  it wasn't for the county, it was the hospital.

4      **Q.   Okay.   I didn't see it on your CV.**

5      A.   I'll have to check.   It's probably there.

6      **Q.   Okay.   And then, you went to North Georgia**

7  **briefly, correct?**

8      A.   Well, I was at North Georgia -- Northeast

9  Georgia Medical Center for -- from about 1980 to '86,

10  or '79 to '86.

11      **Q.   Was that continuous employment with one**

12  **entity?**

13      A.   Yeah.   I was laboratory director at the

14  hospital.   We had three pathologists.   We covered

15  numerous hospitals around Northeast Georgia as well.

16      **Q.   Okay.   So that's when you were working as**

17  **locum tenens; is that right?**

18      A.   No, no.   That was -- you'll have to read the

19  CV.   I don't know if you're reading it or not, but

20  that was the hospital pathologist full-time employed,

21  contracted, with the hospital at Northeast Georgia

22  Medical Center.

23      **Q.   Okay.   And you were with DeKalb at some**

24  **point for a year, right?**

25      A.   Well, we're jumping around.   DeKalb County



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 13

1  was right after Los Angeles.

2      **Q.  Oh, okay.  Okay.  Thank you.  And that was**

3  **for one year, correct?**

4      A.  I was medical examiner -- I just went

5  through this.  I was medical examiner for Cobb and

6  DeKalb County after I left Los Angeles in '76.  So I

7  guess it would be '77 and '78.

8      **Q.  Okay.**

9      A.  I subsequently left that position because of

10  some political activity from the coroner.  And,

11  subsequently, I decided to also leave Cobb County,

12  although I was asked to stay in Cobb County.  But the

13  logistics just required me to have at least two

14  counties.

15      **Q.  Okay.  And then, where did you go after your**

16  **career in Georgia?  Is it New York?**

17      A.  Oh, I went -- yeah.  I worked for a

18  commercial laboratory in New York for about a year.

19      **Q.  And that was a contract job?**

20      A.  Yes.

21      **Q.  But the contract didn't get renewed, right?**

22  **That's what you said in prior testimony, so that's**

23  **why I'm just confirming.**

24      A.  Yeah, the hospital -- right.  The contract

25  with the laboratory was not renewed.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 14

1      Q.  Okay.  And then you went to Naples for six

2  months, right?

3      A.  Oh --

4      Q.  Again, that's from your prior testimony.

5      A.  I was in Naples --

6      Q.  Or was it Chicago for six months?

7      A.  Yeah.  I was in -- I was asked to be

8  coroner's pathologist in Chicago, Naperville.  It was

9  not Naples.

10      Q.  Okay.  So Chicago job was for six months

11  though, right?

12      A.  Yeah.  The reason I left -- I was a

13  coroner's pathologist.  Basically, I worked on a

14  case-by-case basis with the various coroners around

15  Chicago area, the collar counties to Chicago.

16      Q.  Okay.

17      A.  So then I would do pathologist as contract

18  work with them.

19          While I was up there, then I got an

20  offer from Orlando to return, and that's when I

21  returned to Orlando.

22      Q.  When did you go to Naples for six months?

23      A.  I was in Naples for almost a year in that

24  office, but that was -- we're going back so many

25  years.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 15

1      Q.  It's okay.  It wasn't more than a year in

2    Naples, right?

3      A.  It was about a year in Naples, and then I

4    got --

5      Q.  Okay.

6      A.  When I was in Naples, actually, I got the

7    offer to do the coroner's pathologist in Chicago.

8      Q.  Ah.

9      A.  And then, when I was in Chicago, then I got

10   the -- I had already done some work in the Orlando

11   area with medical examiner's office, and when I was

12   in Chicago, then they called and wanted me -- asked

13   if I'd be interested in coming down to Orlando as

14   deputy chief medical examiner.  So, yes, I did -- I

15   took that in 1990.

16     Q.  Right.  As far as your Orlando position as

17   deputy chief medical examiner, you eventually left

18   that job under investigation and controversy, right?

19     A.  Well, I don't think there was much

20   controversy.  The chief medical examiner -- I was

21   there for 12 years as deputy chief medical examiner,

22   until 1982 -- until 2002.

23     Q.  Right.  There was a newspaper article about

24   you relating to your job as medical examiner in

25   Orlando, correct, multiple?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 16

1        A.   Yeah.   Right.   Exactly.   But it wasn't a

2   controversy, it was very straightforward actually.

3               The medical examiner then, Dr. Gore,

4   asked me to change a diagnosis on a jail death case

5   because the county was being sued.

6        Q.   Right.

7        A.   And I did not do that.  So then,

8   consequently, the county wants this, quote,

9   "investigation," which was only the county.  The

10  state medical examiner's commission, no

11  investigation.  Licensure in Florida, no

12  investigation.  State attorney, the only -- the only

13  -- I was involved with the state attorney because

14  they asked me to testify when they were investigating

15  the county in the medical examiner's office.

16       Q.   Okay.

17       A.   Dr. Gore, who asked -- Dr. Gore, who asked

18  me to make the change was ultimately removed by the

19  state medical examiner commission, the only time

20  that's ever happened in Florida.

21       Q.   And you --

22       A.   So I was never investigated -- pardon me?

23       Q.   Did you work for Dr. Gore?

24       A.   Well, I worked for the county.  He was the

25  chief medical examiner, and he's the one that asked



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 17

1  me to change the diagnosis.

**2       Q.  Right.**

3       A.  But I didn't change the diagnosis.

**4       Q.  But you did work for him?**

5       A.  I worked -- we all worked for the county,

6  but he was the chief medical examiner, I was the

7  deputy chief medical examiner.

**8       Q.  Okay.  In previous depositions, you'd stated**

**9  that, because of the controversy, you had to resign.**

**10  Is that still a correct statement?**

11       A.  Well, I didn't have to resign.

**12       Q.  Then why did you resign?**

13       A.  I did resign.

**14       Q.  Why did you resign?**

15       A.  Because I didn't want to put up with that

16  nonsense that was going on with the political people,

17  and I probably would have ended up the same way.  If

18  I had agreed to do that, which was illegal by the way

19  to change a public document, I probably would have

20  ended up the same way Dr. Gore; being actually

21  removed from the office by the medical examiner

22  commission.  And I didn't think that was --

23  basically, as a medical examiner, I thought breaking

24  a log, changing a public record, was not a good idea,

25  and it turned out I was correct.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                     December 09, 2022

Page 18

1       Q.  And county investigated you because you were
2  not logging in all your evidence, right?
3       A.  No.  That had nothing -- that was nothing to
4  do with that.  The only thing they said I was doing,
5  work on county time.
6       Q.  Okay.  The investigation about you billing
7  county for work that you were doing privately, right?
8       A.  Well, yeah.
9       Q.  Okay.  And --
10      A.  But that was under an agreement -- that was
11  under an agreement with the state attorney and the
12  law enforcement of how we were going to handle cases.
13  They needed a medical examiner to testify, but it was
14  not a medical examiner county case, so I did that on
15  my own time under contract.
16      Q.  So, after 2002, once you're done with
17  Orlando, you went to Sarasota?
18      A.  Correct.
19      Q.  For about a year?
20      A.  Yeah.
21      Q.  Why did you leave that position?
22      A.  Well, Dr. Clack, who was the medical
23  examiner, and we were contracted with the county,
24  decided to retire.  So all our contracts were not --
25  basically, they were null and void at that point.


Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 19

1  So, at that point, I went into private practice.

2       Q.  Okay.  And when was the last time you

3  treated a live patient?  You think about 1976?  Does

4  that sound about right?  That's what you testified to

5  in a different deposition.

6       A.  Oh, I don't know.  The last time -- well,

7  when I was in Orlando, we also did all the sexual

8  assault exams on living patients, and we did that

9  from 1990 until '96 or '97 when they went to nurse

10 practitioners.

11      Q.  Okay.  So you probably dealt with live

12 patients until at least 1996?

13      A.  Sure.

14      Q.  Okay.

15      A.  And I also, presently, I am a laboratory

16 director for an endoscopy center.  So we read

17 biopsies, and they're all on live patients.

18      Q.  Right.  And -- right, but you don't meet

19 with those live patients to do the work, do you?

20      A.  Generally, no.  Generally not.

21      Q.  All right.  And what is your current work

22 makeup like?  Is it 30 percent legal, 70 percent

23 surgical pathology?  Does that sound about right?

24      A.  Well, I don't know what you mean by "legal."

25 I do private autopsies, and on some situations, those



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                  December 09, 2022

Page 20

1  do become medical-legal issues.

2      Q.  Okay.

3      A.  So, as a forensic pathologist, we deal with

4  the legal system in many cases, but that doesn't mean

5  we're doing, quote, "legal" cases.

6      Q.  Okay.

7      A.  I don't know what you mean by "legal cases."

8      Q.  How much forensic -- okay.

9          How much forensic pathology work do you

10  think compared to your surgical pathology?

11     A.  Well, the surgical pathology work is

12  probably about, both time -- time-wise is probably

13  about 80 percent of my time.

14     Q.  But the --

15     A.  And, certainly, as far as compensation, it's

16  probably much more than that.

17     Q.  So, forensic pathology, about 20 percent?

18  Does that sound about right?

19     A.  Yeah.  Well, right.  Forensic pathology --

20  my forensic pathology part of the practice involves

21  doing both consultations, like we're doing on this

22  case, and also involves doing private autopsies.

23  Most of the private autopsies that we do have never

24  -- never interface with the legal system.

25     Q.  Okay.  And your surgical pathology work is



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 21

1  GI work, right, gastroenterology?

2      A.  Gastroenterology, yeah.

3      Q.  Right.  That's --

4      A.  We deal with biopsies, taking of the

5  endoscopies -- we have two endoscopy centers, and we

6  do the biopsies taken at those centers.

7      Q.  And as for things that become a legal work,

8  what is the percentage of plaintiff versus defense

9  work, you think?

10     A.  Well, again, if it's an autopsy that I do

11 for the family and the findings become a

12 medical-legal issue, it's usually the family and the

13 family's counsel that will get me involved in the

14 case, in the autopsy.

15     Q.  Okay.  So I did some research on you,

16 Dr. Anderson.  It says that, in total, you've done 37

17 plaintiff's related work and 6 defense work.  Does

18 that sound about right?

19     A.  Well, I don't know what research you're

20 doing, but I've done autopsy -- I've done --

21     Q.  I guess I'm talking about cases that you

22 testified.  Like, among the cases you testified and

23 there is public record for it, there are 37 of them

24 are plaintiff's work and 6 of them were defense work.

25 Does that sound about right percentage-wise, your



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 22

1  plaintiff and defense work?

2      A.  Well, I don't know what -- if you're talking

3  about civil or criminal, but --

4      **Q.  Civil.  Civil work.  I'm talking about civil**

5  **work.**

6      A.  That's probably -- that's probably about

7  right.

8      **Q.  Okay.  Thank you.  Let's --**

9      A.  But with the caveat -- with the caveat that,

10 most of the time in civil cases, the plaintiff -- I'm

11 called by the plaintiff because I've done the

12 autopsy.  An autopsy is done prior to any legal

13 people getting involved.  So I have no -- I have no

14 control over --

15     **Q.  Of course.**

16     A.  -- what the attorney does.

17     **Q.  Oh, of course.  And I'm just trying to make**

18 **sure that you -- you've done more plaintiff work than**

19 **defense work, is just what I'm trying to get at.**

20     A.  Well --

21           MR. HARPER:  Well, I think -- I think

22 what he said, Juliana, let me kind of object --

23           MS. SLEEPER:  Mr. Harper --

24           MR. HARPER:  Object; asked and answered.

25           MS. SLEEPER:  Well, then, I'll not ask

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                          December 09, 2022

Page 23

1   the question.  We'll move on.

2   BY MS. SLEEPER:

3       Q.  Let's talk about your publications and

4   presentations.  You listed your publications and

5   presentations in your CV.  Which publication or

6   presentation in your CV are germane to the issues in

7   this case?

8       A.  Well, essentially, almost all of it relates

9   to forensic pathology, and this certainly is a

10  forensic pathology issue regarding the cause of death

11  and the manner of death.

12      Q.  Okay.

13      A.  So almost all -- almost all of my

14  publications have been related to forensic pathology.

15      Q.  All right.  Have you done any presentation

16  or publishing on microscopic slide reviews?

17      A.  I do microscopic -- microscopic slide review

18  is a -- in other words, doing microscopic slides is a

19  part of an autopsy.

20      Q.  Right.  So my question --

21      A.  We do it, on average -- I've done, what, 6

22  or 7,000-plus autopsies.

23      Q.  Right, right.  But what I'm trying to ask

24  you is, have you done a publication or presentation

25  specific to microscopic slides and the review of it?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 24

1      A.  Well, I think, yeah, in my textbook I wrote,

2  I stressed the fact that microscopic slide evaluation

3  needs to be done.  And, in fact, in the -- the

4  multidisciplinary -- I can't remember the whole name

5  of it, one of the numbers -- I wrote a chapter on

6  expert witnesses and, again, pointed out the fact

7  that pathologists stated that -- [technical

8  disruption] because you can't just look at the tissue

9  with your naked eye and make diagnoses.

10      **Q.  Right.  So microscopic slide review is very**

11  **important?**

12      A.  Review of -- well, doing microscopic

13  analysis, that's part of the autopsy.

14      **Q.  Right.  That's very important; it needs to**

15  **be done, right?**

16      A.  Yes.

17      **Q.  Okay.  And which textbook is that?  Can you**

18  **give me the name?**

19      A.  I don't have my CV in front of me.  Forensic

20  Science and Political Medicine is the textbook, and

21  the second one is a recent publication

22  Multidisciplinary Approach to Forensic Science, or

23  something like that.  And I wrote a chapter in that

24  book.

25      **Q.  So which year were they both -- were they**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 25

1  published, each of them?  The first one, when was it

2  published?

3       A.  Oh, God, I don't know.  2000, I believe.

4  And then the last one was just a couple years ago.

5       Q.  Okay.  So, what, was it like in 2020?

6  During pandemic?  Before pandemic?

7       A.  Well, I think it was before, because when I

8  was in Los Angeles for the opening of the book, so --

9  we weren't wearing masks.  So I think it was before.

10      Q.  Okay.  What about cardiopathology?  Have you

11  done any published journals or presentation on

12  cardiac pathology?

13      A.  No.  I did a fellowship year in cardiac

14  pathology at Duke, as you'll see in the CV.

15      Q.  When did you --

16      A.  But I don't -- well, when I was a -- when I

17  was a resident.

18      Q.  What year was that?

19      A.  19 -- oh, God.  I think Duke was '73, '74.

20      Q.  Okay.  And so, you did fellowship, but did

21  you do -- did you publish anything or present

22  anything on cardiac pathology?

23      A.  Not specifically, other than what's in

24  the -- obviously, the study of the heart is very

25  important in any autopsy that you do.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 26

1       Q.  Right.  And what about -- what about

2   myocardial biopsy?  Have you done any specific

3   studies or published anything on that field?

4       A.  Not specifically.  And biopsies are

5   essentially pieces of the tissue you take.  In an

6   autopsy, you take basically large pieces of tissue in

7   the heart and so forth.

8       Q.  So if your CV shows that your last

9   presentation or publication relating to cardiac

10  matter was in 1969, is that correct?

11      A.  No.  As I said, all of the forensic issues

12  touch upon cardiac pathology.

13      Q.  Right.  I'm talking about specialization in

14  cardiac --

15          MR. HARPER:  Ms. Sleeper, you have to

16  let him finish his answer.  You keep cutting him off.

17  Let him finish his answers, please.

18  BY MS. SLEEPER:

19      Q.  I'm sorry.  Go ahead, Doctor.

20      A.  Any -- anything related to forensic

21  pathology involves -- study all of the organs,

22  including the heart, but nothing specifically as to

23  cardiac pathology, outside of what's in the textbooks

24  and the presentations and so forth.  And, obviously,

25  the cardiac pathology is involved in many, many


Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 27

1  situations where death occurs, traumatic sudden death

2  and so forth.

3      **Q.  So there are pathologists who specializes in**

4  **cardiac pathology, correct?**

5      A.  Yes.  In fact, I did.  That's why I took the

6  year in cardiac pathology when I was at Duke.  I took

7  the year of training specifically for cardiac

8  pathology.

9      **Q.  In 1973?**

10     A.  Yes.

11     **Q.  Okay.  How did you get involved in this**

12  **case?**

13     A.  I believe I was contacted by Mr. Harper to

14  take a look at this specific case.

15     **Q.  When was that?**

16     A.  Not too long ago.  It was, I think, in

17  September of this year.  Last September.

18     **Q.  So, September of 2022, that's when you were**

19  **hired?**

20     A.  That's when I was asked to look at the case,

21  yeah.

22     **Q.  Okay.  Have you had a case with Mr. Harper**

23  **before?**

24     A.  I have had several cases with him before.

25     **Q.  Can you tell me all of the cases that you**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                     December 09, 2022

Page 28

1   had with Mr. Harper?

2       A.  No.  I'd have to research.  I could tell

3   you, but I can't just off the top of my head.  I

4   don't know.

5       Q.  Do you have your computer in front of you?

6       A.  I can get you the list, yeah.

7       Q.  Okay.

8           MR. HARPER:  We can provide it later,

9   Ms. Sleeper.

10          MS. SLEEPER:  Okay.

11  BY MS. SLEEPER:

12      Q.  And did you have a case called Antonio May

13  vs. Fulton County?

14      A.  That sounds familiar.

15      Q.  Right.  That was a case you did with

16  Mr. Harper, right?

17      A.  I believe so.

18      Q.  And you testified in that case in 2021,

19  correct?

20      A.  I don't know.  I'll have to take your word

21  for it.

22      Q.  Okay.  Did you provide us with a full list

23  of last four years of your deposition testimony and

24  trial testimony?

25      A.  I don't recall if I did or not.  I have a

Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 29

```
 1  list.  I don't know that I had time to locate it --

 2       Q.  Right.  Pursuant to the Rule, you have to,

 3  right?

 4            MR. HARPER:  It was sent to you,

 5  Ms. Sleeper.  As part of his expert report, the list

 6  of testimony was sent to you and all defense counsel.

 7            MR. TOMPKINS:  That's not the question.

 8  We have the list.  The question is, is that case on

 9  the list?  I have it, too.  That's the question.

10  BY MS. SLEEPER:

11       Q.  I'm asking that question because, we did

12  receive the list from Mr. Harper, but the case that I

13  just mentioned to you that happened in 2021 is not

14  listed.  Why is that?

15       A.  Well, I may not have updated it.  I'll have

16  to go through.  I only update this every couple of

17  years, so.

18       Q.  Right, okay.  Well, can you give us the full

19  list by end of the day today?

20       A.  I don't know if I'll be able to.  I can get

21  it to you.  I don't know how long it will take me to

22  figure it out.

23       Q.  All right.  Well, I hope we can get it soon.

24            Do you know when you may have started

25  your initial case review in this case?
```



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 30

1              MR. HARPER:  Asked and answered.

2    BY MS. SLEEPER:

3        Q.  I did not ask that question before, but go

4    ahead.

5        A.  Again, in September.  Last September.

6        Q.  Is it last September or this September?

7        A.  Last September would be September 2022.

8        Q.  Oh, okay.  When I hear "last September" --

9        A.  We're in December now.

10       Q.  True, true, true, true, true.

11              What -- what did you review for this

12   case?

13       A.  Well, I have actually sent you a report that

14   lists everything on the report --

15       Q.  I did see that, and I'm aware of it, Doctor.

16   Everything you reviewed are on that list?

17              MR. HARPER:  I think that -- let me

18   just -- if I can clarify some things, Ms. Sleeper.

19   The pathology slides, I don't believe are on this

20   list, but they were -- no, they are on there.  They

21   are on there.

22              THE WITNESS:  They are.  They're on the

23   list.

24              MR. HARPER:  Okay.

25       A.  The only thing I will add would be I did get



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 31

1  the actual slides from the CryoLife Laboratory of the

2  heart that they took for -- the heart was harvested

3  for valves.  As part of that, the heart is always

4  examined by the pathologist at the CryoLife, and I

5  got -- actually got, a couple weeks ago, got the

6  actual slides.  But they corresponded with the

7  report, so there's no issue.

8      **Q.  So let me get this straight.  Did you have**

9  **those slides when you wrote this report?**

10     A.  I did not have the cardiac slides.  I had

11  all of the other slides.

12     **Q.  So what were the other slides?**

13     A.  Well --

14     **Q.  It just says, "Microscopic tissue slides**

15  **from autopsy."  What were those?**

16     A.  Well, if you go -- if you go to the autopsy

17  report --

18     **Q.  Uh-huh (affirmative).**

19     A.  -- you will see that the eight slides, eight

20  histologic sections were submitted, and that was --

21  those were the slides.  Those were the various

22  organs, and I got recuts of those eight.  So there

23  would be eight plus the ones I got from the CryoLife.

24     **Q.  So is it heart slides?**

25     A.  No.  I just said the heart was taken for --



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 32

1   the heart was taken --

2        Q.  Right.  So, I'm sorry.  I didn't hear

3   what -- what were those tissue slides from?  Like,

4   which part of the body was it from, I guess?

5        A.  Well, various samples.  I'd have to pull

6   them all out and look.  There was, I believe, lung,

7   brain, kidney.  Let me see what I have here.

8             Okay.  We had portion of aorta, lungs,

9   liver, spleen, pancreas, adrenal, kidney, prostate,

10  and brain.

11       Q.  Okay.  And you mentioned seeing photos and

12  videos.  How many pictures and which pictures did you

13  review?

14       A.  There was a video and there were several

15  photos.

16       Q.  Right.  That's a little vague because we

17  have so many videos and so many photos in this case,

18  so I want to know which ones you reviewed.

19       A.  Well, there was a photo of him on the

20  ground --

21       Q.  Okay.

22       A.  -- and then a single video, AJ video MP4, I

23  put it.

24       Q.  Oh, so those -- you had a six-second video?

25  It was a very short video, right?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                           December 09, 2022

Page 33

1      A.   Yeah.   It was a very short video, yeah.

2      Q.   Okay.  Did you happen to review -- let me go

3  back.  I'm sorry.

4               Have you produced to us everything you

5  actually reviewed and relied on before you -- for

6  this case before you made your opinion?

7      A.   I believe so, yeah.

8      Q.   Okay.  Did you review any, like, treaties or

9  textbooks coming to this opinion?

10     A.   No, I didn't.  I don't believe I needed to

11  do any research on this particular case.  This was a

12  pretty straightforward case.

13     Q.  So -- okay.  And have you asked for any

14  additional documents for review?

15     A.   No.  I had requested the heart slides, and I

16  did get those, but that was the only other thing.

17     Q.  When did you get the heart slides?

18     A.   I think a couple of weeks ago.

19     Q.  And you said you reviewed it, right?

20     A.   Yeah, I reviewed the slides.  There were six

21  of them, I believe.  Yeah, six of them.

22     Q.  Did you get any chain of custody letter for

23  any of the slides that you received?

24     A.   No.  They were sent directly from -- well,

25  they were sent directly from the medical examiner's



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 34

1  office to me for the Fulton County Medical Examiner,

2  and then from CryoLife -- I received those from

3  CryoLife.

4      **Q.   Okay.  What about any deposition testimony?**

5      A.  No.  I don't do deposition testimony.

6      **Q.  And --**

7      A.  As a -- as a scientist, I just give

8  objective information.

9      **Q.  And is that because you don't consider**

10 **deposition testimony to be fact?**

11              MR. HARPER:  Object to the form.  You

12 may answer.

13     A.  I consider it to be soft evidence.  In other

14 words, deposition testimony is not what we would call

15 hard evidence.

16 BY MS. SLEEPER:

17     **Q.  Right.  Actually, in your 2021 depo, you**

18 **said you don't consider them facts, but you consider**

19 **them opinions, right?**

20     A.  Well, essentially, yes, because facts are --

21 I've been in many situations where stories change,

22 and what's given in a deposition does not match the

23 forensic evidence, depositions that are conflicting

24 with each other, so forth.  So over the years, I've

25 determined that, even patient history, you have to be



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 35

1  careful relying upon.  You have to just basically go

2  with the science.

3       Q.  So what about photos?  Are they facts?

4       A.  Well, photos, unless they've been retouched,

5  are facts.

6       Q.  Videos?

7       A.  Unless they've been retouched.  And I'm

8  assuming the videos and all we got from here were not

9  altered, but you can never be sure.

10      Q.  And medical records, those are facts?

11      A.  Recorded medical records, yes.

12      Q.  Okay.

13      A.  Sometimes -- sometimes parts of medical

14  records, again, have to be considered maybe not

15  totally reliable; for instance, what a patient tells

16  a physician at the time and so forth.

17      Q.  But video, as long as it's authenticated

18  video, it is hard fact, correct?

19           MR. HARPER:  Objection; asked and

20  answered.  That's not -- okay.  Asked and answered.

21  You may answer it again.

22      A.  Yes.

23  BY MS. SLEEPER:

24      Q.  Okay.  And did you know that we had

25  Bojangles' security footage video in this case?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 36

1       A.   Well, my involvement in this case was not
2    to -- was to basically look at the forensic issues
3    involved.   And the major issue I was concerned about
4    was the positional asphyxia part.   So the only part I
5    really needed to know was the fact that, at some
6    point, this gentleman was on the ground with
7    someone's knee in his back.
8       **Q.   Okay.   Is it important to you to consider**
9    **all facts before coming to your opinion?**
10      A.   Well, it depends.   What part of the -- what
11   part --
12      **Q.   Okay.**
13      A.   In other words, what area my opinion is
14   going to cover.   In this case, I'm obviously not
15   going to be involved in discussing what happened at
16   the scene or what should have been done at the scene
17   and so forth.
18      **Q.   Of course not.**
19      A.   So, yeah.
20      **Q.   I'm asking about videos, and if there were**
21   **videos, you considered them as hard facts.   I'm**
22   **asking if -- would it have been important to you to**
23   **review the entirety of a video, rather than just a**
24   **six-second clip of it?**
25      A.   Well, again, the only part of the video that



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 37

1   I was concerned about was the fact -- the positional

2   asphyxia -- the potential positional asphyxia part.

3        **Q.  Okay.  So let's talk about that really**

4   **quickly.  Is there a difference in, you know, a**

5   **patient's outcome if that person was restrained for**

6   **six seconds compared to thirty minutes?**

7                 MR. HARPER:  Let me -- well, okay.  Go

8   ahead.  I'm sorry.  I think you misstated evidence,

9   but I think you clarified it.  So you may answer,

10  Dr. Anderson.

11       A.  I'm sorry.  Go ahead and repeat it again.

12  BY MS. SLEEPER:

13       **Q.  It's a hypothesis, hypothetically, is there**

14  **a difference between a patient's outcome or a**

15  **patient's injury between a person who had six seconds**

16  **of restraint compared to 30 minutes of restraint in**

17  **the same type of restraint?**

18       A.  Well, there may or may not be, depending

19  upon the severity of -- in other words, how much

20  pressure is applied to the chest.

21       **Q.  So let's --**

22       A.  If there's not much applied to the chest or

23  six seconds of severe pressure could, you know, could

24  cause death.

25       **Q.  So you're saying --**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 38

1       A.   If it was severe enough.   It's a matter of

2   degree.

3       Q.   So you're saying -- okay.   Let's -- so, you

4   watched the video, the six-second video, right?

5       A.   Yes.

6       Q.   Are you suggesting that six seconds caused

7   Mr. Mitchell to die?

8       A.   No, of course --

9            MR. HARPER:   I'm going to object to the

10  form -- let me object to the form.   It misstates the

11  evidence in this case.   We know that it was more than

12  six seconds.

13           MS. SLEEPER:   Mr. Harper, I need you to

14  stop narrating and testifying for your witness.

15           MR. HARPER:   No, I -- I just want to

16  make sure that you're not misstating the evidence in

17  the case.

18  BY MS. SLEEPER:

19      Q.   I -- I'm asking -- I'm asking a question,

20  which I could also ask a hypothetical.   But here,

21  Doctor -- let me do a different --

22           Dr. Anderson, were you there at the

23  scene that night?

24      A.   Well, of course not.

25      Q.   Right.   And did you review anything -- a



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 39

1   video or anything else more than six seconds that has

2   to do with Mr. Mitchell's restraint in this case?

3        A.  No.

4        Q.  So, as far as you know, it could have been

5   only six seconds, correct?

6             MR. HARPER:  Let me object to the form.

7   Just object to the form.  It misstates --

8             MR. TOMPKINS:  Your objection is noted,

9   Michael.  Just object to form.  That's the way the

10  process works.  You can't coach the witness.

11  BY MS. SLEEPER:

12       Q.  So, again, Dr. Anderson, let me re-ask the

13  question.

14            As far as you know and you understand

15  from your hard facts, and not soft evidence, the

16  restraint that was put on Mr. Mitchell was six

17  seconds, correct?

18       A.  Well, that was the positional asphyxia

19  component -- or the positional component of the

20  restraint.  He was also handcuffed and had something

21  put over his head.

22       Q.  Right.

23       A.  But that --

24       Q.  But what I'm asking is, time-wise --

25            MR. HARPER:  Ms. Sleeper, you have to



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                      December 09, 2022

Page 40

1   let him finish.

2   BY MS. SLEEPER:

3       **Q.  -- as far as we know, it's six seconds,**

4   **correct?**

5               MR. HARPER:  Let me object.  You're not

6   allowing him to finish his answer.  You said in the

7   very beginning that you would do your best to allow

8   him to finish his answer before you asked another

9   question.  You're not doing that.  He's still talking

10  and you cut him off.

11  BY MS. SLEEPER:

12      **Q.  Dr. Anderson, you can continue whatever you**

13  **were saying before.  I am sorry.**

14      A.  Okay.  Again, this -- the position that we

15  find him in was a component of the sequence of

16  events, the cascade of events, that ultimately led to

17  him dying.  The position, for six seconds or however

18  long it was, clearly was not the cause of death

19  because he later -- he later basically went home

20  ambulatory before he collapsed.  So that's clearly

21  not a positional asphyxia death.  What that shows

22  though, is that this was part of a cascading of

23  events, as I clearly indicated in the report I sent

24  you, a cascade of events, and we can't pick out one

25  particular thing as part -- other than to recognize



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 41

1   that it's in a part of a cascade of progressively

2   serious events that took place, as was the initial

3   trauma to the blows and the trauma he received to his

4   head.

5       Q.  And I thank you for that testimony, but I

6   have a question that is different from your answer.

7   I want you to listen carefully to my question, okay?

8                First question is, do you know for how

9   long Mr. Mitchell was restrained on the night of the

10  incident?

11      A.  No, other than the report from the law

12  enforcement.

13      Q.  And, now, I want to ask you about the term

14  that you keep using, "positional asphyxiation," okay?

15               Do you remember testifying in a past

16  testimony that, generally, somebody who is hogtied

17  does not -- that doesn't mean it will lead to death?

18  Someone who is on their stomach and hogtied,

19  generally, that does not lead to death.  Do you

20  remember stating that?

21      A.  Well, correct.

22      Q.  Okay.  Next question.  You also said,

23  majority of time, people who are on their stomach,

24  hogtied, don't suffer from lack of oxygen?

25      A.  Oh, I may have.  I don't know what -- what



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 42

1  are you referring to?  I've done many depositions

2  over the years.  I don't know what you're --

3  generally speaking, yeah.  I mean, because hogtying

4  is used, four-point even, that is used as restraint,

5  and that generally does not end up -- but, again,

6  "generally" does not apply to a specific case.

7       **Q.  Correct.  Correct.  And so, in this case,**

8  **Mr. Mitchell had his hands tied and was on his**

9  **stomach, right?**

10      A.  Apparently, yes.

11      **Q.  Right.  And, generally, that position**

12  **doesn't cause someone to die, right?**

13      A.  Generally speaking, yes.

14      **Q.  Right.  And, generally, people don't suffer**

15  **from lack of oxygen from that position, correct?**

16      A.  Correct.

17      **Q.  Okay.  You also testified before that,**

18  **depending on how you're restricted, the person could**

19  **overcome the restriction and may be able to breathe,**

20  **right?**

21      A.  Well, sure.

22      **Q.  And in this case, do you have enough**

23  **information for you to know whether or not**

24  **Mr. Mitchell was able to or was not able to overcome**

25  **to breathe?**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 43

1       A.  Well, if he was unable to, he would have
2   been dead at the scene.  In other words --
3       **Q.  Can you state that again?**
4       A.  He would have been dead right there at the
5   scene, had he not been able to overcome it.
6       **Q.  He --**
7       A.  However --
8       **Q.  Hold --**
9              MR. HARPER:  Let him -- please let him
10  finish his answer, if that's possible.
11      A.  However -- however, it is a matter -- we
12  have to remember, it is always a matter of degree.
13  In other words, you can be injured, creating a
14  process that ultimately ends up with death, without
15  dying immediately at the time of the injury.
16  BY MS. SLEEPER:
17      **Q.  But your opinion is that Mr. Mitchell was**
18  **able to breathe in that position?**
19             MR. HARPER:  Objection; misstates prior
20  testimony.  You asked a hypothetical, not in this
21  case.
22  BY MS. SLEEPER:
23      **Q.  I'm asking in this case, Mr. --**
24  **Dr. Anderson.**
25      A.  Well, the question was not was he able to

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                December 09, 2022

Page 44

1  breathe or not breathe.  The question is, was there

2  any -- was there any compromise that basically added

3  to this cascade that we're talking about.

4                  And, again, picking one point out, he

5  obviously did not go into respiratory arrest and die

6  at the scene when he was handcuffed, otherwise he

7  would have been dead right there.  But that does not

8  mean that there was nothing going on at the time, and

9  that this was not a part of an additive group of

10 circumstances that progressively increased the injury

11 -- or the compromise that he was having.

12                 In other words, that can start pulmonary

13 edema developing, but you don't necessarily have to

14 die at that point.  You can die days later, hours

15 later, so forth, even though that was part of the

16 event that basically was part of this cascade.

17      **Q.  I am really interested in that term,**

18 **"pulmonary edema."  Did you find any evidence in the**

19 **autopsy report to indicate that he suffered pulmonary**

20 **edema?**

21      A.  Oh, he's got significant pulmonary edema.

22 The autopsy -- the slides showed that.

23      **Q.  Where -- can you tell me, where in the slide**

24 **shows that and how does it show that?**

25      A.  Well, I can give you a course in pathology



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 45

1   101, basically what happens is the fluid builds up in

2   lungs --

3                  (Indiscernible background discussion.)

4                  MR. HARPER:  We're hearing some

5   background noise.  I'm not sure if -- is that Harvey?

6   Harvey, can you hear us?

7                  MS. SLEEPER:  Can we go off the record

8   for a second.

9                  THE WITNESS:  You shouldn't be on

10  Safari.

11                 THE VIDEOGRAPHER:  Going off the record.

12  The time now is 10:48.

13                 (Whereupon the proceedings went off the

14                  record.)

15                 THE VIDEOGRAPHER:  We're back on the

16  record.  The time now is 10:49.

17  BY MS. SLEEPER:

18      Q.  Dr. Anderson, pulmonary edema, you were

19  saying that it needs to have fluid built up in the

20  lungs, correct?

21      A.  Fluid built up in the lungs, that's what

22  pulmonary edema is.  Due to increasing dysfunction on

23  the cardio -- usually cardiorespiratory function.

24      Q.  It's interesting, though, how the autopsy

25  report does not mention that.

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 46

1      A.  Well, he mentions congestion, but if you

2  look at the slides -- that's why I like to get the

3  slides.  The -- congestion is also present, otherwise

4  unremarkable.  The slides show a significant amount

5  of edema in the lungs, lots of pneumocytes, which is

6  an early stage of what we call alveolar injury, and

7  that's due to hypoxia or acidosis and so forth.

8      **Q.  So, Dr. Anderson, the last part you said was**

9  **not on the autopsy.  The part that's on the autopsy**

10 **actually is, congestion is also present, otherwise**

11 **unremarkable.  The autopsy itself does not mention at**

12 **all anything about fluids or pulmonary edema; is that**

13 **correct?**

14     A.  In his microscopic, he does not mention

15 that.  But it clearly is in the -- the lungs, first

16 of all, he describes it as smooth, purple-red,

17 congested without consolidation or masses.  The lungs

18 are heavy, they're 400 grams and 300, and they should

19 be somewhat less than that.  But there is pulmonary

20 edema.  There is protein -- edema fluid within the

21 alveolar spaces, and that is pulmonary edema.

22     **Q.  Right.  You have past testified that right**

23 **lung normally weighs about 350 to 400; left lung**

24 **weighs about 300 for a normal person, correct?**

25     A.  Right.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 47

1     Q.  And here, the right lung weighed 400 gram,

2  and left lung weighed 300 gram, correct?

3     A.  Right.

4     Q.  So what --

5     A.  But he describes that as congested.  So that

6  may have been -- what congestion is, is basically you

7  see fluid or heaviness of the lungs.

8     Q.  So if I --

9     A.  But it was not -- it was not very

10 significant.  I mean, he didn't -- he died more of

11 acidosis than he did of pulmonary edema.

12    Q.  Correct.  So you cannot tell me, from just

13 that amount of liquid, that it was for sure pulmonary

14 edema, correct?

15    A.  No.  The histology shows that that protein

16 fluid, pink staining fluid, is present in the

17 alveolar spaces if you look at it under the

18 microscope.  That is pulmonary edema.

19    Q.  So, let's say someone who has congested --

20 congestion because of their cold or flu, whatever it

21 is --

22    A.  It's a different congestion.  We're not

23 talking about airway.  That's totally different.

24 Congestion means that there's -- basically, there's

25 increased fluid, blood, in the lungs when you make --


Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 48

1   when you take your sections grossly and look at the

2   lungs.

3        Q.   And --

4        A.   It does not mean -- it does not mean he's

5   got upper airway cold or anything like that.

6        Q.   Not even for pneumonia?

7        A.   Pneumonia is different.

8        Q.   Right.

9        A.   You wouldn't get congestion for pneumonia.

10        Q.   So, someone with pneumonia, would they have

11   fluid in their lungs?

12        A.   Well, sure.  Sure.  And they also have white

13   blood cells and --

14        Q.   So --

15        A.   -- and other inflammatory cells going on,

16   too.

17        Q.   Right.  So, based on what you saw as for his

18   lungs and the insignificant amount of liquid that was

19   present in Mr. Mitchell's lung, was someone with

20   pneumonia would have the same amount of liquid in

21   there?

22        A.   Any time there's a lung injury -- when you

23   have pneumonia, there's inflammation in the lungs.

24   So, consequently, you're going to get damage to

25   capillaries, you're going to get fluid, as well as



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 49

1  white blood cells in the lungs.

2       Q.  I guess, let me --

3       A.  So, yeah --

4       Q.  Okay.  Go ahead.  Go ahead.

5       A.  So, yeah, you would have some fluid, but the

6  lungs will show specific changes microscopically of

7  pneumonia.  We don't have that.  What we have is we

8  have developing pulmonary edema in this individual.

9       Q.  Right.  But the amount of liquid that was

10 there was insignificant, correct?

11      A.  Well, it's not the amount, it's where it is.

12 It's in the air space.  And it is not severe

13 pulmonary edema.  But what it's doing, it's showing

14 another symptom of what was going on.  He did not die

15 because there was -- pulmonary -- the amount of edema

16 he had would not have killed him.  But what -- the

17 fact that he's got pulmonary edema is an indication,

18 again, of this cascading of events which is taking

19 place over the period of time.

20      Q.  Let's talk about your assessment of cause of

21 death.  In your report, you say the cause of death

22 was from head trauma, trauma from police restraint,

23 and lack of -- lack of medical care, correct?

24      A.  That, essentially, was why he died, because

25 he had the trauma, there was some compromise, and



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 50

1  this created a series of events.  There was not --

2  and which there should have been, in my opinion --

3  there was not medical intervention, and that related

4  to, you know, his death.

5      **Q.  So I summarized into three topics.  Does**

6  **that sound about right?  The head trauma, and trauma**

7  **from police restraint, and lack of medical care?  Is**

8  **that -- does that summarize your cause of death?**

9  **Anything else?**

10     A.  No.  I believe you mischaracterized that.  I

11  will pull the report up here.

12     **Q.  Okay.**

13     A.  That's a mischaracterization of what I said

14  in the report.

15     **Q.  Okay.  Tell me what your report says.**

16     A.  You said --

17     **Q.  What did you call the --**

18     A.  All right.  Should be considered to be

19  complications of blunt force trauma and the effects

20  of positional respiratory compromise by law

21  enforcement intervention.  I did not say anything

22  about trauma during the [technical disruption].

23     **Q.  Okay.  Thank you.  Thank you for**

24  **clarification.**

25              **So the three things are the blunt force**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 51

1  trauma and positional compromise and the lack of

2  medical care?

3       A.  The effects of positional respiratory

4  compromise.

5       Q.  Okay.

6       A.  That does not mean -- that was what I've

7  been trying to tell you, that we're looking at a

8  cascade of events.

9       Q.  Okay.

10      A.  So you can't just pick out positional

11 compromise, because that's part of it, but that was

12 not the totality.  It was, again, the fact that this

13 was allowed to go on, for whatever reason --

14      Q.  All right.

15      A.  -- was allowed to go on and not modified,

16 and medical treatment was not instituted, for

17 whatever reason, and that was basically what the

18 cause of -- his cause of death.

19      Q.  Okay.  Let me try the third time and see if

20 I can get it right, okay?

21           So it's the head trauma and then effects

22 of respiratory compromise and the lack of medical

23 care, correct?

24      A.  Absence of adequate medical intervention,

25 yes.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 52

1      Q.  Okay, perfect.  So let's talk each in turn.

2          Do you know how Mr. Mitchell got head

3  injury?

4      A.  I believe, from the looks of it, he was

5  struck multiple times.  Whether or not there was a

6  fall, head trauma impacting something, we don't know.

7  But he had multiple injuries that indicate that there

8  was an assault, some blows inflicted.

9      Q.  Right.  And that's from the external wounds,

10 right?

11     A.  Well, yeah.

12     Q.  And --

13     A.  But also -- the trauma has also caused --

14 would have been a part and parcel of what ultimately

15 went on in the situation when he's under stress,

16 traumatized.  We don't know what's going on

17 physiologically with him, but he's in a high-stress

18 situation, and that's going to add -- be additive to

19 the -- that's going to be the factor that caused the

20 sequence of events to develop.

21     Q.  Okay.  So did you see any brain swelling?

22     A.  There did not appear to be any, but it was

23 fairly soon.  Hypoxia in the brain is not evident

24 unless the individual survives about four to six

25 hours anyway.  So we could not be sure that there was



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 53

1  hypoxia.  We know there was acidosis for sure because

2  that's measured in the laboratory finding, as I

3  indicated in the report.

4       **Q.  Right.**

5       A.  So acidosis in itself changes PH, can cause

6  cardiac arrhythmias without -- even in the absence of

7  decreased oxygenation.

8       **Q.  So, again, I'm going to ask the question.**

9  **You did not see any brain swelling?**

10      A.  That's correct.

11      **Q.  And you did not have any evidence, like hard**

12 **evidence, that there was hypoxic neuro -- hypoxia in**

13 **his brain?**

14      A.  No.

15      **Q.  Okay.  And let's specifically talk more**

16 **about the mechanism of Mr. Mitchell's death, okay?**

17              **What was the mechanism of Mr. Mitchell's**

18 **death?**

19      A.  I believe he was placed, by the traumatic

20 event of being multiple blows and so forth, he was in

21 a physiologic stress situation.  He developed some

22 respiratory compromise, probably both due to the

23 effects of the restraint, as well as normal

24 physiologic changes that may occur when an individual

25 is under stress.  So that develops pulmonary edema,



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 54

1  he develops acidosis as measured by the ketones, and

2  the change in PH over a period of time led to

3  respiratory and cardiac compromise, and he ultimately

4  had an arrhythmia.

5      Q.  So you're saying it was a metabolic death?

6      A.  I believe, yeah.  I mean, we know we have a

7  ketoacidosis situation because -- I don't know why

8  they measured this, but fortunately they did, they

9  measured the hydroxybutyrate.

10     Q.  So, if you saw there was pulmonary edema in

11  the microscopic slides, why did you not mention it in

12  your report?

13     A.  [Indiscernible response.]

14     Q.  What did you say?

15     A.  I said, I'm looking through my report.  I

16  don't know -- well, I mentioned respiratory

17  compromise in several parts of the report.  I don't

18  know that I mentioned histologic findings of

19  pulmonary edema.

20     Q.  Right.  In past reports that you've done in

21  other cases when there were pulmonary edema, you

22  specifically mentioned them.  How come you didn't

23  mention it here?  You're shaking your head.  Is it,

24  like, I don't know?

25     A.  No, I'm just looking through here.  I don't



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 55

1   know why I didn't specifically mention it.

2       Q.  I mean, could it --

3       A.  But I mentioned the respiratory -- well, I

4   don't think pulmonary edema caused the death.  I

5   think pulmonary edema was there as part of the --

6   what ultimately ended up in his having cardiac

7   arrhythmia.

8       Q.  Right.

9       A.  But the pulmonary edema is more of a symptom

10  than it -- he didn't die of pulmonary edema.

11      Q.  So it's not part of cause of death, correct?

12      A.  Well, it's part of --

13          MR. HARPER:  Misstates testimony.  Go

14  ahead, Dr. Anderson.

15      A.  It is a part of the total picture.  You

16  can't pick out one thing.  You have different things

17  going on in different organ systems.  So you can't

18  just pick out one thing.

19          It is a -- it shows that he was having

20  cardiorespiratory compromise is what it shows, the

21  fact that he has edema.

22  BY MS. SLEEPER:

23      Q.  But it was not significant enough for you to

24  put it in your report, correct?

25      A.  No.  It was part and parcel of the -- it's

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 56

1  part and parcel of the respiratory failure that we

2  see in this case.

3      Q.  So did you review the heart pathology

4  slides?

5      A.  Yes.

6      Q.  Did you see any plaque erosion?

7      A.  Well, you're reading it -- yeah, you're

8  reading from the -- what part are you talking about?

9  The muscle or the coronary arteries?

10     Q.  Any of them.  I'm asking, have you seen

11 plaque erosion?

12     A.  Well, no -- well, you don't have plaque in

13 the muscle of the heart.  So what part are you

14 talking about?

15     Q.  I'm asking, from the slides that you were

16 provided, did you see any plaque erosion of the

17 heart?  It's a simple question.

18     A.  No, it isn't, because you don't -- you don't

19 realize what you're saying.  We have different parts

20 of the heart.  We have coronary -- in the slides, we

21 have coronary artery, we have conduction system, we

22 have myocardium.  What part are we talking about?

23     Q.  Well, I mean, tell me, in any of the part

24 that you reviewed, did you see plaque erosion?

25     A.  Well, yeah, but to be specific, there was



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 57

1    nothing in the heart muscle.  The coronary arteries

2    showed significant changes would be consistent with

3    his prior diagnosis of Kawasaki disease.  He had

4    narrowing of the coronary arteries, he had plaque

5    formation --

6         Q.  So --

7         A.  -- in his coronary arteries.  But your

8    question was in the heart.  You have to be more

9    specific.

10                In the coronary arteries, yeah, he has

11   coronary arteries, but no acute changes.  Just -- in

12   other words, those changes were the same at autopsy.

13   He had those same changes, you know, six weeks

14   earlier.  There was nothing that was progressing

15   rapidly.

16        Q.  So you did not see any evidence of acute

17   thrombus --

18        A.  Correct.

19        Q.  -- in the slides you reviewed?

20        A.  Correct.

21        Q.  And you're confident with that?

22        A.  Yeah.

23        Q.  Any evidence of acute myocardiac infarction?

24        A.  No.

25        Q.  And if you saw evidence of any of that,

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 58

1   would that change your opinion as to mechanism of

2   death?

3        A.   Well, it would mean that his cardiac -- in

4   other words, other than having a simple arrhythmia

5   from the acidosis, that he had injury to the muscle,

6   which again would have -- an area that's injured in

7   the heart will cause basically electrical

8   excitability.  So that could have been the cause of

9   his arrhythmia, had he had that, but I didn't see any

10  of that.

11       Q.   So I'm hoping you can answer the question,

12  because I ask you a question, which is like yes-or-no

13  question, and I'm just getting around-the-town kind

14  of answers.  So let me -- let me give you --

15            MR. HARPER:  Let me -- let me object to

16  that.  You're harassing the witness, Ms. Sleeper.

17  He's able to answer the question the best way he sees

18  fit.  He doesn't have to answer the way that you want

19  him to.

20  BY MS. SLEEPER:

21       Q.   I'm going to re-ask the question, okay?  And

22  I want you to answer the question.

23            If you saw --

24            MR. HARPER:  I object to that.  You are

25  being -- you're harassing the witness, Ms. Sleeper.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 59

1  He's able to answer the question to the best of his

2  ability.  The commentary and the insults are not

3  necessary.

4  BY MS. SLEEPER:

5      **Q.  Dr. Anderson, if you saw evidence of acute**

6  **thrombus or acute myocardial infarction, would that**

7  **change your opinion as to mechanism of death?**

8      A.  No.  It's still a cardiac arrhythmia.  The

9  question would be what caused the cardiac arrhythmia.

10     **Q.  But I thought, before, you said the**

11 **mechanism of death was -- what was that you said --**

12 **it was metabolic death; isn't that what you said**

13 **before?**

14     A.  In my opinion, the arrhythmia was caused in

15 this case by the fact that he was in -- had evidence

16 of acidosis, systemic acidosis, and that was what

17 caused the arrhythmia, as opposed to an acute infarct

18 or an acute coronary blood flow situation, which also

19 could cause arrhythmias.  That's the problem with

20 your question.  They also cause arrhythmias.  The

21 question -- so, in the absence of those and the

22 presence of acidosis, we can assume that the most

23 likely cause is the acidosis.

24     **Q.  Okay.  So let me go back and re-ask the**

25 **question.**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 60

1              In your opinion, this was metabolic

2    death; metabolic changes that caused cardiac

3    arrhythmia, correct?

4        A.  Yes, correct.

5        Q.  But if in, let's say, heart slides, there

6    were any evidence of acute thrombus or acute

7    myocardiac infarction, that would kind of change the

8    mechanism of how you get to cardiac arrhythmia,

9    correct?

10       A.  That's correct.  That's exactly what I said.

11       Q.  Okay.  What is an effect of increased heart

12   rate and increased blood pressure with an acute

13   agitation on a patient who has severe arthrosclerotic

14   disease?

15       A.  Well, frequently, we see that situation what

16   ends up with a cardiac death.

17       Q.  Right.  In that case, that leads to acute

18   thrombus, correct?

19       A.  No.  No.

20       Q.  No, it doesn't?  So someone with already bad

21   cardiac -- cardiovascular disease has acute agitation

22   that increases the heart rate and blood pressure;

23   that does not lead to acute thrombus?

24       A.  Most of the time not.  It can -- it can

25   cause what we call a plaque rupture of one of those



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 61

1   plaques, and that can cause a thrombus, if that

2   occurs.  But the majority of the cases, many, many

3   that I've autopsied, that's not necessary the case at

4   all if there is an acute.  And, frequently, an acute

5   plaque rupture will occur in the absence of any of

6   those situations.

7       **Q.  So plaque rupture, if that happens, it leads**

8   **to acute heart attack, correct?**

9       A.  It leads to coronary artery thrombus

10  formation, because when the plaque ruptures, then a

11  clot can form --

12      **Q.  And that could --**

13      A.  -- and that could lead -- well, it can lead,

14  not always, but it can lead to an acute myocardial

15  infarction.  Generally, those situations do not

16  result in an acute death, but rather those are the

17  people that go into the hospital and get treated for

18  their myocardial infarction.

19      **Q.  Right.  So, if someone is in that situation,**

20  **Doctor, and they were to go to the hospital, let's**

21  **say, as soon as possible, and no one refuses, you**

22  **know, transport to hospital and they get to the**

23  **hospital, what is the likelihood of survival?**

24      A.  That's really -- I'd have to defer to a

25  clinician to decide what that is.  I know we see many



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 62

1  cases where people have done that, we do autopsies of

2  them ten years later, and we know they've had a

3  myocardial infarction and so forth.  But as far as in

4  this particular instance, I would defer to the

5  clinician.

6       Q.  Okay.  So let's -- let's go back.

7            **Someone with very bad coronary disease**

8  **having acute thrombus that led to heart attack, the**

9  **survival rate of someone like that going to the**

10 **hospital, it would go up -- the survival rate would**

11 **go up, right?**

12      A.  Well, that's why they take them to the

13 hospital.  If it didn't, they wouldn't waste the

14 time.  They'd just leave them there and say, "You're

15 going to die."

16      **Q.  Right.**

17      A.  So that's why they take them.

18      **Q.  So the person would most likely not die if**

19 **they were given proper medical help at the time,**

20 **correct?**

21      A.  Well, it all depends on severity and

22 individual situations.  I don't think you can -- you

23 can generalize to that point.

24      **Q.  Okay.  What about someone who has a heart**

25 **attack and survives for another hour or so?  Think**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                   December 09, 2022

Page 63

1   about that.  Would that person be able to -- let's

2   say, instead of waiting for an hour, let's say, as

3   soon as they have the heart attack, let's say, within

4   30 minutes, they're taken to the hospital.  Would

5   they survive?

6        A.  Well, it all depends on circumstances.  You

7   can't possibly generalize a situation like that.  How

8   bad was the heart attack?  Was it acute?  Have they

9   had prior heart attacks?

10       Q.  Okay.

11       A.  Did it start an arrhythmia?  I mean, the

12  reason the -- the reason they have defibrillators and

13  so forth is so if somebody is developing an

14  arrhythmia, you can basically treat that arrhythmia.

15       **Q.  So the person has normal pulse rate, having**

16  **a heart attack, but still having somewhat normal**

17  **pulse rate, and they haven't had a heart attack**

18  **before, and they go -- they get the help within the**

19  **30 minutes.  Survival rate is pretty high, right?**

20       A.  Well, again, it depends on the severity.

21  Yeah.  I mean, if it's a massive infarct, you may not

22  survive.  If it is limited and you get medical care,

23  yeah, of course.  I mean, that's why they have

24  medical care --

25       **Q.  Right.**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 64

```
 1        A.   -- is because it improves survival.
 2        Q.   Right.  And if the person is talking
 3   normally and doesn't show any signs of pain, that
 4   also shows that their survival rate is greater,
 5   correct?
 6        A.   Not necessarily.  I mean --
 7        Q.   Okay.
 8        A.   -- in my course -- no.  Not necessarily.
 9        Q.   Okay.  Did you notice that Mr. Mitchell had
10   significant heart damage before -- even before this
11   incident?
12        A.   Well, he had coronary artery changes from
13   his Kawasakis.
14        Q.   Let me re-ask that question.
15             Did you notice that he has significant
16   heart damage, even before this incident?
17        A.   I just answered the question.  He --
18   apparently, if you look at the autopsy repot --
19        Q.   Was that a no?
20             MR. HARPER:  Ms. Sleeper, please allow
21   him to answer the question.  Go ahead, Dr. Anderson.
22        A.   Yeah.  You're defining -- you're saying,
23   "heart damage."  According to the autopsy report, the
24   myocardial part of the heart is not damaged.  He had
25   coronary artery changes that were old and were
```



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 65

```
 1  stable.
 2      Q.  So, to you, he was -- his heart was in great
 3  condition?
 4           MR. HARPER:  Objection; that misstates
 5  testimony.  He didn't say great condition.
 6  BY MS. SLEEPER:
 7      Q.  You can answer the question.
 8      A.  Well, you're mischaracterizing what I said.
 9  I never said his heart was in great condition.  I
10  said that they myocardium did not show evidence of
11  old damage.  The coronary arteries showed significant
12  old, but stable, changes consistent with Kawasakis
13  disease.
14      Q.  So, let me re-ask the question.
15           You have a friend who comes to you and
16  shows you the heart condition, and it looks just like
17  Mr. Mitchell's heart condition, okay, before the
18  incident.  He shows it to you.  What would you tell
19  him, it looks good or that you need to take care of
20  yourself?
21           MR. HARPER:  Object to the form; lack of
22  foundation.  You may answer, if you can.
23           MS. SLEEPER:  It's a hypothetical.
24      A.  Well, you mean they bring me a heart?
25  BY MS.  SLEEPER:
```


Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 66

1       Q.   No.   Let's say you were able to --

2       A.   A heart specimen?

3       Q.   Yeah.   Let's say they can, like -- they can

4   -- you had a chance to review his heart condition.

5   Would you say, "Hey, friend, you know, you need to

6   really take care of yourself.   Your heart is not in

7   great condition," or would you say, "Yeah.   There's

8   nothing to worry about"?

9            MR. HARPER:   Object to the form.   You

10  may answer.

11      A.   Well, again, we're talking about the

12  coronary blood supply to the heart, it compromises

13  this individual.   The actual muscle, heart muscle,

14  and conduction system, according to the autopsy

15  findings, do not show any old damage and are

16  unremarkable.

17  BY MS. SLEEPER:

18      Q.   Okay.   I'm going to then ask this question,

19  so that you can tell me whether a yes or no because

20  it's a whether -- the question is, did it or did it

21  not, okay?   So it's a yes-or-no question, okay?

22            Did he have significant heart damage

23  before this incident?

24      A.   Well, you can't answer the question because

25  you're not being specific enough.   He has coronary



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.

December 09, 2022

Page 67

1 artery changes that are consistent, but the heart,

2 there are many parts of the heart; there's the

3 valves, there's the left ventricle, the right

4 ventricle, the atrium, the coronary artery, the

5 microcirculation.  Which part of the heart are you

6 talking about?

7     **Q.  Okay.  Is there any part of the heart, or**

8 **parts of the heart, that has significant damage**

9 **before the incident?**

10     A.  Well, for about the sixth time now, he has

11 coronary artery changes, which we've been through at

12 some length already.

13     **Q.  So is that yes or --**

14     A.  The coronary --

15         MR. HARPER:  Ms. Sleeper, you have to

16 first allow him to answer the question.  He may not

17 give you the answer you want, but he's allowed to

18 answer the question.  Go ahead, Doctor.

19     A.  The question -- the answer is, yes, he has

20 coronary artery disease, as we have indicated

21 numerous times, and I think I indicated in my report.

22 BY MS. SLEEPER:

23     **Q.  So someone with coronary heart disease, like**

24 **Mr. Mitchell, okay -- it's a hypothetical.  Someone**

25 **with coronary heart disease like Mr. Mitchell, if**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 68

1   they were to go out on a snowy day and were to shovel

2   snow, raising his heart rate, could that cause the

3   person to have a heart attack?

4        A.  Well, what do you mean by "a heart attack"?

5   Again, it's too generic.  But it certainly can cause

6   a situation, and has, where individuals die suddenly

7   because of the -- the extreme circumstances and

8   physical activity they're under, and put too much

9   weight on -- too much load, if you will, on the

10  heart.  But, sure, it can.

11       Q.  And what was Mr. Mitchell's

12  beta-hydroxybutyrate level?

13       A.  Let me be sure.  It's .85, which is roughly

14  four times the normal limit.  Three times the normal

15  limit.

16       Q.  What level --

17       A.  Of the upper range.

18       Q.  What level of beta-hydroxybutyrate caused

19  metabolic significant acidosis?

20       A.  Well, any -- any elevated -- it doesn't

21  cause acidosis.  This reflects the fact that there is

22  acidosis going on.  So the fact that it's elevated

23  indicates that there is acidosis going on in the

24  body.

25       Q.  So what's the normal level?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 69

1    A.  The normal level, you see the reference

2  range, .2 to .27, and his is .85.  So he's roughly

3  three times the upper range of normal.

4    **Q.  So, any time someone's level is above .27,**

5  **they have significant acidosis?**

6    A.  No.  It's a marker that acidosis may be

7  present.

8    **Q.  May be present?**

9    A.  Well, sure.  That's why you put it in

10  context with everything else that's going on in the

11  case.

12    **Q.  Right.  That level alone, you can't say for**

13  **sure shows acidosis?**

14    A.  No.  In any forensic analysis, as we do as

15  forensic pathologists, we take all things into

16  consideration, and not any one factor may not be

17  definitive, but the combination of what we look at in

18  a progressive -- in this case, progressive

19  respiratory compromise, the acidosis, is what's going

20  on in all the other situations.

21    **Q.  But it seems like a circular argument**

22  **though, Doctor, because you said high level of**

23  **beta-hydroxybutyrate causes acidosis, and that is why**

24  **it shows respiratory problem, correct?**

25    A.  Let me get my report up here again.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 70

```
 1                    Okay.  And I'll read it to you, because
 2   you mischaracterized what I said.  "Serum analysis
 3   from serum sample taken from Mr. Mitchell indicates a
 4   significant increase in beta-hydroxybutyrate, one of
 5   the ketone molecules that is associated with
 6   ketoacidosis."  Does not cause ketoacidosis, it's a
 7   marker.  So, again, that's what I said in the report.
 8        Q.  So how do you know he was having respiratory
 9   problem?
10        A.  The pulmonary edema.
11        Q.  Okay.  But you also said pulmonary edema was
12   not significant enough to put it in your report,
13   right?
14        A.  Well, I include -- I mention respiratory
15   insufficiency a number of times, I just didn't
16   mention the histologic changes of pulmonary edema.
17        Q.  And have you had a case with this
18   insignificant amount of pulmonary edema in someone
19   who had respiratory issues?
20        A.  Sure.  All the time.
21        Q.  Which case?  Any case on top of your head
22   out of, like, 50 legal cases you had?
23                    MR. HARPER:  Object to the form.
24        A.  I'm not talking about legal --
25                    MR. HARPER:  Yes.  Go ahead,
```



Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 71

1   Dr. Anderson.

2       A.  I'm not talking about legal cases.  We're

3   talking about an autopsy.

4   BY MS. SLEEPER:

5       **Q.  What about any court cases --**

6       A.  We see pulmonary --

7           MR. HARPER:  Ms. Sleeper, please allow

8   the witness to finish his answer.  Go ahead,

9   Dr. Anderson.

10      A.  I would have to go back over it.  I mean,

11  most of the death cases we are involved in have some

12  degree of pulmonary edema due to the fact that the

13  death isn't instantaneously.  It doesn't occur

14  instantaneously.  But this is part of an autopsy.

15  This is not -- has nothing to do with legal.  We're

16  analyzing -- scientifically analyzing the autopsy

17  report and the histologic findings and the laboratory

18  findings.

19      **Q.  What level of beta-hydroxybutyrate can be**

20  **seen in a completely healthy person?**

21      A.  Well, if the normal range, if this is three

22  times the normal range, then I would say that this is

23  outside of what we would call to standard deviation

24  from the normal range.  So I think it would be

25  unusual to find somebody with this level of



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                  December 09, 2022

Page 72

1  hydroxybutyrate in a normal person.

2        Q.  Are you saying this is normal range based on

3  the lab report?

4        A.  That's their normal range, their reference

5  range.

6        Q.  Right.  Do you have any independent

7  knowledge of what is normal range?

8        A.  Well, the laboratory range is what -- their

9  normal range.  Each laboratory has different normal

10 ranges in different hospitals, so forth.  So what you

11 go by is what the laboratory range is for their

12 laboratory.

13       Q.  I understand that.  My question was, do you

14 have independent knowledge, aside from the lab

15 report, what is a normal range of

16 beta-hydroxybutyrate?

17       A.  Again, we get in -- well, the hospital's

18 reference range is going to be the normal range that

19 they have determined for their population, running

20 whatever specific tests they run.  So each -- each --

21 there may be different normal ranges, but this is

22 three times their normal range.

23       Q.  So you didn't study normal range or any --

24 any -- anything specific as it comes to levels of

25 beta-hydroxybutyrate?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 73

1      A.   I'm trying to explain to you, the normal

2    range is a relative thing.  Each laboratory

3    determines their normal ranges, and those are the --

4    that's why you put a reference range in there.  They

5    may be using a different methodology, in which case

6    their normal range would be different.  But what you

7    do, you compare the finding in their laboratory to

8    their normal range.  The normal range is not -- in

9    other words, laboratories differ --

10     **Q.   So --**

11     A.   -- in their normal ranges.  You determine --

12   when you're running a laboratory, you have new

13   instrument, you determine normal ranges for your

14   person.  They do multiple tests to determine that for

15   their laboratory for their population.

16     **Q.   So, Doctor, let me give you an example.  For**

17   **instance, in the legal world, okay, let's say there's**

18   **this legal term known as "bare metal defense," okay?**

19   **And, in each state, the law is different regarding**

20   **bare metal defense, right?  But if someone were to**

21   **ask me, "Hey, have you studied about bare metal**

22   **defense," even though I can't tell you exactly what's**

23   **going on in South Carolina or Florida, I can tell you**

24   **that, "Oh, yeah, I did.  I've studied bare metal**

25   **defense and I understand it and I've independently**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 74

```
 1  researched it and reviewed a case on it."  However,
 2  my colleague who'd never done that before would say,
 3  "No, I've never even heard of it, I've never done it.
 4  I mean, I've heard of it, but I've never really
 5  studied it.  All I know is it's different from state
 6  to state, and I review -- I can just review the cases
 7  each time when it comes up, but I haven't studied
 8  it."
 9            So my question to you, Doctor, is, when
10  it comes to beta-hydroxybutyrate, did you
11  independently research, review, studied about it?
12            MR. HARPER:  Objection to the question;
13  asked and answered several times, and it completely
14  is beyond the purview of a horrible analogy of law to
15  medicine, unintelligible to be answered within the
16  context of this case.
17  BY MS. SLEEPER:
18     Q.  So, I'm sorry, Doctor.  I'm trying to ask
19  you a question, did you know if -- you know, did it
20  happen or did it not happen, and I want you to just
21  answer the question.
22     A.  I'm totally -- I totally don't understand
23  your question.
24     Q.  Okay.
25     A.  All I can tell you is each laboratory
```


Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                     December 09, 2022

Page 75

1   determines their own normal ranges, and this

2   laboratory determined their normal range to be .02 to

3   .0 -- 0.27; .02 to .27.  His level is .85.  That is

4   three times above their upper limit of their normal

5   range.

6        **Q.  Doctor, this is a very simple question, and**

7   **I'm going to make it as simple as possible, okay?**

8   **I'll even give you options, all right?**

9             **My question is, did you independently**

10  **study or review anything that has to do with**

11  **beta-hydroxybutyrate -- not even review.  Let's say,**

12  **did you ever study levels of beta-hydroxybutyrate in**

13  **your career?**

14       A.  Well, I'm a clinical pathologist.  If you

15  read my resume, it's clinical pathology.  We run

16  laboratories.

17       **Q.  So is that a yes?**

18       A.  That's what clinical pathologists do.  Yes,

19  of course.

20       **Q.  Okay.**

21       A.  And that's why -- that's why I'm telling you

22  that the range is different from laboratory to

23  laboratory.  So what you have to do when you're

24  analyzing this is look at the individual laboratory's

25  range, which I did, and that's what we come up with,



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 76

1  his was three times the level of their normal --

2  upper limit of normal.

3      **Q.  So, now, you can tell me this, I guess,**

4  **since you studied it.  What is the level of**

5  **beta-hydroxybutyrate on someone with keto diet;**

6  **someone who is on a keto diet?**

7      A.  I would have to -- I would have to research

8  that.  That's -- all I -- all I'm looking at in this

9  case is the fact that this indicates -- and,

10  incidentally, in a keto diet, you are stressing --

11  metabolically stressing, and that's why you get the

12  elevation of the ketone.

13     **Q.  Would it surprise --**

14     A.  You are creating -- you are creating ketosis

15  by definition in a keto diet, so that's what you're

16  supposed to do.  But that's not the normal range.  I

17  don't think this individual was on a keto diet.

18          Mr. Mitchell was not on a keto diet, but

19  it shows that, exactly why my point, it shows that

20  there is a stress situation and ketosis is being

21  developed.  And that's what you do in a keto diet,

22  you develop ketosis by definition; that's what it

23  says, you want to get into ketosis, right?  Okay.

24  That's what -- of course it's going to go up, because

25  it does reflect you're in ketosis.  That's precisely



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 77

1  what I'm saying in this case, that it's elevated

2  because he was under metabolic stress and basically

3  going into ketosis.

4       **Q.  Dr. Anderson, how do you know that he was**

5  **not on keto diet?**

6       A.  Well, if he was, I wasn't -- I got no

7  indication that he was.  If you can tell me he was on

8  a keto diet -- was he on a keto diet?

9       **Q.  Well, you're not supposed to ask questions**

10 **to me.**

11      A.  Well, no --

12      **Q.  I -- I'm asking you questions.**

13      A.  -- you said, how did you know, and I said it

14 was never reported that that was an issue, and if it

15 is, I want to -- we're not here -- as a pathologist,

16 I'm not here to argue legally.  So if he was, I'd

17 appreciate you letting me know.  Was he on a keto

18 diet?

19      **Q.  I'm not going to answer your question, but**

20 **I'll ask you a question.**

21           **Would it be surprising to you to know**

22 **that someone who is completely healthy who is on keto**

23 **diet would have about the same level as**

24 **Mr. Mitchell's beta-hydroxybutyrate level?**

25           MR. HARPER:  I'm going to -- let me



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 78

1   object to the form.  It seems to misstate evidence in

2   this case.  You may answer.

3       A.  Well, exactly what we would expect.  If he's

4   on a keto diet, he's in ketosis, and that's exactly

5   what we'd expect.  That's precisely why I'm saying

6   that this reflects the fact that he is going into

7   ketosis from metabolic stress.

8       **Q.  What is keto diet, Dr. Anderson?  Is it high**

9   **fat?  High protein?**

10      A.  Oh, I don't know.  I -- listen --

11              MR. HARPER:  Let me object.  Doctor,

12  just one second.  I understand the question, but I'm

13  just going to object to the question.  It just --

14              MS. SLEEPER:  Basis?

15              MR. HARPER:  Object to form.  You may

16  continue.

17              MS. SLEEPER:  Basis of the form?  Is it

18  foundation?  Is it -- what is it?

19              MR. HARPER:  It is foundation.  It is --

20              MS. SLEEPER:  You're saying I can't ask

21  hypotheticals?

22              MR. HARPER:  It is misstating the

23  evidence in the case.  Yes, you can ask

24  hypotheticals, but I've made my objection.

25  BY MS. SLEEPER:



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 79

1        Q.  Dr. Anderson, your general understanding of

2   keto diet is high fat, high protein, correct?

3        A.  I don't know.  My -- my understanding is

4   simply that, from a pathology standpoint, the idea is

5   to create ketosis, and that's what we're talking

6   about in this case, whether or not he was developing

7   ketoacidosis.  And the beta-hydroxybutyrate shows

8   that he was in ketosis developing ketoacidosis.

9   That's all.

10       Q.  Okay.  Here, in your opinion, what could

11  have caused what you call increased

12  beta-hydroxybutyrate level?  What caused it?

13       A.  The fact that he was under stress, he was

14  becoming acidotic, he had had respiratory

15  interference, he was under stress, he had trauma, and

16  his metabolism was basically creating a situation of

17  acidosis.  And the one way we can measure that is by

18  the one study that was done.

19       Q.  What study?

20       A.  The -- what are we talking about?  The

21  beta-ketoacidosis levels, beta-hydroxybutyrate

22  levels.

23       Q.  You mean the lab report?

24       A.  Well, those are the only studies that were

25  done, right?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 80

1      Q.  Okay.  So --

2      A.  The laboratory.

3      Q.  So how did police restraint cause his

4  increase in beta-hydroxybutyrate level?

5      A.  Interfering with respiration.  Increased

6  respiration causes decreased oxygenation, decreased

7  oxygenation can result in acidosis developing over a

8  period of time, and ultimately with continued stress,

9  continued inability to modify the situation, giving

10 more oxygen and so forth, could create acidosis,

11 which can ultimately end up in a cardiac arrest.

12            And this individual, we measure and show

13 that he does have elevated beta-hydroxybutyrate, he

14 was in ketosis, ketoacidosis, and that that was the

15 most reasonable -- in the absence of any other thing,

16 was the most reasonable explanation for his sudden

17 death.

18      Q.  When you say lack of oxygen, are you talking

19 hypoxia?

20      A.  Yes.

21      Q.  So you are stating that hypoxia increases

22 beta-hydroxybutyrate level?

23      A.  No.  It creates -- hypoxia can cause an

24 individual to go into metabolic acidosis.

25 Respiratory failure, decrease of oxygen, metabolic



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 81

1  acidosis can develop.  And what we're measuring,

2  we're measuring -- in this case, we have

3  beta-hydroxybutyrate levels that show he was in

4  acidosis, ketoacidosis.

5       **Q.  You said --**

6       A.  We don't have PH or anything on this guy

7  because nobody clinically took those measurements.

8  That's why we can't -- that's why we don't have that

9  information.

10      **Q.  Doctor, you said lack of oxygen caused**

11  **hydroxybutyrate level to go up.  Did you not say**

12  **that?**

13      A.  I said -- well, I can't go through this

14  whole thing over and over.  I said that it causes

15  respiratory -- well, I know we'll go back and try to

16  see if, the third time I said it, I change anything,

17  and then bring that up as a problem, right?

18              Respiratory insufficiency can cause

19  hypoxia, which can lead to acidosis.  And when we

20  measure -- if we have something to measure acidosis,

21  in this case, we have one study that shows he was --

22  his hydroxybutyrate level was elevated, indicating

23  that he was -- had some type of metabolic derangement

24  in acidosis, and that can cause arrhythmia.

25      **Q.  So hypoxia caused acidosis?**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 82

1      A.  The fact that you're not getting enough
2  oxygen creates a situation where the body develops
3  acidosis.  If you're without oxygen long enough -- we
4  see some trauma cases where PH is down in the 7.1 or
5  7.0 levels because the individual has been hypoxic
6  for so long, and that's why the acidosis develops.
7      **Q.  But that's not this case, correct?**
8      A.  Well, we don't know.  I think it is.  I
9  think the level -- if they had -- in other words, if
10  they had -- if somebody had measured, presented to
11  the hospital at Grady and they were able to do a PO2
12  on him, then you might find his oxygen level was very
13  low.  But, unfortunately, he wasn't -- that's one of
14  the problems, he wasn't monitored so we know what was
15  going on.
16     **Q.  So how does that play into how he didn't die**
17  **at the scene, but about 30, 40 minutes later is when**
18  **he is unresponsive?**
19     A.  Well, because it's developing over a period
20  of time.  It's not enough initially -- you start the
21  ball rolling, if you will, initially, and it gets
22  worse and worse and worse and worse.
23          Now, ideal medical intervention is
24  before it gets to the fact that their dead, you
25  intervene, and then you can give oxygen, you can



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                December 09, 2022

Page 83

1   treat pulmonary edema, you can do all that.  That's
2   why you intervene medically in situations.
3              But it's not at all unusual for someone
4   to have a situation where they survive a number of
5   hours even and the situation simply gets worse and
6   worse and worse.
7        **Q.  Even though he was no longer in a position**
8   **where he was restrained and he is in his mother's**
9   **car, is he still going through hypoxia?**
10       A.  If he has -- if he has an initial infarct
11  that starts this [technical disruption] and it's not
12  modified medically, then it can continue on.  And,
13  yes, over a period of time it gets worse and worse
14  and worse, and often you can't tell this is going on
15  without actually doing studies, blood studies,
16  oxygenation levels and so forth.  If you don't do
17  that, then just by visually looking at somebody,
18  you're not going to be able to tell.
19       **Q.  How do you modify it medically?**
20             MR. HARPER:  He just --
21       A.  Well, I leave that up to the clinicians.
22  But you obviously give them oxygen, you treat any
23  arrhythmias that are occurring, you treat the
24  pulmonary edema.  But as far as medical management,
25  I'd leave that up to the clinician.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 84

1                    But they do manage it.  I mean, you
2    don't find people who are just leaving people on the
3    street and say, "Well, there's nothing we can do
4    about you."  I mean, they transport, they go to the
5    hospital.  The EMS whole system, EMS, is to give
6    early treatment.  So, obviously, you do want to treat
7    these people.

8         Q.  So, I want to talk to you about cause of
9    death being homicide here.  You've been a medical
10   examiner in Georgia, right?

11        A.  Oh, yeah.

12        Q.  And you can tell me about how to determine,
13   at least in Georgia, for cause of death when it comes
14   to homicide, natural, or undetermined?

15        A.  Most of the time.

16                   (Indiscernible crosstalk.)

17        Q.  Right.

18        A.  But, yeah, okay.

19        Q.  So, what happens if there's competing
20   manners of death?  Such as, let me give you an
21   example, significant underlying heart condition and
22   someone has a minor trauma that leads to death.  What
23   would that be?  Is that -- what would you consider
24   that death to be?  Natural?  Homicide?  Undetermined?

25        A.  Well, what's the trauma?  Is the trauma an



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 85

1  accident?  Is the trauma shot with a gun?  Is the

2  trauma being beaten?  What -- you have to be specific

3  as to what trauma we're talking about.

4       Q.  Okay.  So, let's say minor trauma, as

5  someone gets into a fight with another person.

6       A.  Yes.

7       Q.  That -- what is that?  Is that homicide?

8       A.  If they get in a fight with another person

9  and they die -- the individual dies?

10      Q.  Yeah.

11      A.  I would call that a homicide.  We've

12 prosecuted many people based -- definitely based on

13 that alone, that you take the victim as you find

14 them.  That would be a homicide.

15      Q.  You know that, in this case, the medical

16 examiner said it was undetermined?

17      A.  Well, that's what -- his opinion.  I don't

18 know why he didn't call this a homicide.

19      Q.  Okay.  So you don't agree with him?

20      A.  No.  This is a homicide.

21      Q.  Why?

22      A.  There's an individual -- because he's got

23 blunt force trauma that led to a series of events

24 that ended up in his death.

25      Q.  Do you know how he got his blunt force



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 86

1   trauma?

2       A.  He was beaten.  I don't think he did it -- I

3   don't think it was self-inflicted.  I think he was

4   beaten; blunt force trauma was inflicted by another

5   person.

6       **Q.  So, if you were to watch a police dash cam**

7   **video where Mr. Mitchell is banging his head**

8   **repeatedly onto the window and onto the restaurant**

9   **door, would that change your mind?**

10      A.  Well, if there was no other altercation?

11      **Q.  No.  There was an altercation too, yes.**

12      A.  Well, if there was an altercation too, then,

13  you know, he might have been doing that if he's --

14  he's obviously autistic, had some mental problems,

15  but that would not make a difference.  If there was

16  inflicted trauma by another person, that would be a

17  homicide.

18      **Q.  So --**

19      A.  Regardless of what this individual did.

20  I've had cases where someone was basically beaten,

21  and then had strange behavior because of the fact

22  that they had head trauma and that altered their

23  level of consciousness.

24      **Q.  So let me ask you this.  It's a**

25  **hypothetical, okay?  Let's say I get into a fight**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 87

1  with someone else and I have a terrible heart

2  condition, okay, but I start the fight.  I started

3  the whole thing.  I'm the one who is beating the

4  person up, okay?  And the other person, as they're

5  defending themselves, pushes me, and because of that

6  impact, I get a heart attack because I have a

7  terrible heart and I have a coronary disease, and I

8  die.  Is that homicide?

9       A.  From the medical examiner standpoint, it

10  would be a homicide.  Now, whether or not the State

11  would prosecute a case like that or whether it would

12  be self-defense, self-defense cases are still

13  homicides from the medical examiner's standpoint

14  because they're caused by another person.

15            So what the State decides to do legally,

16  that's up to the State, the prosecution, but that's

17  not the medical examiner's decision.  The medical

18  examiner's decision is this -- in a series of events

19  was caused by an interaction with another person, and

20  he had sufficient trauma that would be consistent

21  with that.  And if there was any other person

22  involved, then it would be a homicide.  Now, whether

23  the State would decide, "Well, no, it wasn't really,

24  you know, it was justified, it was defending

25  themselves," that's a legal issue.  That's not a



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 88

1  medical examiner issue.

2       Q.  Okay.  Let me get back to your report.  We

3  talked about this before.  There were three things

4  that you say as a cause of death.  One of them was a

5  head trauma, the other was the effects of respiratory

6  compromise, and lastly, you know, lack of medical

7  care, right?

8       A.  Intervention, yes.

9       Q.  Yes.  Lack of medical intervention, correct?

10      A.  Yes.

11      Q.  Okay.  And then, in your report, you

12  describe the head trauma and the -- the injury done

13  by the police restraint as a treatable medical

14  emergency.  Do you remember using that term?

15      A.  Let me see if I can find it.

16      Q.  Okay.

17      A.  Well, it was.  It was a treatable -- it was

18  a -- in other words, it's a medical emergency that

19  necessitated treatment.

20      Q.  So it was treatable, correct?

21      A.  Well, yeah.  Any time you have a medical

22  condition, they're treatable.  There's very few that

23  are not treatable.

24      Q.  So, if Mr. Mitchell was timely treated,

25  you're implying he would have not died, right?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 89

1    A.  Well, you can't be -- ever be sure.  But the

2   likelihood was that the pulmonary edema, the lack of

3   oxygenation, the acidosis, could have been treated,

4   because they treat them all the time.  Medical

5   treatment is available for all of the time.  But,

6   yeah, had he been treated, I didn't see any other

7   changes that would have resulted in his death,

8   regardless.  And irrespective of that, that doesn't

9   mean they wouldn't attempt treatment.

10    **Q.  So, according to your opinion, before the**

11   **lack of intervention and treatment, Mr. Mitchell may**

12   **have survived?**

13    A.  I believe so, sure.  I don't see any -- I

14   don't see any underlying condition that would have

15   said that this is so -- this is so severe that he

16   wouldn't have survived.

17    **Q.  Do you know, in this case, Grady EMS**

18   **responded to the scene?**

19    A.  Well, I know that several responded to the

20   scene, yes.

21    **Q.  Right.  And did you review the EMS report?**

22    A.  Yeah, I did.

23    **Q.  And did you notice that it says that they**

24   **suggested transport to the hospital but the mother**

25   **declined?**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 90

1                    MR. HARPER:  Objection -- one second.

2    Objection to the form.  It misstates the evidence in

3    this case.  You may answer.

4        A.  Well, initially -- yeah, I read the report

5    to get the factual information.  But whether --

6    whether or not this was handled properly, whatever,

7    is not in my area of expertise, and I'm not going to

8    give opinions on that.

9    BY MS. SLEEPER:

10       Q.  Okay.  What medical treaties or textbooks or

11   publications do you regularly consult?

12                   MR. HARPER:  Object to the form; vague.

13   He won't know what you mean --

14       A.  I don't know -- yeah, I don't know what you

15   mean by "regularly consult."  I mean, I look at the

16   literature, online courses, pathology, so forth.

17       Q.  What was the last literature you read?

18       A.  Probably several articles in one of the

19   pathology journals probably in the last week or so.

20       Q.  Which pathology journal?

21       A.  Oh, I don't remember.  I go through them and

22   take a look at some things, American Journal of

23   Pathology.

24       Q.  How often do they issue their journal?

25       A.  Monthly.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 91

1        Q.  And do you review them every month?

2        A.  Not necessarily.  I review specific

3   articles.  Is there any -- usually, it's with GI

4   pathology or forensic, anything related to forensic.

5        Q.  And what was the last treaties or medical

6   textbook you reviewed?

7        A.  Probably GI Pathology last week.

8        Q.  Okay.  Anything related to cardiology?

9        A.  Probably not in the last -- well, yeah.  I

10  reviewed -- I reviewed one of the cardiology

11  textbooks a couple days ago, actually, on another

12  case.

13       Q.  Do you have it in your office right now?

14       A.  No.

15       Q.  What was the name of the textbook?

16       A.  I don't remember which one I reviewed.  It

17  was, I think, out of Boston, Dr. Shones [spelled

18  phonetically] out of Boston.

19       Q.  Would you be able to share which book that

20  was with the counsel?

21       A.  I probably could go back and look, yeah.

22       Q.  Okay.  And what year was it published?

23       A.  I have no idea.  I'll have to look at the

24  book.

25       Q.  Have you reviewed anything recently on slide



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 92

1   reviews, pathology slide reviews?

2       A.  I review slides all the time.  I just signed

3   on two autopsies yesterday, so I reviewed the slides.

4       Q.  Have you done any literature review

5   regarding slide reviews?

6       A.  I don't know that there is any specifically

7   regarding slide reviews.

8       Q.  Okay.

9       A.  I mean, pathology -- it's part of pathology.

10  Like, do I review anything on Y-shaped incisions, you

11  know.  It's just part of autopsy pathology.

12      Q.  Doctor, how do you spell

13  beta-hydroxybutyrate?

14      A.  It's in the report.  You can look at the lab

15  report.

16      Q.  Right.  I see that you -- I see it in your

17  report.  Is that the correct spelling on your report?

18      A.  Oh, God.  Oh, let me look.  Let me look.

19  Let me look.  I believe so.

20      Q.  Okay.  Would it surprise you it's not a

21  correct spelling?

22      A.  Beta-hydroxybutyrate?

23      Q.  Uh-huh (affirmative).  It's all right.

24  Never mind.

25      A.  No, no, no.  I'm not sure what the question



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 93

1   is here.  Hydroxybutyrate.

**2        Q.  Right.  Okay.**

3        A.  Tell me what the wrong spelling is.

**4        Q.  So, on Page 3, you spelled it,**

**5   H-Y-D-R-O-X-Y-B-U-T-R-A-T-E.  The correct spelling**

**6   would be, H-Y-D-R-O-X-Y-B-U-T-Y-R-A-T-E.**

7        A.  Okay.  It's a typo.  Sorry.

8             MS. SLEEPER:  Okay.  That's all right.

9   Can we take a break?

10            MR. HARPER:  Yes.  How long,

11   Ms. Sleeper?

12            MS. SLEEPER:  Ten minutes.

13            THE VIDEOGRAPHER:  Sure.  Going off the

14   record.  The time now is 11:48.

15            (Whereupon the proceedings went off the

16              record and a brief break was taken.)

17            THE VIDEOGRAPHER:  Okay.  We're back on

18   the record.  The time now is 12:01.

19            MS. SLEEPER:  Dr. Anderson, we're back

20   from the break, and I do not have any more questions.

21   And I will let Mr. Tompkins ask his questions now.

22                    EXAMINATION

23   BY MR. TOMPKINS:

**24        Q.  Good afternoon, Dr. Anderson.**

25        A.  Hello.

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 94

1       Q.  My name is Jeff Tompkins, and I represent,

2   as you may have heard earlier, Grady Memorial

3   Hospital Corporation and its EMS personnel, Jeremy

4   Holland and James Baumgartner.

5           Ms. Sleeper has covered just about

6   everything I would have covered with you, but I do

7   have some questions for you, sir.  And I want to make

8   sure I understand some of your testimony and some of

9   what's in your expert report.

10          Let me ask this, first, though.  You

11  stand by the statements set forth in your expert

12  report?

13      A.  Yes.

14      Q.  When did you last review that report?

15      A.  I think I reviewed it yesterday briefly.

16      Q.  Did that review cause you to determine that

17  any changes were necessary to the report?

18      A.  No.  I would have -- I think I included the

19  fact that I looked at the heart slides after the

20  report was issued but, basically, I had reviewed the

21  report from CryoLife and I agree with that report.

22      Q.  Your report, do you have it handy, sir?

23      A.  Yes, I do.

24      Q.  And, if you would, turn to Page 2.  That's 2

25  of 4.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                     December 09, 2022

Page 95

1       A.  Okay.

2       Q.  And the second entry is at -- or timed 2207;

3   am I correct about that, or right about that?

4       A.  I believe so, yes.

5       Q.  And that 2207 is a part of a timeline of

6   events that you created, and that actually starts on

7   Page 1 of the report, true?

8       A.  Yes.

9       Q.  Okay.  Now, after the -- 2207, by the way,

10  is 10:07 p.m.; isn't that correct?

11      A.  That's correct.

12      Q.  Then the next entry is 2312, correct?

13      A.  Yes.

14      Q.  And does that represent 11:12 p.m.?

15      A.  That's correct.

16      Q.  You've got for the, what I'm going to call

17  10:07 p.m. or 2207 entry, the records -- records

18  indicate that the responders cleared the scene.  Did

19  I read that correctly?

20      A.  Yeah, that's what I got from the -- I put

21  this timeline together from, basically, that

22  information.

23      Q.  Okay.  And you, I guess, anticipated my next

24  question.

25              Tell me everything that you reviewed in

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 96

1   preparing this timeline that's set forth in your

2   expert report.

3        A.  Well, essentially -- really, the reason for

4   the timeline was really to really give a more or

5   less, rather than comment on what happened at the

6   scene or -- wanted to give a timeline of what his

7   medical history was.  So it wasn't meant to be

8   comprehensive as to what occurred at the scene or

9   what happened and so forth, but just the information

10  I got.  But I basically reviewed -- I believe I had

11  Fulton County PD and the fire department records

12  initially and the EMS report.

13       Q.  All right.  Now, you said "initially."  When

14  did you prepare the report?

15       A.  Well, that's basically what I have.  I

16  prepared the report October the 5th of this year.

17       Q.  All right.  Did you have anything other than

18  what you just told me when you prepared this report

19  dated October 5, 2022?

20       A.  No.  But, again, it was not meant to be

21  comprehensive, it was just to give a timeline and

22  such related to his medical events more than anything

23  else.

24       Q.  Okay.  Well, do you know what happened

25  between 10:07 p.m. and 11:12 p.m.?  That is, between



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 97

1   2207 and 2312 with respect to Mr. Mitchell?

2       A.  I'm sure.  I believe, at this point, his

3   mother took him home.

4       Q.  All right.  Do you --

5       A.  And then, it was subsequently they called,

6   2312, from the residence.  So he went back to his

7   residence.

8       Q.  Do you know --

9       A.  Part of my opinions does not really get into

10  the, you know, what should have happened or did

11  happen, but more or less the timeline was basically

12  to put in frame his medical -- the sequence of

13  medical events.

14      Q.  Okay.  Do you know what Mr. Mitchell's

15  condition was during that interval, that is from 2207

16  until the 911 call at 2312?

17      A.  No.  My understanding was that he was

18  emotionally upset, and just reading from the medical

19  examiner's report, emotionally upset and crying and

20  had other things going on.

21      Q.  And you may have just answered this, but I'm

22  going to ask you to make sure that I have everything.

23  The source of your understanding is what?

24      A.  I believe that fairly came from the medical

25  examiner investigator report.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 98

1       Q.  All right.  You already told us that you did

2   not consider or read any depositions?

3       A.  Correct.

4       Q.  All right.  And have you spoken with

5   Mrs. Shanita Swanson, the mother of Anthony Mitchell?

6       A.  No.

7       Q.  Have you spoken with Mr. Charles Swanson,

8   the stepfather of Mr. Anthony Mitchell?

9       A.  No.  The only person I had contact with was

10  Mr. Harper, the attorney.

11      Q.  So the source of your information would be

12  the documents you already detailed for us --

13      A.  Yes.

14      Q.  -- someone is cutting grass outside, I

15  apologize.

16          The documents you already detailed for

17  us and any conversations you might have had with

18  Plaintiff's counsel?

19      A.  Yes.

20      Q.  You talked about acidosis.  Define acidosis

21  for us, Doctor.

22      A.  Well, basically, a change in the body's PH.

23  So the PH is normally about 7.35 to 7.45, and it goes

24  to the alkaline.  The PH will go up.  If it goes to

25  acidotic, the PH goes down.  Either situation can be


Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                        December 09, 2022

Page 99

1    essentially -- potentially fatal if it basically goes

2    on long enough.

3         Q.   What are the signs of acidosis?

4         A.   Well, sometimes, there is no clinical signs.

5    It's a question of measuring oxygen levels --

6         Q.   Well --

7         A.   -- essentially.  Basically, it's a

8    laboratory diagnosis.  The acidosis --

9         Q.   Go ahead.

10        A.   Basically, it's a laboratory diagnosis.

11        Q.   Right.  Can people experiencing acidosis

12   have physical symptoms of that acidosis?

13        A.   Well, I'd have to leave that up to the

14   clinicians.  But, certainly, in many situations we

15   see where we review autopsy findings and somebody was

16   acidotic when they were -- basically laboratory tests

17   were done, there wasn't a whole lot of physical

18   finds.  Sometimes increased respiration, increased

19   heart rate, but not -- basically, just looking at

20   somebody physically, you're not going to be able to

21   accurately determine that.  It's basically a

22   laboratory diagnosis.

23        Q.   Yeah, but that's really not my question.  My

24   question is, can people experiencing acidosis exhibit

25   symptoms, physical symptoms, of that acidosis; yes or



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 100

1  no?

2      A.  Well, it would depend, I guess.  I'm not

3  sure what the clinical symptoms would be, but I'd

4  defer to the clinician on that.

5      **Q.  So, in other words, you don't know the**

6  **clinical symptoms of acidosis?**

7      A.  Well, I know there can be hyperventilation,

8  there can be decreased ventilation, there can be

9  cardiac -- tachycardia, increased blood pressure

10 possibly, but those can be -- a number of other

11 things can cause that.  So, specifically for

12 acidosis, I don't know if there was a specific

13 clinical finding you would say, "Okay, this person is

14 in acidosis."  But I'd defer to the clinician on

15 that.

16     **Q.  Now, I want to make sure we're talking about**

17 **the same thing.  Are we talking about metabolic**

18 **acidosis?**

19     A.  Well, any type of acidosis.  You get

20 respiratory or metabolic.  Essentially, the acidosis

21 itself, as I indicated, is the fact that the body's

22 PH has decreased, lowered.

23     **Q.  I'm trying not to interrupt your answers.**

24         **What type of acidosis did Mr. Mitchell**

25 **have, in your opinion?**

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

1        A.   I think it started out respiratory and made

2   it a component of metabolic as well.

3        **Q.   All right.**

4        A.   The respiratory probably was the, basically,

5   initiating part.

6        **Q.   All right.   And what's the difference**

7   **between respiratory acidosis and metabolic acidosis?**

8        A.   Well, respiratory, essentially -- I mean,

9   it's really a clinician question, but respiratory

10  basically is based upon the fact that there's

11  inadequate oxygenation of the body due to some

12  interference with either intake of oxygen or oxygen

13  uptake in the lungs.

14       **Q.   And someone -- oh, I'm sorry.   Go ahead.**

15       A.   And then, metabolic is basically due to the

16  fact that the body's increasing metabolism and

17  essentially using up too much oxygen, even though the

18  oxygen might be available.

19       **Q.   If someone is experiencing respiratory**

20  **acidosis, would you expect them to have trouble**

21  **breathing?**

22       A.   Not necessarily, because it wouldn't be

23  interfering with lung function, per se, unless it was

24  some sort of obstructive airway problem.   Now, they

25  may be -- at some point, they may by hyperventilating



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 102

1   trying to get more oxygen in, but you wouldn't

2   necessarily -- in the cases I've reviewed that -- of

3   course, when we do autopsies, particularly forensic

4   autopsies, and medical as well, we review the chart

5   and see what's happened to the individual beforehand.

6   I would say, in a lot of situations, there is really

7   very little clinical -- initial clinical symptomology

8   until actually, you know, the blood work and all is

9   done and the measurements of oxygenation and so

10  forth.  But just looking at the person, you might not

11  see anything.

12       **Q.  With respect to respiratory acidosis, you've**

13  **said that the person could be hyperventilating.**

14  **Define hyperventilation for us, please.**

15       A.  Breathing too fast.  The body wants to get

16  more oxygen in, so you increase your respiratory

17  rate.

18       **Q.  Any evidence that that happened with**

19  **Mr. Mitchell on the night hof November 16th, 2019?**

20       A.  Well, we don't have any -- I don't -- I

21  don't know one way or another.  I don't have any

22  indications or information that I've gotten one way

23  or another that it was measured.  I didn't see any --

24  in the EMS reports or the fire department reports, I

25  didn't see any measurements of respiratory rate or so



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 103

1  forth.

2       Q.  My question, sir, relates to

3  hyperventilating.  That was your term, correct?

4       A.  That would be respiratory rate, yes.

5       Q.  I understand that.

6       A.  Measuring the respiratory rate.

7       Q.  And is there, to your knowledge, any

8  evidence in this case that, at any time on the

9  evening of November 16th, 2019, from the time of the

10  initial 911 call to the Bojangles restaurant until

11  the time of the 911 call that you referenced in your

12  report occurring at 2312, any evidence to your

13  knowledge that Mr. Mitchell was at any point

14  hyperventilating?

15       A.  I have no information one way or another.

16       Q.  All right.  Let's talk for a minute about

17  metabolic acidosis, which we addressed a few seconds

18  ago.  Is nausea a sign of metabolic acidosis?

19       A.  Well, it can be.  Again, these are very --

20  all these symptoms are -- overlap; many, many things

21  that could be happening.  So, sure, you can get it.

22  Do you always get it?  No.  Do you never get it?

23  Sure, you do, sometimes.  And you also get nausea

24  from -- I've had, you know, situations where people

25  are just traumatized and end up with nausea and



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 104

1   vomiting just from the trauma alone.

2        Q.  Would you agree with me, or would you agree

3   with the statement, that people with metabolic

4   acidosis often have nausea?

5        A.  Well, I have no reason to doubt that, but

6   often doesn't mean all the time.  And, again, you

7   know, it's dangerous to generalize -- medically use a

8   generalization on an individual patient.  You always

9   want to know, you know -- you always want to know

10  what's going on with that individual patient, so that

11  would be important to know.  And I don't have any

12  information one way or another from the data I have

13  received what that situation was.

14       Q.  Would you agree with the statement that

15  people with metabolic acidosis often have or

16  experience vomiting?

17       A.  Well, nausea and vomiting go together, so

18  it's basically the same.  And, again, it's the same

19  answer.  Often does not correlate necessarily with an

20  individual patient.  So in an analysis of an

21  individual patient, it's nice to know what often

22  occurs, but it doesn't necessarily exclude other

23  possibilities.  And, again, you'd want to know, was

24  this there or not.

25       Q.  What was the last thing you said?  I



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 105

1  couldn't hear you.  Say it again.

2       A.  Were those -- any specific symptoms there or

3  were they not there.  And I don't see any indication

4  that -- evaluation one way or the other.

5       Q.  You said you don't see any indication of

6  what evaluation?  Maybe my volume is down.

7       A.  Any evaluation --

8       Q.  About nausea or vomiting?

9       A.  Any evaluation, one way or another.

10      Q.  How do you evaluate vomiting?

11      A.  Well, you'd ask the person, you'd watch and

12  see if they were vomiting, ask them if there were

13  nausea, measure their respiratory rate.

14      Q.  Have you seen any evidence in this case,

15  sir, that Mr. Mitchell was experience -- experiencing

16  nausea on the night in question?

17      A.  I just answered that.  I don't have any

18  evidence one way or another on that.

19      Q.  Well, I'm going to try it again, and I'm

20  going to ask it in a yes-no format.

21           Have you seen any evidence in this case,

22  Doctor, that Mr. Mitchell was experiencing nausea on

23  the night in question?  Either --

24      A.  No.

25      Q.  -- you have or you haven't.

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 106

1        A.  No.

2        Q.  **Have you seen or are you aware of any**

3   **evidence in this case, Doctor, that Mr. Mitchell was**

4   **vomiting on the night in question?**

5        A.  No.

6        Q.  **You did not read the deposition of the**

7   **paramedic Jeremy Holland, did you?**

8        A.  I did not read any depositions, I never do,

9   and that's related to the fact that, as I indicated

10  before, I basically want to give an unbiased

11  scientific evaluation of what the actual facts are.

12  So, I don't read depositions.  I read what was in the

13  various reports given at the time, but no

14  depositions.

15       Q.  **I know you've told me you've not read them.**

16  **Have you received any of the depositions taken in**

17  **this case?**

18       A.  No.  I usually -- sometimes, I do get some

19  attorneys, but I specifically request that they not

20  be sent, and I was not sent any in this case.

21       Q.  **All right.  You answered my next question.**

22  **Thank you.**

23            (Indiscernible background utterance.)

24            MR. HARPER:  I'm not sure who that is.

25            THE WITNESS:  I'm sorry?

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 107

1                    MR. TOMPKINS:  We heard a noise.  I

2  didn't know whether it was you trying to do

3  something.

4                    THE WITNESS:  No, I think I was just

5  clearing my throat.  Sorry.

6                    MR. TOMPKINS:  Oh, okay.  No problem.

7                    THE WITNESS:  I'm good.

8  BY MR. TOMPKINS:

9       **Q.  And because you've not read, and indeed**

10  **asked not to receive any of the depositions from the**

11  **people who were at the scene, you can't tell us, can**

12  **you, Doctor, what the Grady EMS personnel knew on the**

13  **night in question while at the scene at Bojangles?**

14      A.  No.  And as I indicated before, part of --

15  that is beyond the scope of what I'm -- my analysis

16  and what I'm going to testify to, as far as what

17  should have happened or didn't happen at the scene.

18  I basically -- you know, that's not part of my

19  opinion.

20      **Q.  Well, you do make certain assumptions in**

21  **your report though, don't you, about facts and**

22  **information gathered -- easy for me to say --**

23  **gathered at the scene?**

24      A.  Well, I do, but of what was reported, yes.

25  The fact that he was spitting up blood and so forth



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                      December 09, 2022

Page 108

1  and he was restrained.  But not as -- as far as your

2  question goes, I'm not going to evaluate, you know,

3  what should have been done or not done or why it

4  wasn't done at the scene.

5       **Q.  In other words, you're not going to offer**

6  **any standard of care opinions about what the various**

7  **personnel did, did not do, should have done, should**

8  **not have done?**

9       A.  Exactly.  All my report actually says is

10  this is a situation medically that would, in my

11  opinion, require some sort of medical intervention.

12      **Q.  Doctor, in your opinion, should everyone who**

13  **has been in a fight be transported to the hospital?**

14      A.  Well, in my experience as a medical

15  examiner, considering the number of cases I've seen

16  where that did not occur and they ended up being

17  medical examiner cases because of un -- un --

18  initially unrecognized trauma, and I've probably had,

19  over my years, probably 30 or 40 situations like

20  that, of my 7,000 autopsies, I would say that, yeah,

21  if you have significant trauma, sometimes because the

22  person who is traumatized doesn't appreciate the fact

23  that they've had the injury, yes, I think they should

24  be transported.

25      **Q.  Now, you say -- I want to make sure you're**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 109

1   not qualifying your answer.  You say, if they had

2   significant trauma.  Did I hear that correctly?

3        A.  Well, any real trauma, because what can be

4   significant -- I've autopsied enough subdural

5   hematoma cases that resulted in death that, you know,

6   initially everybody thought everybody was fine and

7   didn't do anything and, you know, 24 hours -- 12, 24

8   hours later, the individual is dead from a subdural

9   hematoma.  So I would say any type of trauma should

10  be medically evaluated, yes.

11       Q.  That's not my question.  My question is,

12  should anyone, or indeed should everyone who has been

13  in a fight, be transported to the hospital?

14       A.  I think, yes.  I think they should be

15  evaluated.  Based on my experience as a medical

16  examiner, and also clinicians often don't see these

17  people, but we see people who indicated were injured,

18  say, no, everything's fine, and found dead, 12, 24

19  hours later from a subdural hematoma, aortic

20  perforation, or something like that.  In my

21  experience as a medical examiner, I would say, yes,

22  they should be.

23       Q.  So, then I take it you believe that

24  Mr. Mitchell's mother should have taken him to the

25  hospital, rather than taking him home?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 110

```
 1        A.  Well, again --

 2               MR. HARPER:  Object to form.  Object to

 3   form.

 4               MR. TOMPKINS:  Your objection is noted.

 5   BY MR. TOMPKINS:

 6        Q.  Go ahead, Doctor.

 7        A.  I am not evaluating what should or should

 8   not have happened in this particular case.  But in my

 9   opinion, this individual needed medical evaluation --

10   formal medical evaluation in a clinical setting that

11   would allow the trauma to be -- or whatever to be

12   discovered.

13        Q.  So, in your opinion, it would have been good

14   and wise for Mr. Mitchell's mother to have taken him

15   to the hospital?

16        A.  I just answered that question.

17               MR. HARPER:  Object to the form.  It

18   misstates testimony and asked and answered.

19               MR. TOMPKINS:  Yeah.  Okay.

20   BY MR. TOMPKINS:

21        Q.  Go ahead, Doctor.

22        A.  I just said I'm not opining as to what

23   should or should not have been done.  I'm saying --

24        Q.  That's not my question.  I understand that.

25   I'm fine with that.  I asked a different question.
```



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                      December 09, 2022

Page 111

 1      A.  I --
 2      **Q.  The first question -- uh-huh (affirmative).**
 3 **Go ahead.**
 4      A.  No, go ahead and answer your question -- ask
 5 your question again so I'm sure we've got the right
 6 question to answer.
 7      **Q.  Sure.**
 8      A.  Okay.
 9      **Q.  I understand when I asked whether his mother**
10 **should have taken him, that's -- I get your answer,**
11 **you're not commenting on what should or should not**
12 **have been done.  I understand.  But this question is**
13 **whether, in your opinion, it would have been a good**
14 **idea for his mother to have taken him to the**
15 **hospital.  Do you understand the distinction there?**
16             MR. HARPER:  I'm going to object --
17             MR. TOMPKINS:  Your objection is noted.
18 You have an objection to form, it's noted.
19             MR. HARPER:  Yes.
20 BY MR. TOMPKINS:
21      **Q.  Go ahead, Doctor.**
22      A.  I think it would have been a good idea or
23 necessary for someone to have gotten this guy to the
24 hospital, without being more specific.
25      **Q.  I'm sorry.  Say that last part again.**

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                      December 09, 2022

Page 112

1      A.   I'm not going to be more specific than that.

2  As I said in the report, he needed medical

3  evaluation.

4      **Q.   Was he evaluated at the scene?**

5      A.   According to what I can find, he was -- it

6  was indicated that he was not able to -- they were

7  not able to do proper medical evaluation.

8      **Q.   And tell me the source of that information,**

9  **of that understanding.**

10     A.   All I have are the Fulton County police and

11 the fire department records.

12     **Q.   Okay.   Now, let me ask the question again.**

13          **Was Anthony Mitchell evaluated at the**

14 **scene?   When I say "the scene," I mean the Bojangles**

15 **restaurant on Fulton Industrial Boulevard on November**

16 **16, 2019.**

17     A.   Well, he was evaluated in that they -- they

18 gave -- they gave indication that they basically were

19 unable to render any further treatment because of the

20 individual's behavior.

21     **Q.   When you say --**

22          (Indiscernible crosstalk.)

23     A.   -- an evaluation.

24     **Q.   When you say "he was evaluated," tell me**

25 **what you mean.**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 113

1       A.  Let me go back over here.

2             Okay.  They said -- the fire department

3  indicated that Engine 13 agreed that the patient

4  would not allow crew the opportunity to assess him,

5  and this is the reason we don't have an evaluation.

6  But as far as looking at him and so forth, yeah, I

7  mean they attempted to calm the patient down and so

8  forth, but I don't see any record of blood pressure,

9  oxygenation, or anything like that.

10      Q.  What are you reading from, sir?

11      A.  This is FD1.

12      Q.  Okay.  The fire department report?

13      A.  Yes.

14      Q.  Did the Grady personnel do any sort of

15  evaluation of Mr. Mitchell at the scene?

16      A.  I don't have [technical disruption] that

17  that occurred, no.

18      Q.  You broke up on mine.  I don't know whether

19  --

20      A.  The mother had agreed to take him home.

21      Q.  Say that again.

22      A.  Yeah, I don't have a record of that.  I

23  didn't see any record of evaluation, any blood

24  pressure.

25             It's telling me your internet is -- you

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Case 1:21-cv-00996-AT   Document 141-3   Filed 03/03/23   Page 115 of 193

Page 114

1   may be breaking up because of your internet.  Can you

2   hear me?

3          Q.  I can hear you, yes.  Can you hear me?

4          A.  Okay.  Yeah, yeah.  It showed that you were

5   breaking up.

6                  Okay.  I have no record of evaluation as

7   far as blood pressure, oxygenation, anything like

8   that.

9          Q.  And you said something about his mother

10  agreed to take him home?

11         A.  Apparently, according to the fire department

12  records.  That's why she took him home, she agreed to

13  take him home.

14         Q.  I want to make sure I understand what you

15  mean when you say she agreed to take him home.  Is

16  that different than she chose to take him home?

17         A.  I don't know.  That's a matter of semantics.

18  I think I'm -- what does it say here --

19         Q.  I mean, you said "agreed" so I'm just trying

20  to understand what you mean.

21         A.  Yeah.  Wait a minute.  All right.  The

22  patient's mother, says EMT, was on her way to the

23  location and they would release patient into her

24  custody and they could immediately return to service.

25  So I presume that it was on her volition that



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 115

1   she took him.

2        Q.  Okay.  So, I'm going to ask you a couple of

3   things about your report.  I want to go back to it.

4   And I want to direct your attention to the third

5   page.  Tell me when you're there.

6                  MR. HARPER:  Which page, Jeff.

7                  MR. TOMPKINS:  Page 3.

8                  MR. HARPER:  Okay.

9                  THE WITNESS:  Okay.

10  BY MR. TOMPKINS:

11       Q.  Are you there, Doctor?

12       A.  Yes.

13       Q.  All right.  I want to look at the fourth

14  paragraph that starts, "It appears from the reports

15  of FCPD and FD," do you see that?

16       A.  Yes.

17       Q.  All right.  That paragraph is essentially a

18  one-sentence paragraph, but you go on to say -- and,

19  by the way, were there any drafts of this report?

20       A.  Drafts?  As far as -- no.  I mean, I put the

21  report together in pieces, but it's basically the

22  finalized report.

23       Q.  And my question is, are there in existence

24  any drafts of the report that preceded this final

25  report?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 116

1        A.   No.   No.   I just add -- or modify the

2    original report, so there's only one report when it's

3    finalized.

4        Q.   No problem.

5                 In that paragraph, fourth paragraph on

6    Page 3 of 4, it appears from the reports of Fulton

7    County -- well, FCPD and FD, that Mr. Mitchell was

8    placed in handcuffs about the time he was -- excuse

9    me -- confronting the police officers, which is

10   reported to be approximately 2135.   Do you see that?

11       A.   Yes.

12                MR. TOMPKINS:   Did somebody say

13   something?

14                MR. HARPER:   I think there is some

15   background noise.   I'm not sure where it's coming

16   from.

17                MR. TOMPKINS:   Okay.

18                MR. HARPER:   I hear it as well.

19                MR. TOMPKINS:   No problem.   No problem

20   at all.

21   BY MR. TOMPKINS:

22       Q.   All right.   And my -- you got this

23   information from the -- I think you just answered,

24   but I want to make sure it's clear -- from the

25   reports of the fire department and/or the police



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 117

1   department with respect to --

2        A.   Right.   This was meant to be a summary

3   basically to address the -- my opinions as far as the

4   medical progression.

5        Q.   Okay.   No problem.   Let's jump down towards

6   the bottom, and we'll start with the paragraph

7   beginning, "Review of FCPD records," do you see that?

8        A.   Yes.

9        Q.   It says that they were -- the officers were

10  aware that Anthony Mitchell suffered from, and you

11  put in single quote, 'mental disability.'   What did

12  you mean by that?

13       A.   Well, he was autistic, but I believe that

14  was somewhere in that report.   Those were the terms

15  that were used.

16       Q.   Okay.   So when you say "mental disability,"

17  you're talking about his autism?

18       A.   Yes.

19       Q.   All right.   Thank you.

20            Next paragraph.   You talk about how

21  medical evaluation in situations involving possible

22  mental health issues can be complex and lengthy.

23  What mental health issue was Mr. Mitchell

24  experiencing, if any, that night?

25       A.   Well, he was autistic, for one thing, so --



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 118

```
 1  and he was -- he may very well have -- we don't know.
 2  He wasn't evaluated.  He may well have been, under
 3  the stress situation, he may have, you know, a panic
 4  situation, increased trauma, fright, aggression --
 5      Q.  But you don't know any of that, do you, sir?
 6  You're just guessing, right?
 7      A.  Well, that's why I'm saying that's why --
 8  what I'm saying is situations like this are complex
 9  and lengthy, and that's why you need to have
10  extensive evaluation to determine where you are.
11      Q.  Yeah, but I'm interested in, not situations
12  like this, but this situation.
13      A.  Well, we don't know, because he wasn't
14  evaluated.
15      Q.  Well, you seem --
16      A.  That's the point of -- that's the point of
17  -- we're talking about generalities.  This is a
18  situation where a mental health evaluation would be
19  very important, particularly in someone with autism.
20      Q.  Well, you go on to say that, "And in this
21  case," are you with me?  I want you to read along
22  with me.  Second line, that same paragraph, you say,
23  "And in this case, the contribution of the mental
24  status changes from the documented blunt force trauma
25  -- blunt force head trauma."  So, now, now you're
```



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 119

1   talking about Mr. Mitchell, right?

2        A.   In this case, the contribution of mental

3   status changes -- in other words, it's not mental

4   status changes -- the mental status changes from the

5   documented head trauma, changes from the -- in other

6   words, what was going on because of the head trauma,

7   add another layer of complexity, which we find in

8   this instance.  So, in other words, that means it was

9   more complex than what we mentioned in Paragraph 4

10  because there was an added-in -- added layer of, if

11  you will, of another layer of complexity in the fact

12  that he was now traumatized in addition to having an

13  underlying mental situation.

14       Q.   Here's what I want to know.  Tell me what

15  mental status changes Mr. Mitchell had that night.

16       A.   We don't know --

17       Q.   Well, you --

18       A.   -- because he was not evaluated.

19       Q.   Well, but you do say -- in your report, you

20  said he had them.

21       A.   That --

22       Q.   I'm going to read it again for you and I

23  want you -- no.  I'm going to read it, and I want you

24  to read along with me, okay?  We're going to start at

25  the beginning of the paragraph.  "Medical evaluation



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 120

1   in situations involving possible mental health issues

2   can be complex and often lengthy."  Did I read that

3   right so far?

4        A.  Yes.

5        Q.  "And in this case," did I read that right so

6   far?

7        A.  Yep.

8        Q.  "And in this case," you're talking about the

9   Anthony Mitchell case and the situation at Bojangles

10  on the night of November 16th, 2019, true?

11       A.  Right.

12       Q.  All right.  So, "And in this case, the

13  contribution of mental status changes from the

14  documented blunt force head trauma."  Did I read that

15  correctly?

16       A.  Yeah.  Right.

17       Q.  And another -- excuse me.  "Add another

18  layer of complexity to the situation we find in this

19  instance involving Mr. Mitchell."  Did I read that

20  correctly?

21       A.  Correct.  Because we know that there might

22  be mental status changes, and we know we have

23  documented trauma.  We can see the trauma in the

24  autopsy, the cuts to the lips and the damage to the

25  lips and face and so forth.  We know he had blunt



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 121

1  force trauma to the face.  Okay.  So that -- that was

2  the other layer of complexity.

3            In other words, he might have had mental

4  status changes as well, but even in that, whether

5  they're there or not, is added to the necessary

6  complexity of the evaluation, the fact that he now

7  had -- he had blunt force trauma.  That's why I put

8  "documented blunt force trauma. "

9       Q.  Are you finished?

10      A.  Yeah.  I'm reading it back to you.  That's

11  what it means.

12      Q.  Well, here's what I --

13      A.  What I'm saying, whether or not he had

14  mental status changes, but any contribution would be

15  even more complex, would require more complex

16  evaluation because he had some blunt force trauma.

17      Q.  So when you say, "And in this case, the

18  contribution of the mental status changes from the

19  documented blunt force head trauma," you really

20  didn't mean that he had mental status changes; is

21  that what you're telling us?

22      A.  No.  The contribution of the mental -- any

23  mental status changes from -- in addition to the

24  blunt force trauma would require more evaluation.

25  But, yeah, we're not saying that he had mental status



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 122

1  changes, but the evaluation -- the necessity for

2  evaluation is even more -- more significant because

3  he has the blunt force trauma.

4      **Q.  Now --**

5      A.  Also --

6      **Q.  Go ahead.**

7      A.  Which could also end up in alteration of

8  mental status.

9      **Q.  So that I'm clear, are you saying**

10 **Mr. Mitchell did or did not experience or have mental**

11 **status changes on the night of November 16, 2019, at**

12 **the Bojangles restaurant?**

13     A.  We don't know because he was not evaluated.

14     **Q.  How do you evaluate someone for a mental**

15 **status change?**

16     A.  Well, I'll leave that up to clinicians.

17 But, basically, you evaluate them -- I'll leave it up

18 to clinicians.  Mental status changes are something

19 that every clinician in emergency rooms evaluate all

20 the time.  Patient comes in with trauma, they look at

21 their level of consciousness, they're -- how they're

22 responding, whatever, and depending upon what else

23 needs to be done, other specialties can be involved.

24     **Q.  Define mental status changes as you use the**

25 **term in your report, or the phrase.**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 123

1       A.  Well, it could be a variety of things.  It

2  could be a dictionary full of things.

3       Q.  I --

4       A.  Decreased cognition, confusion,

5  hallucinations, somnolence, coma.

6       Q.  Is that --

7              (Indiscernible crosstalk.)

8       A.  But that's not an exhaustive list.  The

9  clinicians -- I'd leave that up to clinicians as to

10  how they're going to evaluate any specific situation.

11      **Q.  My question is a little different, Doctor.**

12  **I want to know what you meant when you said the**

13  **mental status changes; not what the books say, not**

14  **all the possibilities.  I want to know what you meant**

15  **with respect to Mr. Mitchell on November 16th, 2019,**

16  **while at the Bojangles restaurants.  What did William**

17  **R. Anderson, William Roberts Anderson, I believe it**

18  **is per my research, what did you mean?**

19      A.  I indicated that we don't know what his

20  mental status was because we couldn't -- it was not

21  evaluated.

22      **Q.  Was he alert?**

23      A.  Pardon me?

24      **Q.  Was Mr. --**

25      A.  I've lost my microphone, so you have to



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 124

1  speak up.

2      Q.  Yeah, you sound totally different.  Can you

3  hear me okay?

4      A.  Yeah.

5      Q.  All right.  Was Mr. Mitchell alert while at

6  the Bojangles restaurant?

7      A.  I'm sorry.  I didn't hear the first part of

8  your question.

9      Q.  Was Mr. Mitchell alert while at the

10  Bojangles restaurant that night?  And particularly

11  after the police, the fire department, and EMS

12  arrived, was he alert?

13      A.  He may have appeared alert but, again,

14  that's the necessity of doing an extensive formal

15  evaluation, to find out if just looking alert is

16  enough, or was he confused, did he know what he was

17  doing, that sort of thing.  And for how long was

18  he -- did he have a traumatic injury that was then

19  going to progress and change his mental status.  Just

20  because of the particular time -- as we've indicated

21  throughout this depo, we're looking at a continuum

22  that goes from one situation, worsening over a period

23  of time.

24      Q.  What sort of evaluation was needed?  Because

25  you told us earlier that you're not commenting on



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 125

1   that, so I'm a bit confused.

2        A.   A proper medical evaluation, whatever the

3   clinician would need to do to determine what his

4   mental status changes were and whether or not trauma

5   was a part of it.

6        Q.   So you would leave that to the clinician?

7        A.   Yes.

8        Q.   And you don't know what a clinician would or

9   would not have done in terms of evaluating

10  Mr. Mitchell that night, do you?

11       A.   No.  I believe a clinician would have

12  evaluated him, though.

13       Q.   But you don't know what that -- and I'm

14  going to use a preposition at the end, sorry.  You

15  don't know what that evaluation would have consisted

16  of, do you?

17       A.   No, because it would depend upon what the

18  individual clinician found at the time of the -- of

19  looking at the patient.

20       Q.   You said, in response to Ms. Sleeper, that

21  you would leave the medical management up to the

22  clinician, right?

23       A.   Yes.  Correct.

24       Q.   Let's go to the next paragraph, still on

25  Page 3.  Tell me when you're there.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 126

1    A.  Okay.  Yeah, I'm here.

2    **Q.  "The acute and potentially ongoing effects**

3 **of both the physical and psychological trauma**

4 **resulting from an autistic individual, subject" --**

5 **excuse me -- "to physical restraint and having his**

6 **head covered," blah, blah, blah.  What I want to know**

7 **about is what psychological trauma are you talking**

8 **about?**

9    A.  Well, again, we don't know.  We know

10 autistic patients can have other underlying problems,

11 trauma, panic, so forth.  But, again, I'd leave that

12 up to the clinicians.  But, again, we don't know --

13 all I'm saying in that paragraph is the effects of

14 possibly having that needed to be evaluated properly

15 in order to make sure he did or did not have those

16 situations.

17    **Q.  All right.  So you're not saying that**

18 **Mr. Mitchell experienced psychological trauma, are**

19 **you?**

20    A.  No.  It clearly says this is why we need

21 evaluation, to determine, and we can't determine one

22 way or another.

23    **Q.  Okay.  Let's go to the next page, please.**

24    A.  We're on Page 4 now?

25    **Q.  Yes, sir.**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                          December 09, 2022

Page 127

```
 1      A.  Okay.
 2      Q.  In the second full paragraph, "Timely
 3  evaluation and management is critical in situations
 4  of head trauma."  Do you see that?
 5      A.  Yes.
 6      Q.  What head trauma are you talking about with
 7  respect to --
 8      A.  Any --
 9      Q.  -- Mr. Mitchell?
10      A.  Any head trauma.  Any head trauma.
11      Q.  Let me finish the question.
12      A.  Okay.
13      Q.  What head trauma are you talking about with
14  respect to Mr. Mitchell, if any?
15      A.  Well, any -- generally speaking, any type of
16  head trauma -- we know, at least, we have blunt force
17  trauma to the facial area.  We don't know, for
18  instance, if he was knocked down and hit his head,
19  could be developing a subdural hematoma.  We don't
20  know any of that, and that's why I put evaluation is
21  critical in these types of situations.  That's based
22  on my experience of many, many autopsies where
23  evaluation did not occur and we ended up doing an
24  autopsy on those people.
25      Q.  Well, you seem to say in that paragraph
```

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 128

1   though -- well, let me just ask you what you mean by

2   this.  You go on to talk about the delay between the

3   onset of the trauma.  Are you talking about the head

4   trauma?

5        A.  Okay.

6        Q.  No, that's a question.  Are you talking

7   about head trauma there?  When you say the delay --

8   excuse me, "Documented delay between onset of the

9   trauma," what trauma are you talking about?

10       A.  Well, the trauma from the fight.

11       Q.  Okay.

12       A.  Blunt force trauma to the head.

13       Q.  And you believe that occurred at

14   approximately 2135?

15       A.  Well, as nearly as I can put it together.

16  That's not -- it's meant to be a relative timeframe

17  to the other, rather than necessarily accurate.

18       Q.  Well, accuracy is important in these cases,

19  isn't it, Doctor?

20       A.  This is what I got from the report, as

21  nearly as I can put together the time and indicate

22  that there was a delay.

23       Q.  Well, okay.  What I'm trying to understand,

24  and what's confusing me is this:  You say, "The

25  documented delay between the onset of the trauma at



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 129

1  approximately 2135," but on the previous page, you

2  say that he was handcuffed at 2135.  I'm trying to

3  reconcile the timeline you've created and understand

4  it.  Help me.

5      A.  2135 is when the officers arrived.  2158 is

6  when the fire department was dispatched by their

7  call.  So those are the two times I'm referring to.

8      Q.  So when you say, "Between the onset of

9  trauma," which was approximately 2135, did you -- is

10  that wrong or you just meant something else?  I mean

11  --

12     A.  Well, no.  I'm saying this is when the

13  police reported, they're responding to the scene and

14  they found him at the door.  So, obviously, the

15  actual trauma may have occurred earlier.  But,

16  apparently, he was still struggling at the time that

17  the officers got there.  So relative -- generally in

18  that time period.

19     Q.  Okay.

20     A.  The police encountered him at 2135 until was

21  notified at 2158 is, you know, an interval where

22  there could potentially be a problem.

23     Q.  Right.  And the interval -- I want to make

24  sure that I understand you.  You're talking about the

25  23 or so minutes between the 2135 and the 2158; am I



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 130

1  correct?

2      A.  Right.  That's the period of time that, even

3  though they had an injured patient there, the fire

4  department was not called.

5      Q.  All right.  And you say that that's

6  potentially life -- a potentially life-threatening

7  delay?

8      A.  Sure.  Because it delays, basically,

9  attending to the patient, evaluating the patient.

10     Q.  Was it too late to save Mr. Mitchell at that

11  point?

12     A.  No.  He didn't have any -- he didn't have

13  any life-threatening injuries, per se, and he had

14  consequences of the trauma, as we've been through at

15  some length, with the various things that happened to

16  him over that period of time.

17     Q.  Okay.  Let's look at the next paragraph.

18  Tell me when you're there.

19     A.  Yeah, I'm here.

20     Q.  And, again, you -- well, we might not have

21  asked you this.  Did anybody help you prepare this

22  report?

23     A.  No.

24     Q.  So this is all of your own work?

25     A.  Yes.  Correct.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 131

1        Q.   Based on your own evaluation?

2        A.   Yes.

3        Q.   And it sets forth your own opinions in this

4   case?

5        A.   Yes.

6        Q.   Read the next paragraph for me out loud.

7        A.   The lack of -- "Similarly, the lack of

8   medical intervention and the isolation at the scene

9   by either FD or any documented EMS personnel had

10  denied Mr. Mitchell access to potential medical

11  observation, interventions, and may have well altered

12  his course and ultimate outcome -- adverse outcome."

13       Q.   Now, I want you to read it again because you

14  started with a different word.  And I'm going to be

15  quiet, and I'm going to give you a hand signal to go

16  because I don't want to talk over you, all right?

17  Because you didn't start with the word similarly.

18  So, go.

19       A.   All right.  "Similarly, the lack of any

20  medical evaluation at the scene by either FD or any

21  documented EMS personnel that I had -- have denied

22  Mr. Mitchell access to potential medical

23  interventions that may well have altered his clinical

24  course and adverse outcome."

25       Q.   And that's your opinion in this case?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 132

1      A.  Yes.

2      Q.  Okay.  All right.  I want to -- I want to

3  ask you this.  You said, and I wrote this in

4  quotation marks when Ms. Sleeper was asking you about

5  the cause of death, "This is a homicide."  That's

6  your opinion?

7      A.  Are we talking about cause of death or

8  manner of death?

9      Q.  I'm sorry.  Manner of death.  Yeah, thank

10  you.

11      A.  Yes.

12      Q.  All right.  You went on to say that blunt

13  force trauma was inflicted by another person, and

14  that you disagree with the medical examiner's

15  determination that the manner of death was

16  undetermined.  Here's my question --

17      A.  Correct.  I disagree.  I think this should

18  be a homicide.

19      Q.  Who caused the homicide?

20      A.  Pardon me?

21      Q.  Who caused the homicide?

22      A.  Well, in my opinion, the chain of events was

23  started by the blunt force trauma during the

24  altercation.

25      Q.  And by that, you mean the blunt force trauma

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 133

1  caused by or experienced by Mr. Mitchell during the

2  fight with the Bojangles employees, correct?

3       A.  Yes.  Yes.

4            MR. HARPER:  Jeff, I don't know if you

5  allowed Dr. Anderson to finish his answer.  You

6  interjected before he finished.  He said it started

7  with.  He wasn't finished --

8            MR. TOMPKINS:  I heard everything he

9  said.

10            MR. HARPER:  No, no.  You need to allow

11  him to finish his answer, sir.  He did not finish his

12  answer.

13            MR. TOMPKINS:  How do you know?

14            MR. HARPER:  He said it started with,

15  and then you interjected.  There's a starting point

16  and there's an ending point.

17            MR. TOMPKINS:  The record will reveal

18  what everybody said, Mr. Harper, trust me.

19            MR. HARPER:  Dr. Anderson, you may

20  finish your answer, sir.  You said it started with --

21            THE WITNESS:  No, I finished.  He asked

22  me if I thought this was a homicide caused by the

23  individuals who basically started the altercation.  I

24  said yes.

25            MR. HARPER:  I just wanted to make sure

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 134

1  that you weren't saying more when you said it started

2  with.

3                THE WITNESS:  No, that's it.

4                MR. HARPER:  That's fine.

5                MR. TOMPKINS:  You might have wanted him

6  to have one, Michael, but he had finished the answer.

7  BY MR. TOMPKINS:

8      Q.  All right, Dr. Anderson.  Just a couple more

9  things for you and I'll let you go to Mr. Gray.

10               I'm not trying to be difficult, Doctor,

11  but, you know, I read your report and it seems to say

12  that you are saying that Mr. Mitchell experienced

13  certain things, but then you tell me that you don't

14  know, and so I'm just trying to make sure I

15  understand what you mean.  Only you know what you

16  mean, obviously.

17               In that next paragraph, after that one I

18  had you read, you say that Mr. -- well, "Anthony

19  Mitchell was subjected to a cascading series of

20  events."  You've talked about that, not going back

21  over that with you, but you referenced the blunt

22  force head trauma, and then you say, "Compounded by

23  the physical and psychological trauma," but you told

24  me that you don't know whether there was

25  psychological trauma, right?

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 135

 1                  MR. HARPER:  Let me just object; asked

 2   and answered, but go ahead.

 3                  MR. TOMPKINS:  Yeah, that's fine.

 4   BY MR. TOMPKINS:

 5        Q.  Go ahead, Doctor.

 6        A.  My opinion is there would have been in this

 7   individual, but it was not evaluated.  An autistic

 8   man who basically had had trauma, has had a hood

 9   placed over their head, certainly has the potential

10   for psychological trauma.  And that's what needed to

11   be evaluated as well.  That was the gist of why I put

12   that in, he still needed to be -- not being evaluated

13   is the critical point.

14        Q.  All right.  You go on to say, "Thereby," and

15   I'm still in that same paragraph.  I'm not reading,

16   obviously, all of the paragraph.  You talk about

17   psychological trauma and application of the

18   restraints, which you just mentioned, and sensory

19   deprivation in an autistic patient.  Then you say,

20   "Thereby creating a potentially treatable medical

21   emergency that went unrecognized."  Is that your

22   opinion?

23        A.  Yes, because it wasn't evaluated.

24        Q.  You would defer to a clinician regarding the

25   likelihood of Mr. Mitchell's survival, had he been



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 136

1   evaluated as you think he needed to be?

2       A.  Well, at that particular instance, I would

3   -- what I indicated was that there was no -- there

4   were no findings at the autopsy that would have

5   indicated Mr. Mitchell would have died, absent these

6   changes.

7       Q.  I'm going to ask it in a different way.

8   Would you defer to a clinician as to, or with respect

9   to, the likelihood of survival of Mr. Mitchell?

10      A.  No.  I wouldn't necessarily defer to a

11  clinician on that point because we have the autopsy

12  findings.  So I think the autopsy findings of no

13  other underlying problems would have been more --

14  would be a better benchmark, if you will, than any

15  clinical, because there was no clinical evaluation.

16      Q.  Right.  But you also told me, and you

17  comment actually, that you would leave the medical

18  management up to the clinician?

19      A.  Yes, that's correct.

20      Q.  You don't know what the clinician would or

21  would not have done?

22      A.  It would be dependent upon the patient,

23  correct.

24      Q.  Right.  And I want to make sure that you're

25  answering my question, so I'm going to ask it again.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 137

1    You don't know what a clinician would or would not

2    have done with respect to the presentation of

3    Mr. Mitchell on the night of November 16th, 2019, and

4    of course we're talking about before the 911 call to

5    the home; am I correct that you don't know what a

6    clinician would have done?

7        A.   No.   Again, it would have depended upon the

8    clinician and the patient.

9        Q.   Right.   Now, that's going to read like you

10   answered the opposite, because I said, am I correct

11   that you don't know what a clinician would have done?

12       A.   Yes.   We don't know.

13              MR. TOMPKINS:   That's all I have for you

14   for now.   Thank you.

15              MR. GRAY:   Do we want to keep going or

16   do we want to take a break?   It's up to you, Doc.

17              THE WITNESS:   We can take five minutes.

18              MR. GRAY:   Okay.   Let's take five

19   minutes.   Thank you.

20              THE VIDEOGRAPHER:   Going off the record.

21   The time now is 1:01.

22              (Whereupon the proceedings went off the

23               record and a brief break was taken.)

24              THE VIDEOGRAPHER:   We are back on the

25   record.   The time now is 1:06 p.m.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 138

```
 1                        EXAMINATION
 2    BY MR. GRAY:
 3         Q.  Dr. Anderson, my name is Harvey Gray and I
 4    represent the firefighters in this case, Luster,
 5    Whitehead, and Roberts.  I'll try not to be
 6    repetitive but, you know, we lawyers like to pin down
 7    everything we can when we have the chance, so bear
 8    with me.
 9              First of all, when you worked at -- I
10    think you said you were at Cobb and DeKalb County at
11    kind of the same period?
12         A.  Yeah.
13         Q.  Back in the 70s, I think?
14         A.  Correct.
15         Q.  Were you chief medical examiner at DeKalb or
16    Cobb or were you an assistant?
17         A.  No.  I was the coroner's pathologist in
18    DeKalb County, and I was the only pathologist in Cobb
19    County, and the position was titled -- the county
20    title was Chief Medical Examiner, but I was the only
21    medical examiner there.
22         Q.  And when you were there, was Dr. Gerald
23    Gowitt there yet?
24         A.  No.  I think -- Gowitt went to -- he may
25    have been at Gwinnett County at that time, but I
```



Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 139

1   don't remember.  But I was the only one in Cobb

2   County and DeKalb County.

3        Q.  Have you ever worked alongside or with

4   Dr. Gowitt?

5        A.  No.

6        Q.  Has he ever been an expert in any of the

7   cases in which you've been an expert?

8        A.  Oh, I don't know.  I don't keep track of

9   other experts in cases.

10       Q.  All right.  Okay.  You've provided Rule 26

11  reports, correct, in the past?

12       A.  What is this?  I'm sorry.  Which one?

13       Q.  You have prepared -- in any of your cases in

14  Federal Court, you have to prepare what's called a

15  Rule 26 report.  Are you aware of that?

16       A.  Yeah.  Is that the list of cases and so

17  forth?

18       Q.  Well, it's your opinions, and it's the

19  cases.  And I'll tell you that Rule 26 provides that

20  you have to provide a complete statement of all

21  opinions that you're going to offer and the basis for

22  those reasons.  Did you do that in your report that

23  was produced to us?

24       A.  No.  I don't quite understand what the --

25       Q.  Rule 26 requires a Rule 26 report from any



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 140

1   expert who is going to testify and provide opinions

2   at trial.  And the rule itself requires that the Rule

3   26 report provide -- I'll just read it to you -- "A

4   complete statement of all opinions the witness will

5   express and the basis and reasons for them."  Did you

6   do that in this case in your report?

7        A.  What, of all other opinions I've given in

8   other cases?

9        Q.  No.  This case, sir.  This case.  Your

10  report that your attorney provided to us, it's a Rule

11  26 report.  And for you to testify, that Rule 26

12  report has to comply with the Federal Rules.  One

13  requirement is that your report you provided in this

14  case provides a complete statement of all opinions --

15       A.  I gotcha.  I'm sorry.

16       Q.  -- you'll express -- don't talk over me and

17  I won't talk over you -- a complete statement of all

18  opinions the witness will express, and the basis and

19  reasons for them.  Did you do that in the report you

20  provided?

21       A.  Yes, yes.

22       Q.  And then, and you didn't do this, but the

23  rule requires that you certify that your report is a

24  "Complete and accurate statement of all of my

25  opinions and the basis and reasons for them to which



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

1  I will testify under oath."  Will you so certify that

2  right now?

3      A.  Yes.  With the caveat that, if other

4  information becomes available, as I put in the

5  report, I can modify the --

6      Q.  This is the only time I have to talk to you

7  and find out what you're going to testify about and

8  challenge those opinions until we get to a trial, if

9  indeed you're allowed to testify, which is still a

10 question.

11            Let me see if I can just cover some of

12 the things that have been talked about already.

13     A.  I'm having a little trouble hearing you --

14     Q.  Hearing me?

15     A.  -- now that I'm on speaker.  Sorry.

16     Q.  Okay.  Tell me -- if you don't hear

17 something clearly, go ahead and tell me and I'll try

18 and restate it so that you can hear it and we'll be

19 communicating, okay?

20     A.  Okay.

21     Q.  All right.  So the list of cases you're

22 supposed to provide in the past four years that

23 you've provided testimony in, either at trial or by

24 deposition, you said you've had several cases with

25 Mr. Harper, correct?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                     December 09, 2022

Page 142

```
 1        A.  Yes.

 2               MR. GRAY:  Okay.  And I'll address this

 3   to you and Mr. Harper.  I want the style of the case

 4   with the civil action number and the court that it

 5   was -- that was involved.  And, Michael, I'd also

 6   like to get his Rule 26 reports, if those were

 7   federal cases.  Is that okay with you?

 8               THE WITNESS:  Well, I don't have,

 9   necessarily, the style of the reports.

10               MR. HARPER:  I have them, Dr. Anderson.

11   Harvey, I'm not sure if the rule requires us to give

12   all of the reports in the cases that he's testified

13   on.  I know he has to list the cases that he

14   testified on.

15               MR. GRAY:  Well, I could send you a

16   document request for it.

17               MR. HARPER:  Okay.  Well, I mean --

18               MR. GRAY:  I'd rather not do that.

19               MR. HARPER:  Yeah.  We'll discuss that

20   later.  I'll certainly produce whatever the statute

21   and the rule requires.

22               MR. GRAY:  Well, I do -- I do want the

23   case styles so I can --

24               MR. HARPER:  Yep, we can agree on that

25   for sure.  Absolutely.
```

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 143

1                    MR. GRAY:  And if you have Rule 26

2    reports and you have some concern about producing

3    them, just give me a call and we'll talk about it

4    before we go down that road.

5                    MR. HARPER:  Will do.

6    BY MR. GRAY:

7         Q.  I tried to count these.  I'm not sure.  Have

8    you had 25 jobs from 1976 to 2018?

9         A.  Pardon me?

10        Q.  It looks like, on your resume, I looked at

11   this, maybe I'm counting wrong.  It looks like, since

12   you started in Los Angeles in 1976, you've had 25

13   different jobs as a pathologist.  Does that sound

14   correct to you?

15        A.  No, no.

16        Q.  It doesn't?  Well, all of your -- your

17   employment positions are listed an your CV, correct?

18        A.  Yeah.

19        Q.  All right.  And it is true that, some of

20   those positions, you were involuntarily terminated or

21   forced to resign, maybe for reasons that you don't

22   agree with, but there were some of those jobs where

23   that happened, right?

24        A.  No.  I was not forced to resign and I was

25   not terminated.  The only termination was actually in

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 144

1  the Georgia case.

2       **Q.   Okay.   And where was that?   That was when**

3  **you were asked to change your report that you would**

4  **not?**

5       A.   No, no.   The Georgia case was the state

6  crime laboratory was being run by pharmacology

7  physicians -- not physicians, but pharmacologists

8  were basically doing the autopsies in all but Fulton

9  and Cobb County.   And it was, again -- the medical

10  examiners throughout the country agreed that

11  pathologists, medical doctors, should be doing

12  autopsies and not non-medical doctors.

13       **Q.   Uh-huh (affirmative).**

14       A.   So there was some interaction, and I

15  testified in the legislature several times to get the

16  coroner system basically abolished in Georgia, and I

17  testified against Dr. Howard in a murder case.   And,

18  after that, Dr. Howard basically removed what was my

19  certificate of being a medical examiner.   It

20  actually -- I was not paid in that position, I would

21  simply bill when I did an autopsy.   I would bill the

22  local coroner.   So it was a non-paid position.

23            And so, when I testified against him, he

24  revoked the, quote, "certificate."   And I then

25  brought the matter to the medical examiner -- the



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 145

 1  National Association of Medical Examiners, and they

 2  -- board met and they ruled that I was perfectly in

 3  the right and the system should be abolished, and it

 4  ultimately was abolished.  We have a medical examiner

 5  system now in Georgia as well, with actual doctors

 6  doing autopsies.

 7      Q.  So you've never been terminated from any

 8  employment position at any time?

 9      A.  No.

10      Q.  Okay.  I want to go back to this last issue

11  that Mr. Tompkins went over with you because it's

12  still kind of hazy in my mind.  I think, when

13  Ms. Sleeper was examining you and she kind of asked

14  the question as to whether Mr. Mitchell's life could

15  have been saved, and I -- I wrote down that you said,

16  "I'm going to defer to clinicians on that issue and

17  I'm not going to offer an opinion on that."  Did you

18  say that?

19      A.  Well, I would say that -- I think the

20  question was how would the individual have been

21  treated in this particular situation, and I would

22  defer to the clinician.  As I indicated in the

23  report, I don't see anything in the autopsy that

24  would have caused him to die, absent this sequence of

25  events.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 146

1      Q.  Well --

2      A.  He would not have died at this point.

3      Q.  I think you said in there, there's no

4  demonstrable evidence that Mr. Mitchell would have

5  died, absent the above intervening factors.  There's,

6  likewise, no demonstrable evidence that Mr. Mitchell

7  would not have died absent these, right?

8      A.  Well, he could have been hit by lightening

9  or something?  Yeah, I suppose.

10     Q.  No.  He could have died because he has a

11 super compromised heart with 75 percent and 85

12 percent occlusion in his arteries, didn't he?

13     A.  Right.  But --

14     Q.  A person like that can drop dead watching

15 TV?

16     A.  Right.  They also can drop dead if they're

17 under stress and have the situation that he was

18 under.

19     Q.  Right.  And you're not offering any opinion

20 on that issue at trial; nothing like that is in your

21 report?

22          MR. HARPER:  Object to the form.

23     A.  What was -- what is in the report, yes.

24 BY MR. GRAY:

25     Q.  Well, what is in the report are

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 147

1   possibilities.  There's no offered opinion from you

2   with reasonable medical certainty that Mr. Mitchell

3   would have survived with medical intervention or that

4   he would not have survived, right?

5        A.  Well, not specifically, yes.

6        Q.  Okay.  Let me go back to -- when you have

7   papers all over your desk, it's difficult.

8             So your timeline was created based on

9   what Mr. Harper provided to you, correct?

10       A.  Well, the reports that I got, yeah.  That I

11  -- yes.

12       Q.  And it doesn't take medical expertise to

13  prepare a timeline, right?

14       A.  No.  Correct.  As I said, the timeline was

15  basically to put together a timeline from the

16  sequence of events of the night as I thought they

17  would occur -- had occurred.

18       Q.  But a jury, if given those same reports you

19  looked at, could come up with its own timeline

20  without being told about it by an expert; isn't that

21  true?

22       A.  I suppose.

23       Q.  Okay.  Well, you don't suppose, you know

24  that to be true, right?

25       A.  You have to speak up a bit.  I'm --



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 148

1        Q.   You don't have expert qualifications to

2   prepare a timeline, do you?

3        A.   Well, you don't need any, right.

4        Q.   Right.  And did you say that the only video

5   you reviewed was a six-second video provided to you

6   by Mr. Harper?

7        A.   Yes, because I was looking specifically --

8   as I said, I was looking specifically to the issue of

9   what position he had been in.

10        Q.   I get that.  And that six-second video was

11   when he was on the ground with the hood over his head

12   and handcuffed?

13        A.   Yes.

14        Q.   And do you know if that video was taken

15   before any of the firefighters or Grady EMS arrived

16   on the scene?

17        A.   Apparently.

18        Q.   Okay.  And so, do you know that there are

19   approximately 20 videos in this case?

20        A.   Yes.

21        Q.   And you don't see the need to review any of

22   them to reach the opinions you've reached in this

23   case, right?

24        A.   No.  I felt I was looking basically, rather

25   than -- rather than what was going on at the scene, I



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 149

1  wanted to know how it related to possibly what could

2  have aggravated his -- Mitchell's situation

3  specifically.

4      Q.  Do you agree with, other than the conclusion

5  that the manner of death was homicide, do you have

6  any other criticisms of the autopsy report?

7      A.  Well, I don't think it's a criticism, but,

8  no, I don't -- the autopsy seems to be complete.

9      Q.  And how about the CryoLife report?  Do you

10 have any criticisms of that report or dispute any of

11 the findings in there?

12     A.  No.  As I indicated, I agree with the

13 report.

14     Q.  Okay.  And under the subject of coronary

15 arteries, maximum percentage of occlusion, he was 75

16 percent occluded in his left circumflex artery; is

17 that right?

18     A.  Yes.

19     Q.  And he was 85 percent occluded in his right

20 coronary artery, correct?

21     A.  Yes.  Yes.

22     Q.  And that is a very significant level of

23 occlusion, right?

24     A.  Yes, it is.

25     Q.  And that standing alone could result in a --



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                    December 09, 2022

Page 150

1  either a stent being put in place, or a full-blown --

2  hold on.  My computer --

3      A.  Devascularization.

4      Q.  Yeah.  Hold on.  My computer went blank for

5  a second.

6              And someone with that level of occlusion

7  is at high risk for a heart attack, right?

8      A.  Yes.

9      Q.  Independent of being in a fight or banging

10  his head or having the hood over his head or anything

11  else, he's at high risk for a cardiac event, right?

12      A.  Yes.

13      Q.  For some reason, my video, not that it's

14  important, has frozen.  Everybody can hear me, but

15  let's do this again.  All right.  There it goes.  It

16  came back.

17              Kawasaki's disease, are you familiar

18  with that?

19      A.  Is a --

20      Q.  Are you familiar with Kawasaki's disease?

21      A.  Yes, yes.

22      Q.  Okay.  And do you know when Mr. Mitchell was

23  first diagnosed with that disease?

24      A.  I believe it was when he was younger, as a

25  child.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 151

1        Q.  I think it was 2010.  Do you know how much
2   cardiac care he received after 2010 before this event
3   that we're here to talk about today --
4        A.  No, I do not.  I do not.
5        Q.  And wouldn't it be advisable if someone has,
6   particularly a young person, has Kawasaki's disease,
7   to get follow-up with cardiologists?
8              MR. HARPER:  I'm going to object to the
9   form.  I believe it's beyond the witness' expertise.
10             MR. GRAY:  Okay.  That's noted.
11  BY MR. GRAY:
12       Q.  Sir, can you answer my question?
13       A.  Yes.  In this situation, follow-up care
14  would be very important.
15       Q.  Okay.  And that's because Kawasaki's
16  disease, it can cause the type of occlusion that we
17  saw in the -- in the pathology report, correct?
18       A.  Yes.  It's a large vessel coronary artery
19  disease that can also affect the aorta.
20       Q.  Would you agree with the proposition that
21  someone can have normal vital signs while they're
22  having a heart attack?
23       A.  Sure.
24       Q.  Okay.  And so, if the firefighters had taken
25  his vitals and they were normal or abnormal, that



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 152

1  doesn't necessarily mean that he's having a cardiac

2  event, does it?

3      A.  It means, I'm sorry, that he's not having --

4      Q.  It doesn't necessarily mean that he's in the

5  midst of a cardiac event?

6      A.  Normal would not necessarily one way or

7  another, correct.

8      Q.  Okay.  And even high blood pressure or low

9  blood pressure does not confirm that he was having a

10 cardiac event, if that was the case, true?

11     A.  No.  Correct.  That's why I indicated you

12 need formal evaluation.

13     Q.  Yeah.  And formal evaluation would be going

14 to the hospital and getting a clinician to perform an

15 evaluation, correct?

16     A.  Correct.

17     Q.  All right.  And I know when they take my

18 blood pressure, they tell me not even to cross my

19 legs.  So how would you take blood pressure from

20 somebody who's cooperative -- or fighting or

21 resisting having that type of blood pressure taken?

22     A.  I'm going -- I'm going to defer that to the

23 experts in the EMS handling of patients and,

24 basically, I'm sticking with it needed to be done.

25     Q.  Did you see any report that the Grady EMS



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 153

1  people actually did take some evaluation of

2  Mr. Mitchell?

3       A.  I didn't see any particularly.

4       Q.  Respiration --

5       A.  Any blood pressure or pulse or anything like

6  that.

7       Q.  You didn't see anything?

8       A.  I didn't -- I didn't see any, no.

9       Q.  You're aware that firefighters, when they

10  come to a scene like this, they don't transport

11  people to the hospital, right?

12      A.  Correct.  Again, that is out of my area that

13  I'm going to testify to and expertise.

14      Q.  I understand.  But you've been involved in

15  this area for quite some time.  But generally

16  speaking, do you understand that it's only an

17  ambulance that would take someone to the hospital in

18  this type of circumstance?

19              MR. HARPER:  Object to the form; asked

20  and answered and beyond the witness' expertise.

21              MR. GRAY:  All right.

22  BY MR. GRAY:

23      Q.  Can you answer it?

24      A.  Well, again, I know -- I'm not going to give

25  an opinion one way or another on what should or



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                     December 09, 2022

Page 154

1    should not have occurred.

2        **Q.   Okay.   Are you intending to offer an opinion**

3    **as to when Mr. Mitchell's heart went into arrhythmia?**

4        A.   Probably -- considering, when he was found,

5    he was pulseless, so it was probably at least -- he

6    probably went into total cardiac arrest probably 12

7    to -- 12 minutes or more after -- prior to the time

8    he was found in asystole.

9        **Q.   Okay.**

10       A.   The heart usually will only beat for about

11   -- by itself for about 12 to 15 minutes, and then it

12   stops.

13       **Q.   So, Mrs. Swanson says that he was found**

14   **unresponsive ten minutes after she returned home.**

15   **And so, you're saying that somewhere -- if you went**

16   **back from when he was found unresponsive, he was**

17   **probably having a heart attack, arrhythmia,**

18   **approximately 12 minutes beforehand; is that right?**

19       A.   No.   I said cardiac -- the heart actually --

20   basically, when oxygenation stops, the heart will

21   beat without oxygen for about 10 to 12 minutes, and

22   then you won't get any more electrical activity.

23   Later than that, you may get some rudimentary

24   electrical activity, but essentially if he's

25   pulseless, it's probably been over 10, 12 minutes.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 155

1      Q.   Okay.  I'm not sure I understand that, but

2   my -- my expertise in medical issues is pretty

3   limited.  The question is, can we determine or --

4   strike that.

5              Are you intending to offer an opinion

6   when Mr. Mitchell's arrhythmia began?

7      A.   No, because we don't know -- because we

8   don't know if -- he could have been having the

9   arrhythmias all along before he had his final

10  arrhythmia, that's -- so, no, I don't think we can

11  tell.

12     Q.   And -- okay.  That's good.

13              Since you -- you don't know what a

14  clinician would have done if he'd been taken to the

15  hospital; is that right?

16     A.   I don't know what treatment or what they

17  would have done specifically, no.

18     Q.   And you don't know specifically if anything

19  could have been done to save his life if he had been

20  taken to the hospital immediately, do you?

21     A.   Well, we don't know one way or another.

22     Q.   Right.  And you don't know and are not

23  offering an opinion as to anything any of the

24  firefighters that I represent could have done to save

25  his life, correct?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 156

1       A.   No.  I'm not -- as far as any of the

2    actions, I'm not giving any opinions on that.

3       Q.   Okay.  Let me go over your report just a

4    bit.

5            Did you know, or I think it came up in

6    this deposition, that Mr. Mitchell was banging his

7    head on the door of the Bojangles restaurant?

8       A.   There was some reference to that.

9       Q.   Okay.  And do you know if that caused all or

10   any of the head trauma that you've referenced in your

11   report?

12      A.   Well, according to the autopsy, there was

13   some minor head trauma to the forehead and to the

14   lateral side of the head.  Most of it was in the

15   mouth area, which would not necessarily be where a

16   normal individual would bang their head.

17      Q.   Okay.

18      A.   So there was some -- it looks like there was

19   some contusion to forehead and to the left side of

20   the head, I believe, in the autopsy.  But it was

21   minor, and it wasn't a lot, and there were no

22   fractures or anything.

23      Q.   Okay.  So the head trauma itself was minor?

24      A.   Yeah.  I would say that the blows -- from

25   what we can tell from the brain, the blows to the top



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 157

1  of the head, or the forehead and the other side of

2  the head, were really not particularly damaging.

3       Q.  Okay.

4       A.  The other blow, because of some of the

5  other, you know, other trauma, again, that would not

6  have been life-threatening, for sure.

7       Q.  And the -- the -- let me think about this

8  for a second.

9            When you say blunt force trauma, does

10 that mean that an instrument was involved or could

11 that just be with a fist?

12      A.  Any -- any object; fists, any contact.  It

13 could be banging -- his banging his own head would

14 still be blunt force trauma.  But then, the other

15 blows are consistent with, you know, struck by

16 another person.

17      Q.  And you don't know, because you haven't read

18 the deposition of Officer Jones who had interactions

19 with the firefighters when they arrived, what she --

20 what they said, what Officer Jones said, correct?

21      A.  No.  No.  Any of that is -- I'm not going to

22 give opinions on any of that.

23      Q.  And you're not going to offer any opinions

24 about what firefighters or EMS personnel should or

25 shouldn't do within the standard of care in

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.

December 09, 2022

Page 158

1 circumstances like we have here, correct?

2      A.   That's correct.  As you pointed out, what's

3 in the report is basically what I'm going to testify

4 to.

5      Q.   So when you -- I'm now on Page 2 of your

6 report, and you said, "Anthony Mitchell suffered from

7 a form of autism, which may have been the major

8 contributing factor for his behavior."  That's just

9 speculation on your part, right?

10      A.   Where are we?

11      Q.   We're on Page 2 of your report.  We're under

12 the time signature for 031 hours.

13      A.   I got it.  I got it.  Okay.  Yeah, which may

14 have been major contributing factor to his behavior

15 that resulted in the altercation.  Okay.  Got it.

16      Q.   So, that's not a medical opinion with

17 reasonable medical certainty that it was a major

18 contributing factor, you're just saying that's a

19 possibility?

20      A.   Right.  That's why I say, "may have been."

21      Q.   Okay.  Now, the physiological stress that

22 you describe and the physical distress, which was the

23 altercation which you've discussed, all -- those all

24 occurred before any of my clients arrived on the

25 scene; isn't that true?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 159

1       A.  Well, again, as far as the timing of who got

2   where when, I'm not going to -- I didn't address and

3   I don't intend to.

4       Q.  Now, on Page 4, it's contrary to what I

5   think you just told me.  "The degree of head trauma

6   documented by the autopsy is significant."  You just

7   told me it was minor.

8       A.  I'm sorry.  I'm losing you.

9       Q.  On Page 4, you write, "The degree of head

10  trauma documented by the autopsy is significant," and

11  then you continued.  You just told me the head trauma

12  was minor and would not have caused any big problem,

13  right?

14      A.  Well, no.  As I indicated, the impacts to

15  the head, the forehead and the side of the head were

16  not significant.  The other impact, I think,

17  indicates that there was a lot of force to the mouth

18  area, those injuries.

19      Q.  Yeah.  So you're calling blows to his, maybe

20  his cheek and his lip, as head trauma?

21      A.  I'm sorry.  Again, I did not hear your

22  question.  I lost my headphones, so I'm sorry.

23      Q.  Well, it sounds to me like you're saying

24  that blows to his, either his mouth area or cheek

25  area, are head trauma in your opinion?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 160

1    A.  Yeah.  It's all blunt force trauma.  It's

2  all part of the head.

3    Q.  And those are significant, right?

4    A.  Yeah.  I think those were significant

5  enough, certainly, to cause injury, bleeding, and so

6  forth.  They weren't just little bumps.

7    Q.  And then, when you continue that sentence,

8  it says, "raising the possibility of acute brain

9  swelling and hypoxic neuronal changes that may not be

10  evident."  So, once again, that's not a conclusion of

11  -- with reasonable medical certainty; it's just a

12  possibility that you're raising, correct?

13    A.  Well, no.  The fact that they may not be

14  evident is well-documented.  Under the microscope --

15  an individual usually has to survive the trauma for

16  about four to six hours before it becomes evident

17  when you look at it under the microscope.  So if it's

18  more acute than that, you may still have those

19  injuries, but you wouldn't -- you know, the

20  histologic changes would not have appeared yet.

21    Q.  And I don't want to belabor this too much.

22  On the bottom of Page 4, Mr. Tompkins asked you about

23  that.  You said, "Because there is no demonstrable

24  evidence that Mr. Mitchell would have died absent the

25  above intervening factors."  It's also true that



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 161

1   there's no demonstrable evidence that he would not

2   have died from those -- without those --

3        A.  Right.  Again, you can't prove a negative.

4             MR. GRAY:  Right.  Okay.  That's all the

5   questions I have.  Thank you for your time.

6             THE WITNESS:  Okay.  Thank you.

7             MR. HARPER:  I have a few questions, if

8   no one else does to follow up on, Defense Counsel, if

9   you guys are done.

10            MS. SLEEPER:  I have a follow-up, but

11  I'll wait until you're done, Mr. Harper, so that I

12  can ask everything at once.

13            MR. HARPER:  Okay.

14                       EXAMINATION

15  BY MR. HARPER:

16       Q.  Dr. Anderson, I want to make sure that we

17  understand what you believe the cause of death was to

18  a reasonable degree of medical certainty, okay?  Are

19  you with me?

20       A.  Okay.

21       Q.  All right.  So, do you believe that the

22  police restraints in this case, to a reasonable

23  degree of medical certainty, contributed to Anthony

24  Mitchell's death?

25       A.  I think all of the series of events that we



GeorgiaReporting.com/Schedule
404.389.1155

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 162

1  have were all contributing, essentially.  The

2  contributing or cascade of events, as we have

3  outlined in detail multiple times now, it resulted in

4  an arrhythmia that resulted in his death.

5       Q.  Okay.  So, let's focus on the police

6  restraint.  I understand the cascade of events, but

7  how specifically did the police restraints contribute

8  to the cascade of events that led to Anthony

9  Mitchell's death?

10      A.  I think it probably added to his general

11 overall stress situation, as well as the placing of

12 them, particularly when the knee was on him, to

13 inhibiting some respiratory activity to the point

14 that he probably then began to develop some edema,

15 although it did not -- that was not basically -- that

16 was a precipitating event, in addition to the trauma.

17      Q.  Okay.  I don't want you to answer the

18 questions in probables, I want you to answer the

19 question in more likely than not.

20           Do you believe, more likely than not,

21 the police restraint contributed to Anthony

22 Mitchell's death?

23      A.  In part, yes.

24      Q.  And what were the other parts?

25      A.  Well, as we went through, the fact that he



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 163

1   was traumatized, had the trauma, he began to develop

2   pulmonary edema, which was probably exacerbated to

3   some extent by the restraint position, and then he --

4   that led to more respiratory -- more respiratory

5   changes, ultimately lack of oxygen and acidosis, and

6   ultimately, arrhythmia.

7        Q.  Okay.  So, now, let's talk about the EMS

8   treatment, or the lack thereof.  You put in your

9   report that the absence of adequate medical

10  intervention also contributed to the cause of death;

11  is that correct?

12       A.  Well, I did not -- yeah, ultimately,

13  intervention may have potentially altered his course,

14  because we don't see any other factors that would

15  have, independent of this, resulted in his death.

16       Q.  Okay.  So, let's talk about the type of

17  medical intervention that could have impacted this

18  case.  I want you to assume that, when the

19  firefighters arrived on the scene, that Mitchell had

20  already been in the fight with the Bojangles

21  employees.  You follow me?

22       A.  Okay.

23       Q.  And he had already been restrained for 34

24  minutes, off and on, by the police, all right?

25       A.  All right.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 164

1     Q.  We know the firefighters did not provide any

2  medical treatment, correct?

3     A.  Apparently that's true, correct.

4     Q.  So -- so what -- you testified earlier that

5  when someone is suffering from pulmonary edema and

6  ketoacidosis, that the clinical signs would be

7  oxygenation studies and blood studies; is that

8  correct?

9     A.  Well, in order to evaluate them, that's what

10  you would have to do.  In other words, it may not be

11  obvious just from a physical examination, it would

12  need to be evaluated.

13     Q.  Do you believe that, after the fight and the

14  restraint, that, at that point when the firefighters

15  arrived, that there could have been some detection of

16  oxygenation issues from Anthony Mitchell?

17           MS. SLEEPER:  Objection; leading.

18  Mr. Harper, this is your witness, so --

19           MR. HARPER:  You've objected for the

20  record, Ms. Sleeper.

21           MS. SLEEPER:  I know, you're just -- you

22  just continue to ask leading questions, so I would

23  ask you to stop asking those leading questions.

24           MR. HARPER:  The question is do you --

25  that's fine.  Objection noted.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 165

1              MR. GRAY:  Let me also object.  It's

2   beyond the scope of the opinions he's offered in his

3   Rule 26 report, and he's not going to be able to do

4   that, Michael.  You may want him to, but he's given

5   his opinions, he's confirmed his reports.  Those

6   opinions are not in his report.

7              MR. HARPER:  Mr. Gray, if you want to

8   object to the form, you're able to do so, but

9   speaking objections --

10             MR. GRAY:  I'm objecting for -- I'm

11  letting you know what the objection is so you can ask

12  a different question that is going to be admissible.

13             MR. HARPER:  You're able to object, of

14  course, and I'm able to ask, all right, and we can

15  deal with the admissibility parts of this later.

16             MR. TOMPKINS:  I'm joining.

17             MS. SLEEPER:  I'm joining that objection

18  as well.

19             MR. HARPER:  Absolutely.  Noted.

20  BY MR. HARPER:

21      Q.  The question, Dr. Anderson, in your report,

22  you put the lack of medical intervention contributed

23  to Mitchell's death; is that correct?

24      A.  Yes.

25      Q.  All right.  So what I'm trying to

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 166

1  understand, sir, is what type of medical intervention

2  after the fight and after the police restraints could

3  the firefighters have observed and intervened on?

4              MS. SLEEPER:  Objection; speculation.

5  BY MR. HARPER:

6       Q.  You may answer.

7       A.  I don't really understand your question.

8       Q.  Well, you said before --

9       A.  I'm not going to comment upon their standard

10  of care.

11       Q.  No, that's not my question, sir.

12       A.  As in the report, I said this was going to

13  be -- medical intervention of some sort, in my

14  opinion, should have been initiated, without saying

15  what X, Y, Z should have done or should not have

16  done.

17       Q.  All right.  So you have no opinion on what

18  the firefighters could or could not have done

19  medically when they arrived at the scene; is that

20  correct?

21       A.  No.  Other than to say that I believe

22  that -- I believe some sort of medical intervention

23  was necessary to further evaluate this patient.

24       Q.  All right.  And you believe the lack of that

25  intervention contributed to Mitchell's death?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 167

1                    MR. GRAY:  That's a leading question,

2   Michael, and I'm going to object.

3   BY MR. HARPER:

4       Q.  Do you believe that the lack of medical

5   intervention contributed -- it's in the report.

6                    Do you believe that the lack of medical

7   intervention contributed to Mitchell's death?

8       A.  It's in my report, yes.

9       Q.  Right.  But your point is you don't feel

10  like you're able to opine on what that intervention

11  could have been because you're not an EMS personnel;

12  is that correct?

13      A.  Right.

14                   MS. SLEEPER:  Objection; leading.

15      A.  I'm sorry.  Repeat your question.  I may

16  have lost the last part of it.

17  BY MR. HARPER:

18      Q.  No, I was done.  I have another question,

19  but I was done with that one.

20                   My next question, Dr. Anderson, is --

21  and I think you may have answered this, but can

22  oxygenation issues be detected in a patient hours

23  before they die?

24      A.  Well, sure.  People -- people live for years

25  with some altered -- lung disease patients with


Elizabeth Gallo
COURT REPORTING, LLC

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                          December 09, 2022

Page 168

1  alteration in their oxygenation and so forth.

2  They're managed.  That's why they're medically

3  managed with oxygen and so forth.

4      **Q.  So the -- the issues in this case with the**

5  **pulmonary edema and the ketoacidosis, what I'm trying**

6  **to understand is, based on your medical opinion, how**

7  **likely were these medical conditions evident prior to**

8  **Mitchell's death?  How long after the -- strike that**

9  **question.**

10          **Do you believe that the ketoacidosis and**

11 **the pulmonary edema would have been evident in**

12 **Mitchell after the fight and the police restraints?**

13     A.  Well, the milieu is there for those to

14 develop.  How rapidly that developed or what it

15 developed was -- we don't know because there was no

16 evaluation.  It may well have been at the scene that

17 it did not develop at all, or they may have been well

18 -- but the point is that that's what needs to be

19 determined at that point.

20     **Q.  So --**

21     A.  You know where to go from there and that

22 point on.

23     **Q.  So, had there been a medical evaluation at**

24 **the scene, at the Bojangles, you're saying that the**

25 **EMS personnel may or may not have been able to detect**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 169

1   the ketoacidosis and the pulmonary edema?

2      A.  Right.  And they may not have been able to

3   tell at that point, but we would know one way or

4   another.  But without evaluation, we don't know what

5   stage it's at.

6      **Q.  All right.  So, when you say that there's a**

7   **lack of medical intervention, I guess you're speaking**

8   **of any medical intervention after the fight and after**

9   **the restraint, and prior to the death; is that**

10  **correct.**

11     A.  I'm sorry.  Repeat your question.

12            MR. TOMPKINS:  First of all, let me

13  object to the leading question.  You can ask him what

14  he's saying, you can't tell him what he's saying.

15  BY MR. HARPER:

16     **Q.  Here's the question --**

17            MR. TOMPKINS:  You keep -- yeah, it's a

18  leading question, Mr. Harper.

19            MR. HARPER:  Objection noted, Jeff.

20  Objection noted.

21  BY MR. HARPER:

22     **Q.  Dr. Anderson, the question is, are you**

23  **saying that those lack of medical treatment from**

24  **after the fight and after the restraint, and before**

25  **the death, that time in between -- you follow me?**



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 170

```
1   After the fight and after the restraint, and prior to
2   the death, you're saying there should have been
3   medical treatment in between that time; is that
4   correct?
5        A.  I don't really understand your question.  I
6   want to make sure I do.  Go ahead and repeat it
7   again.
8        Q.  Are you saying there should have been
9   medical treatment provided to Anthony Mitchell after
10  the restraint and after the fight, and prior to his
11  death?
12            MS. SLEEPER:  Objection; leading.
13  BY MR. HARPER:
14       Q.  In between that time, Dr. Anderson -- do you
15  follow me?
16       A.  No.
17       Q.  Should there have been treatment after the
18  fight, and prior to the death?
19       A.  Well, I don't understand -- no, I don't
20  understand what you're asking me.  After the fight,
21  there was no medical intervention.
22       Q.  Right.  That's the question.  The question
23  is, should there have been?
24       A.  Well, I mean, we've said that three or four
25  times in the report.
```



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 171

1        Q.   Okay.   That's what I want to make sure.   And

2    the lack of that medical treatment, in your medical

3    opinion, contributed to Mitchell's death?

4        A.   Yes, because as I said in the last

5    paragraph, we don't have any -- the autopsy doesn't

6    show any demonstrable change in his situation,

7    including the coronary arteries.   There wasn't --

8    hadn't been the same probably for months, years

9    before, but this particular situation then put him in

10   a stress situation that caused an already compromised

11   heart to fail, have an arrhythmia.

12       **Q.   You mentioned earlier that you viewed the**

13   **video, the six-second video with the police officer's**

14   **knee in Mitchell's back, and that, I believe you**

15   **said, alone, could cause the issue that Mitchell**

16   **suffered from; is that correct?**

17                MS. SLEEPER:   Objection; leading.   Can

18   you stop asking leading questions?   That's not going

19   to be admissible in Motion for Summary Judgment.

20   Those are not admissible questions.

21                MR. HARPER:   Objection noted.

22                MS. SLEEPER:   Please restate your

23   question.

24                MR. HARPER:   I will.

25   BY MR. HARPER:



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                      December 09, 2022

Page 172

1      Q.  Dr. Anderson, do you believe that the

2  six-second video that you saw had evidence in it that

3  contributed to Mitchell's death?

4      A.  Well, it showed -- the video clip that I

5  show shows the officer compressing his --

6  Mr. Mitchell on the ground, and that would be

7  interfering with respiratory function.  Clearly, that

8  would not have caused the death at that time.  What

9  it did, it contributed to an already ongoing

10 situation, and that ultimately ended up in his death,

11 as was said in the report.

12     Q.  How would it affect your opinion if the

13 officer's knee was in Mitchell's back, off and on,

14 for 34 minutes prior to that six-second video that

15 you saw?

16     A.  I would still say it was contributing.

17     Q.  Okay.  Contributing to the death; is that

18 correct?

19     A.  Contributing --

20     Q.  Contributing to his death?

21     A.  Yes.

22     Q.  You said contributing -- okay.  Yes?

23     A.  Yes.

24          MR. HARPER:  All right.  Thank you.  No

25 further questions.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                      December 09, 2022

Page 173

```
 1                    FURTHER EXAMINATION
 2   BY MS. SLEEPER:
 3       Q.  Doctor, I have just few -- few questions,
 4   okay?
 5               So, we talked about blunt force trauma,
 6   right?
 7       A.  Yes.
 8       Q.  And you said, that, alone, was not
 9   life-threatening, correct?
10       A.  As far as we can tell from -- as I
11   indicated, you know, the death occurs very shortly
12   after head trauma, you may not see the change in the
13   autopsy.  The head trauma to the top -- to the
14   forehead and the side of the head certainly didn't
15   appear to be that significant.
16       Q.  Right.
17       A.  The other trauma could have created some
18   problems, did not appear to be anything I could brain
19   -- brainstem transection or anything like that, but
20   it was significant, but it probably would not have
21   caused death in and of itself.
22       Q.  Now, let's talk about the police restraint,
23   okay?  Let's assume Mr. Harper's hypothetical is true
24   and that there was 35 minutes of, off and on,
25   Mr. Mitchell being on prone position and sitting back
```



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 174

1   up, and that was the restraint that he had, okay?

2   Would that, alone, caused his death?

3       A.   No.  As I indicated, that is another

4   contributing factor to a cascade of events that

5   occurred.

6       Q.   So, now, let's talk about the blunt force

7   trauma plus the police restraint.  Would those two,

8   alone, could have caused death?

9       A.   Well, we don't know.  We don't know because

10  we don't know what his condition was at the time.

11      Q.   Right.  But before -- uh-huh (affirmative).

12  Go ahead.

13      A.   We don't know if he was already developing

14  hypoxia, we don't know if whatever else, his

15  cognitive changes, were going on.  We don't know that

16  because we don't have an evaluation at that point.

17  That's the whole issue.

18      Q.   Right.  So you testified before, and also

19  it's on -- in your report, that the blunt force

20  trauma and the police restraint were both treatable

21  injury.  Do you remember that?

22      A.   Well, they weren't treatable injuries, they

23  were treatable -- they were contributing to a

24  situation that was a treatable medical condition.

25      Q.   Okay.  So there were treatable medical



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                      December 09, 2022

Page 175

1  condition, correct?

2      A.  Well, because what was developing in the

3  body, not the individual -- obviously, being in

4  restraints is not a medical condition.  It's -- it's

5  creating a medical -- it's creating a medical

6  condition, if you will.

7      **Q.  Right.  So, that's not a life-threatening**

8  **medical condition; that's a treatable medical**

9  **condition, correct?**

10     A.  Well, that doesn't -- life-threatening and

11 treatable, I mean, patients are treated all the time

12 for life-threatening conditions.

13     **Q.  Okay.**

14     A.  I mean, that's why -- that's why you treat

15 them.

16     **Q.  So, it is your opinion that, after the blunt**

17 **force trauma and police restraint, with proper care,**

18 **it was treatable?**

19     A.  Most likely, it would have been.  But,

20 again, we don't know what situation he was in because

21 we don't have the numbers and evaluation to tell.

22     **Q.  Okay.  So, let's talk about blunt force**

23 **trauma.  How much of the blunt force trauma was the**

24 **contributing factor to his death?**

25     A.  Well, again, we can't be sure, because we



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 176

1  don't know what -- what changes had occurred

2  clinically in his mental condition.

3       Q.  Right.

4       A.  In other words, was the brain starting to

5  swell, was he becoming cognitively impaired, whatever

6  was going on, or was he not.  We don't know because

7  the evaluation wasn't done.  So we don't have the

8  benchmark we need to determine that.

9       Q.  So, let's talk about this then.  What if the

10 blunt force trauma never happened, okay?  None of

11 that happened; just very agitated individual in

12 police restraint, okay?  Would that, alone, cause

13 someone's death?

14      A.  Again, it depends on the circumstances.

15 What kind of restraints?  How excited was he?

16 Certainly, we've had people die multiple times in

17 police restraints who were excited and agitated and

18 had underlying conditions.  That happens fairly

19 frequently, so we don't know.

20      Q.  Okay.  In this --

21      A.  We know though -- we know though that

22 after he -- that that didn't occur at the time of the

23 restraint.

24      Q.  Okay.

25      A.  The death didn't occur, because he would



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 177

1  have been dead right there at the scene.

**2      Q.  Right.  So, in this case, police -- police**
**3  restraint was not the cause of death?**

4            MR. HARPER:  Object to the form; asked

5  and answered.

6      A.  We've been through this so many times.  It's

7  a part of the cascade of events that occurred.  I

8  don't know how else -- I can't answer it any other

9  way.

10  BY MS. SLEEPER:

**11     Q.  It's fine.  I have one more question.**

**12            In your report, when you mentioned "may**
**13  have been," or you use the word "can" or "could,"**
**14  you're talking about possibilities, right?**

15     A.  Well, basically, yeah.  I mean, any time you

16  do an autopsy, or any time you do a forensic autopsy,

17  we're doing the possibilities; is this possibly a

18  homicide, it most likely is, but it could be

19  something else, yeah, maybe.  The medical examiner,

20  forensic pathologist, has to come up with a most

21  likely conclusion based upon the evidence, and that's

22  what I did in this case.

23            MS. SLEEPER:  That's all the questions I

24  have.  Thank you.

25            THE WITNESS:  Okay.  Are we done?



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 178

1              MR. TOMPKINS:  Not yet.  Almost though.

2  I've got a few questions for you.  It won't take but

3  just a second.

4                   FURTHER EXAMINATION

5  BY MR. TOMPKINS:

6      Q.  You're not an internal medicine doctor, are

7  you?

8      A.  I am a pathologist.  You see on the resume.

9      Q.  That wasn't my question.  I'm going to ask

10  it again.

11      A.  No, I'm not an internist, I'm not a

12  pediatrician, I'm not a surgeon, I'm not a

13  psychiatrist, I'm not a gastroenterologist.

14      Q.  You're not board certified in internal

15  medicine, are you?

16      A.  Again, I am not.  I'm only a pathologist.

17  I'm board certified in pathology.

18      Q.  So -- and I'm asking these, Doctor, for the

19  record.

20      A.  Sure.  I understand.

21      Q.  And all of these, quite frankly, are yes-no

22  questions.  And if you choose to answer and explain

23  what all you aren't, that's fine, but you can answer

24  these questions pretty simply with a yes or no.

25  Let's try it again.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                December 09, 2022

Page 179

1              Are you board certified in internal

2  medicine?

3       A.  No.

4       Q.  Are you board certified in emergency

5  medicine?

6       A.  No.

7       Q.  Do you practice emergency medicine?

8       A.  No.

9       Q.  Are you board certified in cardiology?

10      A.  No.

11      Q.  Do you practice cardiology?

12      A.  No.

13      Q.  In the -- excuse me -- case lists, plural,

14  that you provided, one deals with depositions

15  particularly, and there is -- you list the -- the

16  case, or at least a part of the name of the case, and

17  the attorney and that sort of thing.  Are you with me

18  so far?

19      A.  Yes.

20      Q.  Okay.  And you also list the type of file.

21  It says, "Case type," then it says -- and, typically,

22  they all say, "Med-legal consultation," true?

23      A.  Right.

24      Q.  And then, it says, "File type," and then it

25  -- "Criminal defense" predominates, it seems.  But

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                          December 09, 2022

Page 180

1  here's my question.  One says, "JAC" in all caps,

2  "/court-appointed."  I'm just trying to understand,

3  what does that mean, Dr. Anderson?

4      A.  Well, in Florida, the indigent patients --

5  indigent clients can actually -- are allowed to hire

6  experts through the attorneys, and the attorneys are

7  then paid by Justice Administration Commission in the

8  state of Florida.  So that's who I would bill in

9  those cases.  So these are usually criminal defense

10 cases on indigent patients.

11      Q.  Okay.  All right.  So, now, that makes sense

12 to me.  So, the difference between, you know, your

13 notation that it's criminal defense and the notation

14 that it's JAC/court-appointed, is simply who retained

15 and who's paying you; is that fair?

16      A.  Yeah, essentially.  All the JACs are

17 basically criminal defense cases.

18      Q.  Okay.  All right.  And so that -- that's

19 really what I wanted to know.  And the reason I'm

20 asking you that is that, with respect to the

21 depositions, is it fair to say that the overwhelming

22 majority of your activity as an expert witness has

23 been testifying on behalf of a criminal defendant?

24      A.  Yeah.  In my total practice, I would say,

25 yeah, certainly.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 181

1        Q.  All right.  And my math tells me, I've
2   counted -- and I know you didn't list everything,
3   we've learned that, but I've counted the number of
4   cases you've listed on your deposition list, and they
5   total 40.  I've got 19 criminal defense, 5
6   JAC/court-appointed, so I -- that really means that
7   there are 24 criminal defense cases, true?
8        A.  Yeah.
9        Q.  Then I've got 12 plaintiff's cases in the
10  civil arena.  Is that accurate?
11       A.  Yeah.  I think that's pretty accurate.
12       Q.  All right.  And then, I've got civil
13  defense, 2, and family request, 1.  What does family
14  request mean?
15       A.  Well, generally, those are autopsies where
16  the family has requested an autopsy --
17       Q.  Okay.
18       A.  -- and it becomes a medica-legal issue.
19       Q.  All right.  So when it says "family
20  request," the family has requested, would it be fair
21  to call it a private autopsy?  Is that what we're
22  talking about?
23       A.  Yes.
24       Q.  Okay.  All right.  And so, if I take the
25  criminal defense cases and the plaintiff's civil

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 182

1   cases that you've identified, my math tells me it's

2   90 percent of your work.  Does that sound about right

3   to you with respect to your depositions?

4        A.   What is -- I'm sorry.  What is 90 percent?

5        Q.   That, of the cases you have listed, in 90

6   percent of those cases, you are testifying on behalf

7   of a criminal defendant, a defendant in a criminal

8   case --

9        A.   Yeah.

10       Q.   -- or on behalf of a plaintiff, that is

11  someone suing in a civil case; is that correct?  Does

12  that sound right to you, that 90 percent would fall

13  into those two categories?

14       A.   Well, I would say, yeah, the majority of the

15  cases are either criminal defense cases, and then the

16  others are generally plaintiff cases, and the

17  majority of those have been plaintiff's cases because

18  they're autopsies I've done.

19       Q.   Okay.  And then, with respect to your court

20  testimony, there are 19 cases identified in the list

21  you provided, or that you provided to Mr. Harper and

22  he provided to us.  And of those, the breakdown is 14

23  criminal defense, 12 regular and 2

24  JAC/court-appointed; and then 4 plaintiff's civil

25  cases; and then 1 family request.  So, of those 19,



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.

December 09, 2022

Page 183

1   18 of them would either be cases where you testified
2   on behalf of the criminal defendant, or on behalf of
3   the plaintiff; is that correct?
4        A.   Well, I guess so.  I never -- I never
5   calculated them.  I don't know why you put those two
6   groups together, but I suppose you can put it
7   together any way you want.
8        Q.   I think you're right about that.  And that
9   represents 95 percent of your work, yes?
10       A.   Well, that is -- these are only the cases
11  that come to court.  The vast majority of the
12  autopsies I do, which are roughly 60 to 70 private
13  autopsies per year, never get into the legal system.
14       Q.   I'm not asking about that, sir.  I'm asking
15  about the report you provided.  I'm asking about your
16  document.  The document you've created.
17       A.   Yeah.  I just don't -- you know, I don't --
18  I mean, I know that it's relative -- you said 90
19  percent of my work.  That's not -- that's not 90
20  percent of my work, it's 90 percent of the cases that
21  have come into court.
22       Q.   Ninety percent of your depositions fall into
23  the category of testifying on behalf of a criminal
24  defendant or a plaintiff, true?
25       A.   That's true.



Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 184

1       Q.  As depositions?

2       A.  If that's what your numbers show, yeah.  I

3   never added it up that way, that's all I'm saying.

4       Q.  And of the times you've testified in court,

5   95 percent of the time you were testifying on behalf

6   of a criminal defendant or a plaintiff, true?

7       A.  Correct.

8       Q.  And if we took the plaintiff's cases out,

9   then 74 percent of the time you were testifying in

10  court on behalf of a criminal defendant, true?

11      A.  Yeah.  I'd say those are majority of the

12  cases that go to court, yes.

13              MR. TOMPKINS:  That's all I have for

14  you.  Thank you, sir.

15              THE WITNESS:  Okay.

16              MR. HARPER:  I think we may be done.

17  Anyone else?

18              MR. GRAY:  Don't tell me that we're

19  done.

20              MR. HARPER:  We're done right on time

21  actually, as far as the pre-payment is.  I think it

22  was four hours.  So I think we're in good shape.

23              THE VIDEOGRAPHER:  Okay.  Going off the

24  record.  The time now is 2:05.

25              MR. HARPER:  One second, DeJuan.



Page 185

```
 1                 THE VIDEOGRAPHER:  I'm sorry.

 2                 MR. HARPER:  Harvey, I didn't know if

 3   you were saying something.

 4                 MR. GRAY:  No, I wasn't.  I was just

 5   joking around.  I'm ready to close the door on this.

 6                 MR. HARPER:  All right.  Sounds good.

 7                 MR. GRAY:  Thank you.

 8                 THE VIDEOGRAPHER:  Going off the record.

 9   The time now is 2:05.

10                 (Whereupon the proceedings went off the

11                  video record and clarifications were

12                  obtained by the court reporter.)

13                 THE COURT REPORTER:  Ms. Sleeper, would

14   you like to order this transcript?

15                 MS. SLEEPER:  Yes, please.

16                 THE COURT REPORTER:  Do you prefer

17   electronic?

18                 MS. SLEEPER:  Yes.

19                 THE COURT REPORTER:  Okay.  I guess I'll

20   have to call Mr. Gray.

21                 Mr. Harper, would you like to order a

22   copy?

23                 MR. HARPER:  Yes, E-Tran.

24                 THE COURT REPORTER:  Okay.  And,

25   Mr. Tompkins?
```

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 186

```
 1                MR. TOMPKINS:  Yes, please.

 2                THE COURT REPORTER:  Electronic or a

 3  hardcopy, sir?

 4                MR. TOMPKINS:  Electronic, I'm sorry.

 5                THE COURT REPORTER:  That's okay.  And

 6  we're reserving signature.  Is that okay to go to

 7  Mr. Harper to give to the witness?

 8                MR. HARPER:  Yes.

 9                (Deposition concluded at 2:05 p.m.)

10

11  (Pursuant to Rule 30(e) of the Federal Rules

12  of Civil Procedure and/or O.C.G.A. 9-11-30(e),

13  signature of the witness has been reserved.)

14

15

16

17

18

19

20

21

22

23

24

25
```

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 187

```
 1                    C E R T I F I C A T E

 2

 3

 4    STATE OF GEORGIA:

 5    COUNTY OF JACKSON:

 6

 7        I hereby certify that the foregoing transcript

 8    was reported, as stated in the caption, and the

 9    questions and answers thereto were reduced to

10    typewriting under my direction; that the foregoing

11    pages represent a true, complete and correct

12    transcript of the evidence given upon said

13    deposition, and I further certify that I am not of

14    kin or counsel to the parties in the case; am not in

15    the employ of counsel for any of said parties; nor am

16    I in any way interested in the result of said case.

17

18        This 28th day of December 2022.

19

20

21        _____

22        Heather Brown, CCR
          CCR 4759-4284-5258-1376

23

24

25
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 188

1                    DISCLOSURE OF NO CONTRACT

2

3        I, Heather Brown, do hereby disclose pursuant to

4   Article 10.B. of the Rules and Regulations of the

5   Board of Court Reporting of the Judicial Council of

6   Georgia that Elizabeth Gallo Court Reporting, LLC was

7   contacted by the party taking the deposition to

8   provide court reporting services for this deposition

9   and there is no contract that is prohibited by

10  O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the

11  Rules and Regulations of the Board for the taking of

12  this deposition.

13

14       There is no contract to provide reporting

15  services between Elizabeth Gallo Court Reporting, LLC

16  or any person with whom Elizabeth Gallo Court

17  Reporting, LLC has a principal and agency

18  relationship nor any attorney at law in this action,

19  party to this action, party having a financial

20  interest in this action, or agent for an attorney at

21  law in this action, party to this action, or party

22  having a financial interest in this action.  Any and

23  all financial arrangements beyond our usual and

24  customary rates have been disclosed and offered to

25  all parties.

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 189

1    CASE:  Shanita D. Swanson vs Fulton County, GA, et al.

2    NAME OF WITNESS:    William R. Anderson, M.D.

3        The preceding deposition was taken

4    in the matter, on the date and at the time and

5    place set out on the title page hereof.

6        It was requested that the deposition

7    be taken by the reporter and that same be

8    reduced to typewritten form.

9        It was agreed by and between counsel

10   and the parties that the deponent will read and

11   sign the transcript of said deposition. Said jurat

12   is to be returned, within 30 days after the transcript

13   is made available, to the following address:

14               Elizabeth Gallo Court Reporting, LLC

15               2900 Chamblee Tucker Road

16               Building 13, First Floor

17               Atlanta, Georgia 30341

18   If an errata is executed and returned

19   to EGCR within the 30 days allocated by law,

20   the executed errata will be sent to the taking

21   attorney for filing with the original transcript.

22   Should an executed errata not be forwarded from

23   EGCR to the taking attorney for filing, the

24   deposition was not reviewed and signed by the

25   deponent within 30 days.

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                                    December 09, 2022

Page 190

1   NAME OF CASE:       Shanita D. Swanson vs Fulton County, GA, et al.
    DATE OF DEPOSITION: 12/09/2022
2   NAME OF WITNESS:    William R. Anderson, M.D.

3   EGCR JOB NO.:       94180

4                       CERTIFICATE

5        Before me this day personally
    appeared WILLIAM R. ANDERSON, M.D., who, being duly
6   sworn, states that the foregoing transcript of
    his/her deposition, taken in the matter, on
7   the date and at the time and place set out on
    the title page hereof, constitutes a true and
8   accurate transcript of said deposition.

9                       _____

10                           WILLIAM R. ANDERSON, M.D.

11       SUBSCRIBED and SWORN to before me

12  this _____ day of _____ 20_____.

13  in the jurisdiction aforesaid.

14  _____       _____

15  My Commission Expires      Notary Public

16    STATE OF _____

17    COUNTY/CITY OF _____

18

19    []   No changes made to the Errata Sheet;

20  therefore, I am returning only this signed,

21  notarized certificate.

22    []   I am returning this signed,

23  notarized certificate and Errata Sheet with

24  changes noted.

25

**Elizabeth Gallo**
COURT REPORTING, LLC

Georgia Reporting.com/Schedule
404.389.1155

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                          December 09, 2022

Page 191

```
1                  Errata Sheet

2   NAME OF CASE:       Shanita D. Swanson vs Fulton County, GA, et al.

3   DATE OF DEPOSITION: 12/09/2022

4   NAME OF WITNESS:   William R. Anderson, M.D.

5   Reason Codes:  1. To clarify the record

6                  2. To correct transcription errors

7                  3. Other
    _____
8   _____

9    Page _____ Line _____ Reason _____

10   From _____ to _____

11   Page _____ Line _____ Reason _____

12   From _____ to _____

13   Page _____ Line _____ Reason _____

14   From _____ to _____

15   Page _____ Line _____ Reason _____

16   From _____ to _____

17   Page _____ Line _____ Reason _____

18   From _____ to _____

19   Page _____ Line _____ Reason _____

20   From _____ to _____

21   Page _____ Line _____ Reason _____

22   From _____ to _____

23

24   SIGNATURE:_____DATE:_____

25            William R. Anderson, M.D.
```

Elizabeth Gallo
COURT REPORTING, LLC

GeorgiaReporting.com/Schedule
404.389.1155

Shanita D. Swanson vs Fulton County, GA, et al.
William R. Anderson, M.D.                                    December 09, 2022

Page 192

```
1                 Errata Sheet

2  NAME OF CASE:      Shanita D. Swanson vs Fulton County, GA, et al.

3  DATE OF DEPOSITION: 12/09/2022

4  NAME OF WITNESS:   William R. Anderson, M.D.

5  Reason Codes:  1. To clarify the record

6                 2. To correct transcription errors

7                 3. Other
   _____
8  _____

9   Page _____ Line _____ Reason _____

10  From _____ to _____

11  Page _____ Line _____ Reason _____

12  From _____ to _____

13  Page _____ Line _____ Reason _____

14  From _____ to _____

15  Page _____ Line _____ Reason _____

16  From _____ to _____

17  Page _____ Line _____ Reason _____

18  From _____ to _____

19  Page _____ Line _____ Reason _____

20  From _____ to _____

21  Page _____ Line _____ Reason _____

22  From _____ to _____

23

24   SIGNATURE:_____DATE:_____

25           William R. Anderson, M.D.
```