## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| SHANITA D. SWANSON, Natural Mother and  Administrator of the Estate of Anthony J. Mitchell, | ) ) ) ) | |
| Plaintiff, | ) | Civil Action No: 1:21-cv-00996-AT |
| | ) | |
| V. | ) | |
| | ) | |
| FULTON COUNTY, GA, GRADY MEMORIAL HOSPITAL CORPORTION, JAMES LUSTER, JEREMIAH WHITEHEAD, WILLIAM ROBERTS, JAMES BAUMGARTNER JEREMY HOLLAND, JENNIFER JONES, VICTORIA WHALEY, DOUGLASS HARDNETT, and DESMOND LOWE, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO FULTON COUNTY POLICE DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WILLIAM R. ANDERSON, M.D.

COMES NOW Plaintiff as she responds to the Police Officer Defendants'

Motion to Exclude Anthony J. Mitchell's cause of death opinions offered by

Plaintiff's expert, William R. Anderson, M.D..   Dr. William Anderson has been a

forensic pathologist for over 44 years, since 1979, and he has performed over 7,000

autopsies in his career.   Dr. Anderson is clearly qualified to offer opinions in this

case.   The methodology used by Dr. Anderson in this case was to analyze the case

facts with his education, training and extensive experience.   Therefore, his opinions

are reliable and his testimony will be able to assist the jury to understand why

Anthony Mitchell died on November 16, 2019.   Accordingly, Dr. Anderson's opinions are legally valid and should not be excluded.

## I.      <u>INTRODUCTION</u>

This case involves the tragic death of a 19 year old autistic young man, Anthony J. Mitchell.   After being taunted by Bojangles restaurant employees Mitchell got into a serious physical altercation where he was chased and beaten by the employees.   The police officers who arrived to the scene then used an illegal restraint on Mitchell.   The firefighters and Grady EMS personnel did not provide any medical care to Mitchell when they arrived on the scene.   As opposed being taken to a hospital by Grady EMS, Anthony Mitchell was allowed to go home with his mother.   About an hour after he arrived home Anthony Mitchell went into cardiac arrest, and, shortly thereafter, he died.

The Officer Defendants are requesting this Court to exclude Dr. Anderson's causation opinions and thereby end this case, despite their inexcusable and illegal behavior.   However, Dr. Anderson's opinions can withstand this challenge because they are legally valid.   Dr. Anderson opined in this case that Anthony Mitchell's fatal cardiac arrhythmia was due to the fight with the Bojangles employees, the police restraint and the lack of medical intervention by the EMS Defendants.   Dr. Anderson believes that the aforementioned case facts caused Mitchell to suffer a fatal cardiac arrhythmia due to his respirational compromise as exhibited by Mitchell

suffering from Pulmonary Edema, which Dr. Anderson saw on Mitchell's autopsy pathology tissue slides.   Dr. Anderson further opined that Mitchell's respiratory compromise was caused by Mitchell suffering from metabolic acidosis, which was proven by the level of beta- hydroxybutyrate in Mitchell's blood, which Dr. Anderson saw on Mitchell's post-mortem lab results.   Dr. Anderson used his education, training, experience, case facts, microscopic slides review and lab results to support his causation opinions in this case.

The Officer Defendants believe that Dr. Anderson's opinions should be voided because they lack scientific literature, or support from peer reviewed journals.   They misinterpret the law.   Dr. Anderson's extensive experience as a forensic pathologist clearly qualifies him to apply the facts of this case to his education, training and autopsy methodology such as reviewing pathology tissue slides and post mortem lab results to legally arrive at his conclusions within a reasonable degree of medical certainty.

## II.   <u>STATEMENT OF FACTS</u>

On November 16, 2019, Plaintiff's 19 year old autistic son, Anthony Mitchell, went to the Bojangles Restaurant located at 5628 Fulton Industrial Blvd SW., Atlanta, Georgia 30336 ("Bojangles").   (Doc. 47, ¶ 16, 17).   Employees at the Bojangles restaurant taunted Anthony Mitchell which led to a physical confrontation between Mitchell and the employees.   (Doc. 47,¶ 19, 20, 24).   The Officer

Defendants responded to the Bojangles regarding the confrontation. (Doc. 47, ¶ 11,12,13,14). Once on scene, Police Defendants detained Anthony Mitchell and contacted Plaintiff. (Doc. 47, ¶ 49, 50).

When Plaintiff arrived to the Bojangles she witnessed Mitchell being restrained as follows: Two police officers held him down in the prone position on the concrete pavement in the parking lot, on his stomach, with his hands cuffed behind his back and with his face covered with a Bojangles nonporous cloth apron.   (Ex. 1, Plaintiff's Affidavit ¶2).   Plaintiff witnessed Defendant Officer Desmond Lowe placing one of his knees firmly in the middle of Anthony Mitchell's back. *Id.* Plaintiff witnessed Defendant Officer Douglass Hardnett restrain Mitchell's legs. *Id.* Although Plaintiff provided Defendants with a video showing only a few seconds of the restraint at issue, Plaintiff actually witnessed Officer Lowe's knee in Mitchell's back for at least five minutes, maybe longer, <u>while Mitchell was not resisting.</u> *Id.* Plaintiff also witnessed officers Jennifer Jones and Victoria Whaley looking at Mitchell while he was in the aforementioned position and did nothing to stop Defendant Lowe from keeping his knee in Mitchell's back continuously for five minutes, or longer. (*Id.* ¶ 2,3,4).   Plaintiff later learned that the Defendant officers restrained Mitchell in the aforementioned position, off and on for at least 34 minutes prior to her arrival to the scene. (Doc. 47, ¶ 41).   During the Defendant Officers 34 minute restraint of Anthony Mitchell, Mitchell can be heard on a police car dash

camera audio screaming that he was in pain, begging for help, crying and saying he

was sorry.   (Ex. 2, Police Car Dash Camera Video and Audio File.   At time marker

8:25 Mitchell can be seen escorted out of the Bojangles by Officers; At time

market18:40 thru 23:00 Mitchell can he heard screaming and crying while being

restrained by the Officers).

Also during the 34 minutes of the officers restraining Mitchell, firefighter

Defendants Luster, Whitehead and Roberts arrived to the scene, did not provide any

medical care to Mitchell and left him alone in the care of the Officers. (Doc. 47, ¶¶

32-40).   The Defendant Firefighters willfully and wantonly abandoned Mitchell by

leaving him at the scene without any medical supervision other than the Officers on

the scene. *Id.*

Grady EMS personnel arrived to the scene approximately 13 minutes after the

firefighters left the scene, and, according to Plaintiff, they also did not provide any

medical care to Mitchell.   (Doc. 47, ¶¶ 41-46).

Grady EMS Defendants released Mitchell to Plaintiff; Plaintiff then drove

back to her residence with Anthony Mitchell. (Doc. 47, ¶ 51). Approximately ten

minutes after she arrived home with Anthony Mitchell, Plaintiff found Anthony

Mitchell unresponsive in his bedroom. (Doc. 47 ¶ 53).   The same Defendant

firefighters and Defendant Grady EMS personnel that left him untreated at the

Bojangles were called to Mitchell's home to render aid to Mitchell for cardiac arrest.

(Doc. 47 ¶¶ 58-64).   Mitchell was pronounced dead shortly thereafter at Grady Memorial Hospital. (Doc. 47, ¶ 67).   The Fulton County Medical Examiner's office investigated Anthony Mitchell's death as a homicide.   (Ex. 3, Fulton County Medical Examiner's Investigative Report).   Dr. William R. Anderson found the manner of death for Anthony Mitchell to be a homicide.   (Ex 4. William R. Anderson, M.D. Curriculum Vitae and Rule 26 Expert Report).

Plaintiff contends that the restraint used by Police Defendants on Anthony Mitchell compromised his breathing and contributed to causing his death. (Doc. 47 ¶¶ 30, 79, 80).   Dr. Anderson opined that the police restraint and the lack of medical intervention by the Defendant Firefighters and Defendant Grady EMS personnel caused Mitchell's death.   (Ex 4., William R. Anderson, M.D. Curriculum Vitae and Rule 26 Expert Report).   On December 9, 2022, Defendants deposed Dr. Anderson. (Ex 5. - Deposition of William R. Anderson).

## III.   ARGUMENT AND CITATION OF AUTHORITY

The United States Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceutical, Inc.,* 509 U.S. 579 (1993), and the text of Rule 702 require trial judges to serve as gatekeepers in determining the admissibility of expert testimony; however, any decision regarding admissibility is not a position on the strength or weight of the testimony. Fed.R.Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).   In the 11th Circuit, courts routinely look to three elements to

determine if an expert is qualified under *Daubert* and Rule 702.   As the Eleventh Circuit Court of Appeals has stated, the elements for consideration are whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; ( 2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). "[ A]lthough there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8*, *Inc. v. Hurel¬Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir. 2003). The trial court has broad latitude in evaluating each of these three factors. *Griffin v. Coffee County et al*, No.5:2019cv00092-Document 164 (S.D. Ga. 2022).

As to qualifications, an expert may be qualified "by knowledge, skill, training, or education." *Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1193 (11th Cir. 2010). The expert need not have experience precisely mirroring the case at bar in order to be qualified. *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001). However, where an expert does have experience directly applicable to an issue at bar,

experience alone may provide a sufficient foundation for expert testimony.   *Frazier,*
387 F.3d at 1261.

As to reliability, courts look, when possible, to: (1) whether the expert's theory
can be and has been tested; ( 2) whether the theory has been subjected to peer review
and publication; (3) the known or potential rate of error of the particular scientific
technique; and (4) whether the technique is generally accepted in the scientific
community. *Daubert*, 509 U.S. at 593-94.   However, these factors are not
exhaustive, and "a federal court should consider any additional factors that may
advance its Rule 702 analysis." *Quiet Tech*., 326 F.3d at 1341. At all times in this
flexible inquiry, the court's focus must be "solely on principles and methodology, not
on the conclusions that they generate." *Seamon v. Remington Arms Co., LLC*, 813
F.3d 983, 988 (11th Cir. 2016).

Finally, as to the third Daubert factor, expert testimony is likely to assist the
trier of fact to the extent "it concerns matters beyond the understanding of the
average lay person and logically advances a material aspect of the proponent's case."
*Kennedy v. Elec. Ins. Co.,* Case No. 4:18cv148, 2019 WL 2090776, at *5 (S.D. Ga.
May 13, 2019) (citing *Daubert,* 509 U.S. at 591); *Frazier*, 387 F.3d at 1262-63.
Rule 702 permits experts to make conclusions based on competing versions of the
facts, but those conclusions must still assist the trier of fact by explaining something
that is "beyond the understanding of the average lay person."' *Jackson v. Catanzariti*,

No. 6:12- CV-113, 2019 WL 2098991, at *10 (S.D. Ga. May 14, 2019) (citing *Frazier,* 387 F.3d at 1262).   Expert testimony generally will not help the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* (quoting *Cook v. Sheriff of Monroe Cnty*., 402 F.3d 1092, 1111 (11th Cir. 2005)). Such testimony "is properly excluded when it is not needed to clarify facts and issues of common understanding which jurors are able to comprehend for themselves." *Hibiscus Assocs. Ltd. v. Bd. Of Trs. of Policemen & Firemen Ret. Sys*., 50 F.3d 908, 917 (11th Cir. 1995).

"The burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1306 (11th Cir. 1999); *Mccorvey v. Baxter Healthcare Corp*., 298 F.3d 1253, 1257 (11th Cir. 2002).   However, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of proffered evidence." *Quiet Tech*., 326 F.3d at 1341.   Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### A. Dr. Anderson is qualified to testify in this case.

The Eleventh Circuit has established that "experts may be qualified in various ways," and "[w]hile scientific training or education may provide a possible means to

9

qualify, experience in a field may offer another path to expert status." *Frazier*, 387

F.3d at 1260-61.   Indeed, Rule 702 itself states outright that a witness may be

qualified as an expert "by knowledge, skill, experience, training, or education .... "

Fed. R. Civ. P. 702.   Thus, contrary to Defendants' suggestions, a person need not

receive formal accolades or conduct independent research to be considered an

expert.   Rather, if Dr. Anderson has the professional experience, education, and

training that is relevant to the issues in this case, the Court must deem him qualified

to testify.

Dr. Anderson has the scientific training, the education and the experience in

the practice of forensic pathology as it pertains to opining on the cause of death for

Anthony Mitchell. ." *Frazier*, 387 F.3d at 1260-61.   Dr. Anderson's received his

Doctor of Medicine degree from the University of Miami in 1963. (Ex. 4, Dr.

Anderson's C.V.)   He completed a residency in Anatomic Pathology at Strong

Memorial Hospital University of Rochester School of Medicine Rochester, New

York in 1970. *Id.*   He completed a residency in Cardiac Pathology and Clinical

Pathology at Duke University Hospital Duke University School of Medicine

Durham, North Carolina in 1974.   *Id.*   He completed a residency in Forensic

Pathology at the University of North Carolina Medical Center University of North

Carolina School of Medicine Chapel Hill, North Carolina in 1976. *Id.*   He has been

10

a forensic pathologist for over 44 years and he has performed over 7,000 autopsies in his storied career. *Id.*

Dr. Anderson is qualified to examine a dead body to determine and opine on a cause of death, and, therefore, he is qualified to offer the opinions in this case.   *Id.* Dr. Anderson is qualified to testify about how an examiner evaluates a body, determine indicators of respirational compromise, and opine on how respirational compromise can cause death, and then apply those concepts to Anthony Mitchell's circumstances and death. *Id.*   Such testimony concerns the steps involved in postmortem evaluations and the scientific chain of events that could result in death and is typically within the scope of a qualified forensic pathologist's expertise, i.e., determining cause and manner of death. *Id.*

Contrary to Defendant Officers' arguments, the 11th Circuit has ruled that simply pointing to medical literature to support an expert's opinions does not make an expert qualified. *United States v. Paul*, 175 F.3d 906, 912 (11th Cir. 1999) (explaining an expert who lacks the relevant skills, experience, training, and education does not become qualified to testify as an expert merely because he read relevant articles). Plaintiff has clearly established that Dr. Anderson is qualified to opine on the cause and manner of Anthony Mitchell's death.   *Id.*

Defendant Officers also attempt to discredit Dr. Anderson's opinions because they are inconsistent with opinions from other Defense experts in this case, Richard

Mitchell, M.D. and Gerald Gowitt, M.D.   Specifically, the Officers suggest Dr. Anderson should not be permitted to offer his opinions because the opinions are not supported by Defense experts.   But in a Daubert inquiry, a court is not concerned with the correctness of an expert's opinion.   Instead, the focus is on whether the expert is qualified to give the opinion, whether the expert's methodology is reliable, and whether the opinion is helpful.   *Seamon*, 813 F.3d at 988. Contrary to the Officers' arguments, whether Dr. Anderson's cites medical literature or whether his opinions differ from other experts in this case has no bearing on whether Dr. Anderson is qualified.   *Herman Miller, Inc. v. Belnick LLC*, No. 1:18-CV-05012, 2021 WL 2582534, at *1 (N.D. Ga. Jan. 4, 2021) ("An expert's opinion should not be excluded on the basis of its correctness, and it is not part of the Court's gatekeeping function 'to make ultimate conclusions as to the persuasiveness of the proffered evidence.'") (quoting *Quiet Tech.*, 326 F.3d at 1341).   An expert could rely on sources like medical literature, but not to show he is qualified to offer such opinions, even where the medical literature is consistent with an expert's opinions. *Paul*, 175 F.3d at 912. Ultimately, these issues have no bearing on Dr. Anderson's qualifications.   *Id.*

## B. The methodology Dr. Anderson used to reach his conclusions are reliable.

The Committee Note to the 2000 Amendments of Rule 702 expressly says that, '[i]f the witness is relying solely or primarily on experience, then the witness

must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.   *Powell v. Variety Wholesalers, Inc., et. al.,* CV617-058 (S.D. of Ga., 2019), quoting *Frazier,* 387 F.3d at 1261.

Dr. Anderson methodology was based on his experience, not the review of medical literature, and application of his experience. When an expert opinion is based on experience, a court may decide such testimony is reliable based upon that expert's personal knowledge or experience. *Am. Gen. Life Ins. Co. v. Schoenthal Family*, *LLC*, 555 F.3d 1338 (11th Cir. 2009); see also *Kumho,* 526 U.S. at 151.   Dr. Anderson explained how his experience lead to the conclusion reached, why that experience is a sufficient basis for the opinion and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (emphasis in original) (citation omitted). In other words, to admit Dr. Anderson's opinions, he only must be able to demonstrate a sufficient connection between his experience and the opinions he offers. *Id.*

As outlined below, Dr. Anderson's testified that Anthony Mitchell's fatal cardiac arrhythmia was caused by fight with the Bojangles employees, the police restraint and the lack of medical intervention by the EMS Defendants.   Dr. Anderson opined that the aforementioned facts caused Mitchell to suffer the fatal arrhythmia due to his respirational compromise exhibited by Mitchell suffering from

Pulmonary Edema.   Dr. Anderson saw Pulmonary Edema on Anthony Mitchell's autopsy pathology tissue slides.   Dr. Anderson further opined that Mitchell's respiratory compromise was caused by him suffering from metabolic acidosis which was indicated by the level of beta- hydroxybutyrate in Mitchell's blood, which Dr. Anderson saw on Mitchell's post-mortem lab results.

The following deposition testimony clearly establishes how Dr. Anderson used his education, training, experience, case facts, microscopic slides review and test results to support his causation opinions in this case.   (Ex. 4, Dr. Anderson Deposition Transcript).

**Page 23 of Dr. Anderson's Deposition:**

**Line 3-7. Q. Which publication or presentation in your C.V. are germane to the issues in this case?**

A. Well, essentially, almost all of it relates to forensic pathology, and this certainly is a forensic pathology issue regarding the cause of death and the manner of death.

**Line 15. Q. All right. Have you done any presentation or publishing on microscopic slide reviews?**

A. I do microscopic slide review…doing microscopic slides is a part of an autopsy. I've done, what, 6 or 7,000-plus autopsies.

**Page 24.**

**Line 17. Q. Okay. And which textbook is that? Can you give me the name?**

A. Forensic Science and Political Medicine is the textbook, and the second one is a recent publication Multidisciplinary Approach to Forensic Science…. And I wrote a chapter in that book.

**Page 25.**

**10   Q. Okay. What about cardio-pathology? Have you done any published journals or presentation on cardiac pathology?**

A.   I did a fellowship, 1 year, in cardiac pathology at Duke University.

**Page 33.**

**Line 8. Q. Okay. Did you review any, like, treaties or textbooks coming to this opinion?**

   10     A. No, I didn't. I don't believe I needed to do any research on this particular case. This was a pretty straightforward case.

**Page 37.**

**Line 13. Q. Is there a difference between a patient's outcome, or a patient's injury between a person who had six seconds of restraint compared to 30 minutes of restraint in the same type of restraint?**

A.     Well, there may or may not be, depending upon the severity of -- in other words, how much pressure is applied to the chest.

A.     If there's not much applied to the chest, or <u>six seconds of severe pressure could cause death.</u> (Emphasis added).

**Page 40.**

**Line 14.**   A.   Again, the position that we find him in was a component of the sequence of events, the cascade of events that ultimately led to him dying. The position, for six seconds or however long it was, clearly was not the cause of death because he later -- he later basically went home ambulatory before he collapsed. So that's clearly not a positional asphyxia death. What that shows though, is that this was part of a cascading of events, as I clearly indicated in the report I sent you, a cascade of events, and we can't pick out one particular thing as part -- other than to recognize that it's in a part of a cascade of progressively serious events that took place, as was the initial trauma to the blows and the trauma he received to his head.

And, again, picking one point out, he obviously did not go into respiratory arrest and die at the scene when he was handcuffed, otherwise he would have been dead right

there. But that does not mean that there was nothing going on at the time, and that this was not a part of an additive group of circumstances that progressively increased the injury or the compromise that he was having.   In other words, that can start pulmonary edema developing, but you don't necessarily have to die at that point. You can die days later, hours later, so forth, even though that was part of the event that basically was part of this cascade. (emphasis added).

**Line 17. Q. I am really interested in that term, "pulmonary edema." Did you find any evidence in the autopsy report to indicate that he suffered pulmonary 20 edema?**

A. Oh, he's got significant pulmonary edema. The autopsy -- the slides showed that.

**Page 53.**

Line 1. A. We know there was acidosis for sure because that's measured in the laboratory finding, as indicated in the report.

**Line 4. Q. Right.**

Line 5.   A.   So acidosis in itself changes PH, can cause cardiac arrhythmias without decreased oxygenation.

**Line 15.   Q. Okay. And let's specifically talk more about the mechanism of Mr. Mitchell's death, okay?**

Line 19.   A. I believe he was placed, by the traumatic event of being multiple blows and so forth, he was in a physiologic stress situation. He developed some respiratory compromise, probably both due to the effects of the restraint, as well as normal physiologic changes that may occur when an individual is under stress. So that develops pulmonary edema, he develops acidosis as measured by the ketones, and the change in PH over a period of time led to respiratory and cardiac compromise, and he ultimately had an arrhythmia.

**Q. And what was Mr. Mitchell's beta-hydroxybutyrate level**?

 A. …It's .85 which is roughly 4 four times the normal limit. Three times the normal limit.

**Line 16. Q. What level --**

Line 17. A. Of the upper range.

**Line 18.   Q. What level of beta-hydroxybutyrate caused metabolic significant acidosis?**

Line 20.   A. Well, any -- any elevated -- it doesn't cause acidosis. This reflects the fact that there is acidosis going on. So the fact that it's elevated indicates that there is acidosis going on in the body.

**Line 25.   Q. So what's the normal level?**

**Page 69.**

Line 1.   A. The normal level, you see the reference range, .2 to .27, and his is .85. So he's roughly 3 three times the upper range of normal.

**Line 4.   Q. So, any time someone's level is above .27, 5 they have significant acidosis?**

Line 6.   A. No. It's a marker that acidosis may be present.

**Line 8.   Q. May be present?**

Line 9.   A. Well, sure. That's why you put it in context with everything else that's going on in the case.

**Line 12.   Q. Right. That level alone, you can't say for sure shows acidosis?**

Line 14.   A. No. In any forensic analysis, as we do as forensic pathologists, we take all things into consideration, and not any one factor may not be definitive, but the combination of what we look at in a progressive -- in this case, progressive respiratory compromise, the acidosis, is what's going on in all the other situations.

**Page 70.**

Line 1. "…Serum analysis from serum sample taken from Mr. Mitchell indicates a significant increase in beta-hydroxybutyrate, one of 5 the ketone molecules that is associated with ketoacidosis." Does not cause ketoacidosis, it's a marker. So, again, that's what I said in the report.

**Line 8. Q. So how do you know he was having respiratory problem?**

Line 10.   A. The pulmonary edema.

**Page 72.**

**Line 6.   Q. Right. Do you have any independent knowledge of what is normal range?**

Line 8 A. Well, the laboratory range is what – their normal range.  Each laboratory has different normal ranges in different hospitals, so forth.  So what you go by is what the laboratory range is for their laboratory.

**Line 13. Q. I understand that.  My question was, do you have independent knowledge, aside from the lab report, what is a normal range of beta-hydroxybutyrate?**

Line 17.   A. Again, we get in -- well, the hospital's reference range is going to be the normal range that they have determined for their population, running 20 whatever specific tests they run. So each -- each there may be different normal ranges, but this is three times their normal range.

**Page 74.**

**Line. 9 My question is, did you independently study or review anything that has to do with beta-hydroxybutyrate -- not even review. Let's say, did you ever study levels of beta-hydroxybutyrate in your career?**

14 A. Well, I'm a clinical pathologist. If you read my resume, it's clinical pathology. We run 16 laboratories.

**17     Q. So is that a yes?**

18     A. That's what clinical pathologists do. Yes, of course.

21     A. And that's why -- that's why I'm telling you that the range is different from laboratory to laboratory. So what you have to do when you're analyzing this is look at the individual laboratory's range, which I did, and that's what we come up with.

**Page 80.**

**Line 3. Q. So how did police restraint cause his increase in beta-hydroxybutyrate level?**

Line 5. A. Interfering with respiration. Increased respiration causes decreased oxygenation, decreased oxygenation can result in acidosis developing over a period of time, and ultimately with continued stress, continued inability to modify the situation, giving more oxygen and so forth, could create acidosis, which can ultimately end up in a cardiac arrest.

Line 12.   And this individual, we measure and show that he does have elevated beta-hydroxybutyrate, he was in ketosis, ketoacidosis, and that that was the most reasonable -- in the absence of any other thing, was the most reasonable explanation for his sudden death.

## Page 83.

Line 3. A.   But it's not at all unusual for someone to have a situation where they survive a number of hours even and the situation simply gets worse and worse and worse.

**Line 7. Q. Even though he was no longer in a position where he was restrained and he is in his mother's car, is he still going through hypoxia?**

Line 10. A. If he has -- if he has an initial infarct that starts this and it's not modified medically, then it can continue on. And, yes, over a period of time it gets worse and worse and worse, and often you can't tell this is going on without actually doing studies, blood studies, oxygenation levels and so forth. If you don't do that, then just by visually looking at somebody, you're not going to be able to tell.

**Line 19. Q. How do you modify it medically?**

Line 21 A. But you obviously give them oxygen, you treat any arrhythmias that are occurring, you treat the pulmonary edema.

## Page 89.

Line 1. A. Well, you can't be -- ever be sure. But the likelihood was that the pulmonary edema, the lack of oxygenation, the acidosis, could have been treated, because they treat them all the time. Medical treatment is available for all of the time. But, yeah, had he been treated, I didn't see any other changes that would have resulted in his death, regardless. And irrespective of that, that doesn't mean they wouldn't attempt treatment.

**Line 10. Q. So, according to your opinion, before the lack of intervention and treatment, Mr. Mitchell may have survived?** I believe so, sure. I don't see any -- I don't see any underlying condition that would have said that this is so -- this is so severe that he wouldn't have survived.

**Page 172.**

**Line 1.   Q. Dr. Anderson, do you believe that the six-second video that you saw had evidence in it that contributed to Mitchell's death?**

A. Well, it showed -- the video clip that shows the officer compressing his -- Mr. Mitchell on the ground, and that would be interfering with respiratory function. Clearly, that would not have caused the death at that time. What it did, it contributed to an already ongoing situation, and that ultimately ended up in his death, as was said in the report.

**Line 12. Q. How would it affect your opinion if the 13 officer's knee was in Mitchell's back, off and on, for 34 minutes prior to that six-second video that 15 you saw?**

Line 16.   A. I would still say it was contributing to the death.

**Line 22.   Q. Now, let's talk about the police restraint, okay? Let's assume Mr. Harper's hypothetical is true and that there was 35 minutes of, off and on, Mr. Mitchell being on prone position and sitting back.**

**Page 174.**

**Line 1. …up, and that was the restraint that he had, okay? Would that, alone, caused his death?**

A. No. As I indicated, that is another contributing factor to a cascade of events that occurred.

**Line 12.   Q.   In your report, when you mentioned "may have been," or you use the word "can" or "could," you're talking about possibilities, right?**

Line 15.   A. Well, basically, yeah. I mean, any time you do an autopsy, or any time you do a forensic autopsy, we're doing the possibilities; is this possibly a homicide, it most likely is, but it could be something else, yeah, maybe. The medical examiner,

<u>forensic pathologist, has to come up with a most likely conclusion based upon the</u> <u>evidence, and that's what I did in this case.</u> (emphasis added).

In addition to his deposition testimony, Dr. Anderson gave the following causation opinions in his Rule 26 Expert Report (Ex. 5):

"Anthony Mitchell was subjected to a cascading series of events including blunt force head trauma, compounded by the physical and psychological trauma of the application of restraints and sensory deprivation (in an autistic patient), thereby creating a potentially treatable medical emergency that went unrecognized in the absence of adequate medical evaluation-a cascade that ultimately resulted in his death.

Because there is no demonstrable evidence that Mr. Mitchell would have died absent the above discussed intervening factors, the Cause of Death should be considered to be complications of blunt force trauma, and the effects of positional respiratory compromise created by the law enforcement interventions, in the absence of adequate medical intervention.

The Manner of Death should be considered to be Homicide.

<u>These opinions are rendered to within a reasonable degree of medical certainty</u>, and based upon the data which are presently available. I reserve the right to modify those opinions in the event further information becomes available." <u>(emphasis added)</u>

Accordingly, based on his deposition testimony and Rule 26 expert report Dr. Anderson demonstrated a connection between the case facts (physical altercation, police restraint and lack of EMS medical intervention) and his experience (analyzing Mitchell's pathology slides which discovered Mitchell's pulmonary edema, and analyzing beta-hydroxybutyrate post-mortem lab results which found Mitchell's metabolic acidosis) in order to establish the causation opinions he offers in this case. See *Frazier*, 387 F.3d at 1261 (noting where a witness relies on experience in

forming an opinion, the witness must link that experience to his ultimate conclusion and explain how the experience is applicable to the case at bar). Moreover, whether Dr. Anderson's conclusions are correct, or whether they are supported by defense causation experts, Dr. Mitchell and Dr. Gowitt, does not demonstrate Dr. Anderson's opinions are unreliable. See *Seamon*, 813 F.3d at 988 (noting the court's focus must be "solely on principles and methodology, not on the conclusions that they generate"). This is true even if other experts or healthcare providers disagree with Dr. Anderson's conclusions.   (Id.) Accordingly, Dr. Anderson's opinions are reliable.

### C. The testimony offered by Dr. Anderson will assist the trier if fact.

The final analysis under *Daubert* is whether the expert's opinion assists the trier of fact.   *Powell*, at 6.   Dr. Anderson's education, training and experience in performing over 7000 autopsies in his career will be helpful and needed to explain how Anthony Mitchell's death was caused by the physical altercation, police restraint and lack of medical intervention that resulted in Mitchell's pulmonary edema, metabolic acidosis and fatal cardiac arrhythmia.

Prior to the Defendant Officers filing their Motion to Exclude, their counsel asked Dr. Anderson to find literature that supported his opinions in this case. Although Dr. Anderson stated in his deposition that causation in Mitchell's death was straightforward and did not require any research, he submitted two articles to the

Officers' counsel. (Ex. 6, Medical Literature).   The first article establishes that beta-hydroxybutyrate can be used to measure acidosis in patients like Anthony Mitchell. The second article was created by The Journal of Forensic Science.   It details and explains how improper prone police restraints (like the restraint used on Mitchell) can lead to death.   Page one of the article specifically states that prone restraint deaths can result from metabolic acidosis, which is exactly what Dr. Anderson opined.   Both of the aforementioned articles provide further proof that Dr. Anderson's conclusions are supported by the scientific community.   Despite providing this literature to the Officers they still filed their Motion to Exclude.

The Officer Defendants also made multiple unsubstantiated allegations in their Motion to Exclude, which they attempt to support with persuasive legal authority from courts across the country, not the 11th circuit.   First, they allege Dr. Anderson did not consider the duration of the police restraint applied on Mitchell. As stated in Dr. Anderson's deposition testimony above he opined that whether the Officer's knee was in Mitchell's back for 6 seconds or 34 minutes it still contributed to the cause of death in this case.   The evidence proves that the officer's knee was in Mitchell's back off and on for 34 minutes.

The second point they make is that Dr. Anderson did not know Anderson's PH level when he died, so he could not know for sure if Mitchell suffered from metabolic acidosis.   Dr. Anderson stated in his deposition that we didn't know the

PH level because the EMS Defendants do not medically intervene in the case and perform the PH test.   However, Mitchell's metabolic acidosis was confirmed by the post-mortem beta-hydroxybutyrate lab results.

The third point they make is that Dr. Anderson did not offer any peer reviewed data to support his opinions.   Dr. Anderson stated that based on his education and experience that Mitchell's autopsy was a straight forward case, and he did not need to perform any independent research to reach his opinions.   Nonetheless, however, Dr. Mitchell provided the Officers with the aforementioned literature.   Moreover, the defense expert report and deposition excerpts attached to the Officers' Motion to Exclude of Drs. Mitchell and Gowitt also did not provide any literature or studies to disprove the causation opinions offered by Dr. Anderson.

Finally, the Officers allege that Dr. Anderson couched in his opinions in terms of mere possibilities, so his testimony cannot assist the trier of fact.   However Dr. Anderson addressed that allegation by stating on page 174 line 15 of his deposition testimony that "The medical examiner, forensic pathologist, has to come up with a most likely conclusion based upon the evidence, and that's what I did in this case." (Ex. 4).   He also ended his Rule 26 expert report with the statement that all of his opinions in this case were offered within a reasonable degree of medical certainty. Therefore, Dr. Anderson's opinions can clearly assist the trier of fact in this case.

## IV.   <u>CONCLUSION</u>

Dr. Anderson's causation opinions in his expert report and deposition are clearly based on the facts of this case, are legally reliable and can clearly assist the trier of fact in this case.   Dr. Anderson will undoubtedly undergo a vigorous cross-examination should this case go to trial.   But his opinions should not be excluded as a matter of law.   For the reasons set forth above, Plaintiffs respectfully request the Court deny Defendants' Motion to Exclude Dr. Anderson's opinions.

Respectfully submitted, this 17th day of March, 2023.

<u>/s/ Michael D. Harper</u>
MICHAEL D. HARPER
Georgia Bar No. 328378
Attorney for Plaintiff

Michael D. Harper, P.C.
3481 Lakeside Dr., NE, Suite 2406
Atlanta, GA 30326
Phone: (404) 271-6618
Fax: (404) 600-2146
Email: mharper@mharperlaw.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), I hereby certify that the foregoing has been prepared in compliance with Local Rule 5.1(B) in Times New Roman 14-point typeface.

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing **PLAINTIFF'S RESPONSE IN OPPOSITION TO FULTON COUNTY POLICE DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF PLAINTIFF'S EXPERT WILLIAM R. ANDERSON, M.D.** using the CM/ECF system which will automatically send Email notifications of such filing to the parties and/or attorneys of record.

Respectfully submitted, this 17th day of March, 2023.

/s/ Michael D. Harper
MICHAEL D. HARPER
Georgia Bar No. 328378
Attorney for Plaintiff

Michael D. Harper, P.C.
3481 Lakeside Dr., NE, Suite 2406
Atlanta, GA 30326
Phone: (404) 271-6618
Fax: (404) 600-2146
Email: mharper@mharperlaw.com